**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTHEW DUNDON, AS THE TRUSTEE | : | |
| OF THE ENDO GENERAL UNSECURED | : | **Civil Action** |
| CREDITORS' TRUST, | : | |
| *Plaintiff*, | : | |
| v. | : | |
| | : | **No.  24-4221** |
| ACE PROPERTY AND CASUALTY | : | |
| INSURANCE COMPANY, et al., | : | |
| *Defendants*. | : | |

**MEMORANDUM**

**KENNEY, J.**                                                                    **February 10, 2026**

Defendants Aspen Insurance UK Limited, Catlin Syndicate Limited a/k/a AXA XL Syndicate Limited, Chubb Custom Insurance Company, and Columbia Casualty Company move for summary judgment on each count of Plaintiff Matthew Dundon's Complaint as applied to the 2013–2014 insurance policy tower ("2013–2014 Products Policy Tower"). ECF No. 316; *see also* ECF Nos. 318, 320. Plaintiff Matthew Dundon cross moves for summary judgment. ECF No. 341. For the reasons set forth below, the Court will **GRANT** in part and **DENY** in part Defendants' Motion (ECF No. 316) and **DENY** Plaintiff's Cross-Motion for Summary Judgment (ECF No. 341).

I.     **BACKGROUND**

A.  **General Factual Background**

This is an insurance coverage dispute arising from litigation over prescription opioids. During the relevant period, non-party Endo International plc ("Endo") was a pharmaceutical company that manufactured opioid products. ECF No. 341-5 ¶¶ 10–11. In connection with its business operations, Endo obtained insurance coverage, including multiple products insurance policies in each of the following years: 2013–2014, 2016–2017, and 2017–2018. *See* ECF No. 315

¶¶ 4–12, 22–23, 25–30, 35–41. Endo's insurance policies in each of these years formed an insurance "tower," with one policy serving as the primary policy and others providing layers of excess coverage. *See* ECF No. 316-1 at 12 (chart identifying 2013–2014 tower); ECF No. 311-2 ¶ 38 (chart identifying 2016–2017 tower); ECF No. 312-2 ¶ 67 (chart identifying 2017–2018 tower); *see also Pharmacia Corp. v. Arch Specialty Ins. Co.*, No. 22-2586, 2024 WL 208146, at *1 n.1 (3d Cir. Jan. 19, 2024) (defining an insurance tower as a structure in which "a primary insurer respond[s] first to any covered loss, and excess insurers respond[] in a predetermined order if the loss exceeds the [primary policy's] coverage" (first and second alterations in original) (citation omitted)). Endo also obtained multiple commercial general liability insurance policies from 2010–2022, in addition to the above products insurance policies. *See* ECF No. 319 ¶ 1.

1.  *The Underlying Opioid Litigation and Bankruptcy Action*

Based on Endo's role in manufacturing and promoting opioids, various state and local governments, third parties, and individuals sued Endo and its affiliates. *See* ECF No. 315 ¶¶ 1–3, 21, 42–49; ECF No. 312-2 ¶ 6. By 2023, there were over 3,500 such suits. *See* ECF No. 319-10 at 50. Most relevant to the instant Motion are lawsuits brought by state and local governments, filed at least as early as 2014. These include suits, among others, by the State of California, City of Chicago, City of Lansing, Summit County, Jefferson County, and Schuyler County. *See California v. Purdue Pharma*, No. 30-2014-00725287 (Cal. Super. Ct.); *Chicago v. Purdue Pharma*, No. 1:14-cv-4361 (N.D. Ill.); *County of Summit v. Purdue Pharma, L.P.*, No. 17-md-2804 (N.D. Ohio); *Jefferson Cnty. Comm'n v. Purdue Pharma. Prods., L.P.*, No. 17-op-45170 (N.D. W. Va.); *City of Lansing v. Purdue Pharma, L.P.*, No. 17-cv-01114 (W.D. Mich.); *Schuyler Cnty. v. Purdue Pharma, L.P.*, No. 19-op-45408 (E.D. Mo.). Defendants argue that over 2,500 lawsuits by state and local governments, as well as Native American tribal governments, were filed against Endo. *See* ECF No. 316-1 at 8.

2

After the above lawsuits were initiated, *see, e.g.*, ECF No. 315 ¶¶ 1–3, Endo filed for Chapter 11 bankruptcy before the U.S. Bankruptcy Court for the Southern District of New York on August 16, 2022, *id.* ¶ 50; *see also In re Endo Int'l plc*, No. 22-22549 (Bankr. S.D.N.Y. Aug. 16, 2022). The bankruptcy court confirmed a reorganization plan, which, in conjunction with a trust agreement, provided for the formation of the Endo General Unsecured Creditors' Trust and the appointment of Plaintiff Matthew Dundon as trustee. *See* ECF No. 341-3 ¶ 1; 315 ¶¶ 54–55. The reorganization plan provides for "full and final satisfaction, settlement, release, and discharge of" numerous opioid claims. *See* Fourth Amended Plan at 99–102, *In re Endo Int'l plc*, No. 22-22549 (Bankr. S.D.N.Y. Mar. 18, 2024).

2. *The Trustee's Instant Suit Against Certain Insurers*

On August 15, 2024, Plaintiff, as trustee of the Endo General Unsecured Creditors' Trust (hereinafter, "the Trustee"), brought the instant action for a declaratory judgment and breach of contract against certain insurers that issued policies to Endo. ECF No. 1; *see also* ECF No. 113 (operative complaint). The Complaint alleged that Defendants were obligated to cover Endo's liability, defense costs, and settlement payments arising from the above opioid litigation.[1] *See* ECF No. 113 ¶¶ 119, 139. Specifically, the Trustee alleged that three products policy towers and Endo's commercial general liability policies provided coverage for various opioid lawsuits:

1. The 2013–2014 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by state and local governments. *See id.* ¶ 122.

2. The 2016–2017 products insurance policies, which the Trustee alleged provided

---

[1] The Complaint also alleged that certain Defendants were obligated to cover Endo's liability and defense costs related to litigation over transvaginal surgical mesh products and products containing ranitidine. *See* ECF No. 113 ¶¶ 73, 107, 119. However, the instant Motions concern only coverage for the cost of opioid litigation. The Trustee voluntarily dismissed coverage claims related to ranitidine, *see* ECF No. 249 at 2–3; ECF No. 250 at 2–3, and the claims seeking coverage for surgical mesh litigation are subject to a separate briefing scheduling. *See* ECF No. 346 at 1–3.

coverage for lawsuits brought by individuals. *See id.* ¶¶ 87, 122.

3. The 2017–2018 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by third-party payors. *See id.*

4. The commercial general liability policies issued from 2010–2022, which the Trustee alleged provided coverage for the opioid lawsuits in connection with "Unbranded Promotional Activities." *See id.* ¶¶ 112, 135, 139.

The 2013–2014 products insurance policies are most relevant to the instant Motion (ECF No. 316) and Cross-Motion (ECF No. 341) and are discussed below.[2]

## B. The 2013–2014 Products Insurance Policies

### 1. *The Primary Policy*

The primary policy for the 2013–2014 year was issued by Defendant Gemini Insurance Company and ran from September 26, 2013 to September 26, 2014. *See* ECF No. 315-1 at 4. That policy (No. GL 12089-1) covers, in relevant part, "all damages that the insured becomes legally obligated to pay for bodily injury or property damage" and all defense costs for "a claim seeking such damages." *Id.* at 39.[3] And it defines bodily injury to mean physical injuries, sicknesses, or diseases "sustained by a person," as well as any resulting "[m]ental anguish, shock or humiliation." *Id.* at 73. The policy also explicitly recognizes that an "organization" or another person can claim damages "for care, loss of services, or death resulting . . . from the bodily injury." *See id.* at 49.

The primary policy contains certain notice and timing requirements. Among them, a claim for bodily injury must be "first made against the insured during the policy period," or any

---

[2] Defendants filed separate summary judgment motions and briefing with respect to each of the above four categories of insurance coverage. *See infra* Section I.B. The Court likewise issues separate summary judgment rulings for each category of coverage. *See* Commercial General Liability Summary Judgment Order & Opinion; 2016–2017 Tower Summary Judgment Order & Opinion; 2017–2018 Tower Summary Judgment Order & Opinion.

[3] The policy marks defined words in bold. For readability, the Court omits the use of bold text.

applicable "extended reporting period." *Id.* at 39. And the bodily injury itself has to take place either "before the end of the policy period or, if applicable, the extended coverage period." *Id.* Another section of the policy, which specifies the duties of the policyholder, requires the policyholder to include in its notice of "an occurrence, offense, critical fact or loss" the "names and addresses of any injured persons" to "the extent possible." *See id.* at 59.

The primary policy also has an extended reporting period endorsement, which is comprised of three sections: "1: When Extended Reporting Periods Apply," "2. Basic Extended Reporting Period," and "3. Supplemental Extended Reporting Period." *Id.* at 19–20. As relevant here, the first section, "When Extended Reporting Periods Apply," identifies certain criteria, such as policy cancellation or non-renewal, under which "[e]xtended reporting periods apply to all claims-made coverage." *Id.* at 19. The second section, "Basic Extended Reporting Period," states that a basic extended reporting period "is automatically provided without additional charge" and lasts (1) for six years "for loss associated with a critical fact," if the insured reports the critical fact within sixty days of the policy's expiration, or (2) for sixty days "for any other loss."[4] *Id.* The third section, "Supplemental Extended Reporting Period" provides an additional extended reporting period if it is purchased or where the insured has purchased an extended coverage period. *Id.* at 19–20. The Trustee does not argue that Endo is entitled to a supplemental extended reporting period here. *See generally* ECF No. 349.

### 2. *The Excess Policies*

Following the primary policy, there are eight excess layers of coverage, not including self-insured layers. *See* ECF No. 316-1 at 12. These layers, in order, were issued by the following Defendants:

---

[4] A "critical fact" is defined in relevant part by the policy as "[a] verbal or written demand for any damages which would be covered under this Policy." ECF No. 315-1 at 74.

5

- Defendant Ironshore Specialty Insurance Co., which issued Policy No. 001160202. ECF No. 315-2 at 3. These claims are stayed. *See* ECF No. 214 at 1 & n.1.
- Defendant Columbia Casualty Co., which issued Policy No. ADE 2054989843-11. ECF No. 315-3 at 2–3.
- Defendant Aspen Insurance UK Ltd., which issued Policy No. O0A0YWK13A0H. ECF No. 315-4 at 2, 6.
- Defendant Markel International Insurance Co. Ltd., which issued Policy No. 100126-1289-XSCLM-2013. ECF No. 315-5 at 3. All claims against Markel are stayed. ECF No. 138 at 1.
- Defendant Chubb Custom Insurance Co., which issued Policy No. 7995-73-17. ECF No. 315-6 at 6–7.
- Defendant Columbia Casualty Co., which in addition to the above layer of coverage, issued Policy No. ADE 4032127311-0. ECF No. 315-7 at 2, 3.
- Defendant Catlin Syndicate Ltd., which issued Policy No. 509/DL575113. *See* ECF No. 315-8 at 2.
- Defendant Endurance Specialty Insurance Ltd., which issued Policy No. EXC10004224400. ECF No. 315-9 at 2. All claims against Endurance are stayed. ECF No. 139 at 1.

The excess policies default to incorporating the terms of the primary policy or of policies that follow the primary policy, but the excess policies state that their own provisions prevail over another policy's terms. *See* ECF No. 315-3 at 4; ECF No. 315-4 at 3, 5; ECF No. 315-6 at 7, 11; ECF No. 315-7 at 2, 4; ECF No. 315-8 at 16, 19. It is undisputed that the excess policies, like the primary policy, cover "damages . . . for bodily injury." *See* ECF No. 315-1 at 39. However, the Parties dispute whether the excess policies include the primary policy's basic extended reporting period. *See infra* Section III.A.1–3.

## C. Procedural History

After the Trustee brought the instant action on August 15, 2024, the matter was stayed with respect to some Defendant-insurers—Endurance Specialty Insurance Ltd., Liberty Specialty Markets Bermuda Limited, and Markel International Insurance Company Limited—because these Defendants invoked arbitration clauses in their insurance policies. *See* ECF Nos. 138, 139, 140. Certain claims were also stayed against Defendant Ironshore Specialty Insurance Company

because some of its policies contained arbitration clauses, which Ironshore invoked. *See* ECF No. 214 at 1 & n.1; *see also* ECF No. 213-1 at 2 n.1. With respect to all other claims and Parties, the case proceeded.

On June 10, 2025, the Court held an initial pretrial conference, at which the Parties identified certain key ("bellwether") issues in the litigation and agreed to propose early summary judgment briefing schedules on these issues. *See* ECF No. 281 at 1. The Parties subsequently identified bellwether issues and proposed summary judgment briefing deadlines, which the Court adopted. *See* ECF Nos. 286, 287, 288, 289. As relevant here, the bellwether issues identified for the 2013–2014 tower are as follows:

1. **Damages "Because of Bodily Injury."** Whether the underlying governmental opioid lawsuits seek to recover damages "for" or "because of bodily injury," or as otherwise specified in the insurance policies;

2. **Claims-Made Requirement, Batching, and Extended Reporting.** Whether the governmental opioid lawsuits were claims first made during the applicable policy period, including whether the lawsuits are subject to "batching" or other provisions that bring them within the policy period; and

3. **Notice.** Whether notice of the governmental opioid lawsuits was provided to the insurers "as soon as practicable" or otherwise as provided under the affected policies, and whether any deficient notice means that the insurers are not obligated to provide defense or indemnity for the opioid claims.

ECF No. 287 at 2.

Pursuant to the briefing schedules, Defendants moved for summary judgment with respect to the bellwether issues on August 8, 2025. *See* ECF No. 314 (Defendants' motion regarding commercial general liability policies); ECF No. 316 (Defendants' motion regarding 2013–2014 tower); ECF No. 311 (Defendants' motion regarding 2016–2017 tower); ECF No. 312 (Defendants' motion regarding 2017–2018 tower); ECF No. 306 (Defendants the Underwriters at

Lloyd's London's motion); ECF No. 308 (Defendant Gemini Insurance Company's motion regarding 2016–2017 tower); ECF No. 309 (Defendant Gemini Insurance Company's motion regarding 2017–2018 tower). The Trustee filed his opposition briefs and cross-moved for summary judgment on October 6, 2025. *See* ECF No. 339 (cross-motion regarding commercial general liability policies); ECF No. 339-29 (accompanying opposition and cross-motion brief); ECF No. 341 (cross-motion regarding the three products policy towers); ECF No. 349 (accompanying opposition and cross-motion brief).[5] Defendants filed reply briefs on November 20, 2025 and November 25, 2025. *See* ECF Nos. 357, 358, 359, 360, 361, 362, 365, 368, 374, 375. The Trustee filed sur-reply briefs on December 19, 2025, *see* ECF No. 379 (sur-reply brief regarding products policy towers); ECF No. 381 (sur-reply brief regarding commercial general liability policies), and Defendants filed responses to the sur-reply briefs on January 30, 2026, *see* ECF Nos. 388, 389.

Defendants' summary judgment motion regarding the 2013–2014 Products Policy Tower (ECF No. 316), and the Trustee's Cross-Motion (ECF No. 341), are now before this Court.

## II.    <u>LEGAL STANDARD</u>

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In making such a showing, the movant bears the initial burden "of informing the district court of the basis for its motion," and identifying specific parts of the record that establish "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied this burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis

---

[5] The sealed version of the Trustee's opposition brief was originally filed at ECF No. 344, but that version of the brief did not contain complete pagination. A version with complete pagination was refiled at ECF No. 349, and the Parties cite to this docket entry when referring to the Trustee's opposition brief.

omitted) (quoting Fed. R. Civ. P. 56(e)). Likewise, where applicable, a party may move for summary judgment on a claim based on a pure question of law. *See Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

While district courts should not "needlessly" encourage "piecemeal litigation," motions for summary judgment may be limited to certain issues in the case, such as only certain claims or "part[s] of [a] claim or defense." *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 606 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). Such a motion "can serve [as]a useful brush-clearing" of the case and "facilitate the resolution of the remainder of the case through settlement" under appropriate circumstances. *Id.*

## III.    DISCUSSION

Defendants Aspen Insurance UK Limited, Catlin Syndicate Limited a/k/a AXA XL Syndicate Limited, Chubb Custom Insurance Company, and Columbia Casualty Company move for summary judgment on certain bellwether issues regarding coverage for lawsuits brought by state and local governments. *See* ECF No. 316 at 1; *see also* ECF No. 318 (joinder brief of Defendant Aspen); ECF No. 320 (joinder brief of Defendant Catlin). They argue that most government lawsuits brought against Endo were not claims made during the policy period and that, regardless, none of the government lawsuits seek "damages . . . for bodily injury," as required by Defendants' insurance policies. *See* ECF No. 316-1 at 15, 22; *see also* ECF No. 320 at 5–7 (Defendant Catlin, raising separate argument that coverage for the government suits does not reach its excess layer); ECF No. 318 at 3–8 (Defendant Aspen, raising arguments under New York law based on its policy's New York choice-of-law clause). The Trustee cross-moves for summary judgment on these issues, *see* ECF No. 341 at 1, and the Court addresses each issue in turn.

9

### A. Timeliness of Claims

The 2013–2014 policies are claims-made policies and therefore required claims to "be made against [Endo] during the policy period or, where applicable, the extended report[ing] period." *See* ECF No. 315-1 at 3 (capitalization omitted). The Parties identify only two government suits—the Chicago and California lawsuits—that were filed during the policy period. *See* ECF No. 341-5 ¶¶ 44–45. For that reason, the Trustee argues that other claims were timely under the six-year basic extended reporting period of Endo's primary policy. *See* ECF No. 349 at 99–100. And because the primary policy was exhausted by other claims, *see* ECF No. 316-1 at 12, the Trustee maintains that the excess policies incorporated this six-year period.

Because the excess policies do not incorporate the primary policy's six-year basic extended reporting period, only the Chicago and California lawsuits—of the lawsuits identified by the Parties—were timely under the excess policies. And because the Court decides the issue of timing on this basis, it need not reach other arguments made by Defendants, such as that Endo did not meet the requirements for the six-year basic extended reporting period to apply.[6] *See* ECF No. 316-1 at 19.

1. *The Excess Policies Do Not Include the Primary Policy's Six-Year Extended Reporting Period*

Defendants argue that the excess policies do not incorporate the primary policy's six-year

---

[6] Defendants also argue that the Trustee cannot rely on "batching" provisions in the policies to invoke coverage for later-filed suits. *See* ECF No. 316-1 at 20–21. However, the Trustee does not develop an argument for batching in his opposition, stating instead that he cannot "rule out [the] possibility" of coverage based on batching "without further discovery," in light of the early nature of the summary judgment briefing. ECF No. 349 at 114 n.94. The Trustee notes, for instance, that Defendants have not produced correspondence with Endo regarding "notice of any batched claims under the Batch Coverage Endorsement." *Id.* at 129.

In light of the Court's ruling on bodily injuries *infra* Section III.B, further briefing on batching may not be required. Nonetheless, the Parties shall confer and address the impact of the Court's summary judgment rulings, as set forth in the accompanying Order.

basic extended reporting period. ECF No. 316-1 at 18. Instead, according to Defendants, some excess policies provide an extended reporting period only for an additional fee and others contained shorter extended reporting periods under which government lawsuits were not timely made. *See id.*

Only the extended reporting periods of five excess layers are in dispute. *See supra* Section I.B.2 (noting that the 2013–2014 tower has eight excess layers of coverage, excluding self-insured layers, but that three of these layers involve stayed claims). Those five excess layers, in order, were issued by:

- Defendant Columbia Casualty Co.;

- Defendant Aspen Insurance UK Ltd.;

- Defendant Chubb Custom Insurance Co.;

- Defendant Columbia Casualty Co., issuing an additional excess policy;

- and Defendant Catlin Syndicate Ltd.

*See supra* Section I.B.2. Though the five excess policies default to incorporating the terms of the primary policy or of policies that follow the primary policy, they each contain language that displaces the primary policy's extended reporting provisions. *See* ECF No. 315-3 at 4; ECF No. 315-4 at 5; ECF No. 315-6 at 11; ECF No. 315-7 at 2, 4; ECF No. 315-8 at 16, 19. Accordingly, the excess policies do not incorporate the primary policy's basic extended reporting period, as demonstrated for each excess policy below.

### a. Defendant Columbia Casualty's First Excess Policy

Defendant Columbia Casualty issued excess coverage to Endo under Policy No. ADE 2054989843-11. ECF No. 315-3. That policy incorporates the terms of the primary policy, or "any more restrictive provisions of the underlying policies," "except for the premium, Limit of Liability,

retroactive dates, or any defense obligations and *any other provision specifically set forth in this Policy*," *Id.* at 4 (emphasis added). The policy has its own extended reporting period provision that offers a 90-day extended reporting period "starting with the end of the Policy Period . . . if and so long as, such Extended Reporting Period exists under the Underlying Insurance," as well as an additional, longer reporting period for purchase. *Id.* at 13.

Because an extended reporting period is "specifically set forth" in Columbia Casualty's policy, the primary policy's six-year extended reporting period does not govern coverage by Columbia Casualty. *See id.* at 4. Nor are the later-filed government suits claims made under Columbia Casualty's 90-day extended reporting period. After the Chicago and California lawsuits, the next government lawsuit identified by the Parties was not filed until December 15, 2015, more than 90 days after the policy period ended on September 26, 2024. *See* ECF No. 315 ¶ 2. Accordingly, government suits other than the Chicago and California lawsuits were not claims made under the Columbia Casualty excess policy.

### b. Defendant Aspen's Excess Policy

Defendant Aspen provided excess coverage to Endo under Policy No. O0A0YWK13A0H. ECF No. 315-4. The policy states that it will provide coverage "in accordance with the same . . . terms . . . as are contained in the [primary policy]" except any "terms and conditions of this Policy including any and all endorsements attached hereto which may be inconsistent with the Followed Policy." *Id.* at 5. The policy contains an extended reporting period endorsement, which states that the insurer will "have the option to extend the coverage granted by this Policy" for "an additional premium" when certain conditions, such as non-renewal of the policy, are met. *Id.* at 9.

This extended reporting period endorsement differs materially from the primary policy's extended reporting period, because it conditions an extended reporting period on the payment of

additional premiums. And, as argued below, the structure of the Aspen policy makes clear it was intended to replace the primary policy's basic extended reporting period provisions. *See infra* Section III.A.3. Thus, insofar as Endo did not pay for an extended reporting period under the Aspen policy, *see* ECF No. 316-12 at 1–2, coverage would be available only for claims made during the policy period.

### c. Defendant Chubb's Excess Policy

Defendant Chubb's excess layer is Policy No. 7995-73-17, which "follow[s] the terms and conditions" of the primary policy except where Chubb's terms and conditions, in relevant part, (1) "differ[] from any term or condition contained in the [primary policy]" and (2) "provide less coverage." ECF No. 315-6 at 11. Chubb's policy contains an extended reporting period provision that states that a "Follow-Form Extended Reporting Period is available, but only by an endorsement, and for an additional premium." *Id.* at 27.

This extended reporting period provision "differs from" the primary policy's extended reporting period provision, since an extended reporting period that follows the underlying policy must be purchased. *See id.* at 27, 35. Assuming Endo did not pay Chubb for a follow-form extended reporting period, no extended reporting period would be available for this layer. *See* ECF No. 316-9 at 2.

The Trustee likely lacks coverage under the Chubb layer for an additional reason: It does not apply" when a loss "is not covered by all underlying insurance for reasons other than the exhaustion of [policy limits]." *Id.* at 35. The excess layer directly above the Chubb policy was issued by Defendant Markel International Insurance Company Ltd., against whom this suit is stayed. ECF No. 138 at 1. And the Markel policy expressly declines to follow the primary policy's basic extended reporting period and instead offers an extended reporting period for a fee. ECF No.

315-5 at 15–16. The Markel policy would therefore cover only suits filed during the policy period—namely, the California and Chicago lawsuits—unless Endo purchased Markel's extended reporting period. And because the Chubb policy "does not apply" when a loss "is not covered by all underlying insurance for reasons other than the exhaustion of [policy limits]," *id.* at 35, the failure to purchase an extended reporting period under the Markel policy would preclude coverage under the Chubb policy, too, insofar as the Markel policy was an underlying insurance policy.[7]

### d.  Defendant Columbia Casualty's Second Excess Policy

Defendant Columbia Casualty's second excess layer of coverage, Policy No. ADE 4032127311-0, contains similar language to Columbia Casualty's first excess layer. *See* ECF No. 315-7 at 4 (providing coverage in conformity with the primary policy "except for the premium, Limit of Liability, retroactive dates, or any defense obligations and any other provision specifically set forth in this Policy"); *id.* at 13 (providing a ninety-day extended reporting period by default "starting with the end of the Policy Period . . . if and so long as, such Extended Reporting Period exists under the Underlying Insurance," and an additional extended reporting period for purchase). Because the government suits were not claims made under Columbia Casualty's first excess layer, they are likewise not claims made under Columbia Casualty's additional excess layer.

Additionally, similar to the Chubb policy, this policy excludes coverage "for any loss not covered by any underlying insurance except . . . by reason of the depletion or exhaustion of the available underlying insurance." *Id.* at 7 (also noting that "[t]his Policy shall not drop down for any reason other than exhaustion of the applicable underlying limits"). Because earlier layers of

---

[7] No evidence appears to indicate whether Endo purchased an extended reporting period from Markel. The Court's conclusion about Chubb's coverage therefore does not depend on the Markel layer. The Court notes only that, to the extent Endo never purchased an extended reporting period from Markel, this would supply additional grounds for finding that the Chubb and the second Columbia Casualty policy did not incorporate the primary policy's basic extended reporting period.

coverage, such as the Markel and Chubb layers, would likely not cover most underlying government suits, that independently precludes coverage under Columbia Casualty's second excess policy. *See id.* at 3 (listing Markel's and Chubb's policies in Columbia Casualty's schedule of underlying insurance).

### e.   Defendant Catlin's Excess Policy

The last layer of excess coverage, supplied by Defendant Catlin, is Policy No. 509/DL575113. ECF No. 315-8. The Trustee concedes that this policy does not follow the primary policy's extended reporting period. *See* ECF No. 349 at 116 & n.95; *see also* ECF No. 315-8 at 32 (stating that "this Policy shall not follow the terms and conditions of the 'Basic Extended Reporting Period' . . . issued by the Gemini Insurance Company"). Instead, the Catlin Policy states that an extended reporting period is available only for purchase. *See* ECF No. 315-8 at 32. Assuming Endo did not purchase an extended reporting period under the Catlin Policy, *see* ECF No. 316-10 at 2, no such period would apply to this layer.

### 2.   *The Terms of the Excess and Primary Policies Need Not Expressly Contradict for the Excess Policies to Govern*

In the light of the above, each excess policy contained more restrictive extended reporting period provisions than the primary policy. Nonetheless, the Trustee argues that the excess policies adopt the primary policy's basic extended reporting period unless the excess policies expressly contradict the primary policy. ECF No. 349 at 116. That argument is belied by the language of the excess policies, which does not require an express conflict. *See* ECF No. 315-3 at 4 (Columbia Casualty policy, requiring only that a provision is "specifically set forth in this Policy" in order not to follow the primary policy's provision); ECF No. 315-7 at 4 (same as to second Columbia Casualty policy); ECF No. 315-6 at 11 (Chubb policy, requiring only that a provision in the excess policy "differs from" the primary policy); ECF No. 315-4 at 5 (Aspen policy, requiring only that

15

a provision is "inconsistent" with the primary policy).

The case to which the Trustee points, *Howden North America Inc. v. ACE Property & Casualty Insurance Co.*, does not establish otherwise. *See* ECF No. 349 at 116 (citing 875 F. Supp. 2d 478 (W.D. Pa. 2012)). It states only that excess policies "often incorporate[] by reference the terms and conditions of the underlying policy," and that an excess policy's terms control when the policies conflict. *Howden N. Am. Inc.*, 875 F. Supp. 2d at 492. It does not address a circumstance, like here, where excess policies establish the conditions under which they follow the underlying policies. Because the excess policies identify the circumstances under which they do not follow form to the primary policy, and those circumstances are broader than express contradiction, the primary policy's extended reporting period does not govern.

3. *The Excess Policies Displace the Primary Policy's Basic Extended Reporting Period, Not Merely its Supplemental Extended Reporting Period*

The Trustee also argues that, at most, the excess policies displace the primary policy's supplemental extended reporting period but not its basic extended reporting period. *See* ECF No. 349 at 117. But the structure of the excess policies demonstrates that the parties intended to displace the primary policy's extended reporting period provisions as a whole. For instance, the Aspen policy contains an endorsement titled "Extended Reporting Period Endorsement." ECF No. 315-4 at 9. That endorsement does not distinguish between basic and supplemental extended periods. *See id.* It states only that the insured shall "have the option to extend the coverage granted by this Policy" for an additional premium. *Id.*; *see also id.* at 10 (listing the additional premiums required to purchase extended reporting periods ranging from 12 to 60 months). Because this provision refers holistically to an extended reporting period, it generally replaces the "Extended Reporting Periods" provision of the primary policy.[8] *Compare* ECF No. 315-4 at 9, *with* ECF No.

---

[8] Additional features of Aspen's extended reporting period endorsement reflect that it displaces

16

315-1 at 19.

Moreover, the Trustee's argument—that the excess policies' extended reporting periods supplement the primary policy's basic extended reporting period—renders the ninety-day extended reporting period in Columbia Casualty's excess policies largely superfluous. That ninety-day period "start[s] with the end of the Policy Period." ECF No. 315-3 at 13; ECF No. ECF No. 315-7 at 13. And because the six-year basic extended reporting period (for losses associated with critical facts) also begins "with the end of the policy period," ECF No. 315-1 at 19, it would

---

the primary policy's basic extended reporting period. The Aspen and primary policies require similar criteria to be met—such as cancellation and non-renewal—for an extended reporting period to be available. *Compare* ECF No. 315-1 at 19 (section 1), *with* ECF No. 315-4 at 9 (headers a, b, and c). However, unlike the primary policy, the Aspen policy requires an extended reporting period to be purchased for an additional premium. *See* ECF No. 315-4 at 9. Because these extended reporting period endorsements substantially mirror each other, it suggests that the parties intended for the Aspen endorsement to be a wholesale substitute for the primary policy's endorsement.

The Trustee argues that the primary policy's renewal and cancellation criteria—contained in a section titled "1. When Extended Reporting Periods Apply," do not apply to the basic extended reporting period, which appears in the subsection that immediately follows, titled "2. Basic Extended Reporting Period," *see* ECF No. 315-1 at 19. *See* ECF No. 349 at 101–03. Instead, according to the Trustee, because the policy states that the basic extended reporting period is "automatically provided without additional charge," ECF No. 315-1 at 19, the renewal and cancellation requirements of section 1 do not apply. *See* ECF No. 349 at 101–03, 117–18.

This argument fails. The plain language of section 1 is broad: It identifies "When Extended Reported Periods Apply." ECF No. 315-1 at 19. And it repeatedly uses the plural form of "extended reporting periods," while the following sections—"2. Basic Extended Reporting Period" and "3. Supplemental Extended Reporting Period"—use the singular. *Id.* This suggests that section 1 establishes requirements for both sections 2 and 3.

The Trustee argues that section 1 does not establish criteria for the basic extended reporting period because the policy states that the basic extended reporting period is provided "automatically . . . without additional charge," ECF No. 315-1 at 19, is misplaced. *See* ECF No. 349 at 102–03. In this context, automatic is best read to mean without having to take additional steps, such as the notice requirements set forth for the supplemental extended reporting period. *See* ECF No. 315-1 at 20; *Berkley Assurance Co. v. Hunt Constr. Group*, 465 F. Supp. 3d 370, 378–79 (S.D.N.Y. 2020) (holding that an "automatic" reporting period still required cancellation or non-renewal of a policy and noting that "something can be 'automatic' without always being in effect"). However, it is still subject to the cancellation and non-renewal criteria of section 1.

17

override Columbia Casualty's ninety-day provision. Such a reading renders Columbia Casualty's extended reporting periods superfluous and is therefore disfavored. *See Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 167 (3d Cir. 2011).

As a final matter, the record plainly contradicts the Trustee's argument with respect to some policies. The Markel policy specifies that it does not follow the primary policy's basic extended reporting period. ECF No. 315-5 at 15; *cf. also* ECF No. 315-8 at 32 (Catlin policy, also specifically declining to follow the primary policy's basic extended reporting period). And, as discussed above, because neither the Chubb policy nor Columbia Casualty's second excess policy apply when earlier excess layers deny coverage—there likely would be no coverage under these policies, which sit below the Markel policy, too.

### 4. *Defendants' Arguments about Failure to Exhaust Policy Limits for the Chicago and California Lawsuits are Premature*

Lastly, Defendants argue that they have no duty to defend even the Chicago and California lawsuits because the costs associated with those lawsuits would not reach their excess layers of coverage. ECF No. 316-1 at 22; *see also* ECF No. 368 at 23–24. Defendants contend that their excess policies as a group "sit[] above $25 million in other insurance." ECF No. 316-1 at 22. Defendant Catlin independently notes that its layer of coverage requires $85 million of coverage to be exhausted by other insurance. ECF No. 320 at 2; *see* ECF No. 315-8 at 19 ($75 million underlying limit and a $10 million self-insured retention). And Defendants assert that the Trustee has not met his burden of demonstrating that the costs of the Chicago and California lawsuits exceed these amounts. *See* ECF No. 316-1 at 22; ECF No. 320 at 7.

Summary judgment on this ground is premature given the unique posture of the case. The Court ordered early summary judgment briefing, prior to most discovery, limited to certain bellwether issues determined by the parties. *See* ECF No. 287 at 1–2 (adopting Parties' proposed

18

order); *see also* ECF No. 283 at 1–2 (proposed order). These bellwether issues were whether: (1) the government lawsuits sought damages for bodily injuries, (2) the government lawsuits "were claims first made during the applicable policy period," and (3) whether proper notice of these suits was provided, and "any deficient notice means that the insurers are not obligated to provide defense or indemnity for the opioid claims." ECF No. 287 at 2. Whether the costs associated with the government suits reach certain excess layers is not an identified bellwether issue.[9] And because the current summary judgment motion is limited to these bellwether issues, Defendants' arguments that the Trustee was required to submit an affidavit as to the unavailability of certain facts is off base. *See* ECF No. 368 at 22 (citing Federal Rule of Civil Procedure 56(d)); Fed. R. Civ. P. 56(d) (addressing when a nonmovant "cannot present facts" essential to opposing a motion for summary judgment).

\* \* \* \*

Endo's primary policy was exhausted due to non-opioid claims, leaving only the excess policies. Those excess policies do not follow the six-year basic extended reporting period of the primary policy. Instead, the excess policies contain their own extended reporting period provisions, which either did not apply or provided a more restrictive window within which claims against Endo could be made. And, the only claims identified by the Parties that fall within the policy period or the excess policies' more restrictive extended reporting windows are the Chicago and California lawsuits. But even if additional government suits were claims made during the coverage period, many would not be covered because they do not seek damages for bodily injury, as discussed

---

[9] The Court declines to read the last bellwether issue, including "whether any deficient notice means that the insurers are not obligated to provide defense or indemnity for the opioid claims," ECF No. 287 at 2, to encompass whether the costs of the government suits would reach certain excess layers. Defendants do not argue otherwise. The purpose of this early summary judgment briefing was principally to resolve critical issues of law that would drive the remainder of the litigation. *See* ECF No. 291 at 18. The costs of these suits is not such an issue of law.

below.

### B. Damages "For Bodily Injury"

Defendants argue that the government lawsuits do not seek "damages . . . for bodily injury," as required by Endo's insurance policies, ECF No. 315-1 at 39.[10] *See* ECF No. 316-1 at 22. The Court first addresses which coverage standard—the duty to defend or duty to indemnify—governs this coverage dispute. It then turns to whether the underlying government suits seek damages for bodily injuries. Many of these suits do not seek damages for bodily injuries, and Defendants have no duty to defend—and consequently no duty to indemnify—these suits. However, at least one suit potentially does seek such damages, as identified below.

#### 1. *The Duty to Defend Standard Applies*

The Trustee and 2013–2014 Tower Defendants agree that the duty to defend, as opposed to the duty to indemnify, governs the Parties' coverage arguments at this stage. *See* ECF No. 316-1 at 15 & n.7; ECF No. 349 at 34. An insurer must defend an insured's suit, or reimburse defense costs, "when [the underlying] complaint, on its face, alleges an injury that is at least *potentially* within an insurance policy's scope of coverage." *See Kramer v. Nationwide Prop. & Cas. Ins. Co.*, 313 A.3d 1031, 1039 (Pa. 2024) (emphasis added). In making that determination, courts must accept the allegations of the underlying complaint as true and compare the "four corners of the insurance contract to the four corners of the complaint." *Erie Ins. Exch. v. Moore*, 228 A.3d 258, 265 (Pa. 2020) (citation omitted). "[I]f any doubt or ambiguity exists, it must be resolved in favor of coverage." *Id.* And ordinarily, "to the extent there are undetermined facts that might [have an] impact on coverage, the insurer has a duty to defend until the claim is narrowed to one patently

---

[10] The insurance policies also cover claims seeking damages for "property damage," ECF No. 315-1 at 39, but the Trustee does not argue that this provision establishes coverage here, *see* ECF No. 349 at 37–99.

outside the policy coverage, for example through discovery [in the underlying suit]." *Id.* (citation omitted).

The Trustee argues that where an insurer has a duty to defend, and "the underlying lawsuits [are] settled," the insurer must also indemnify the suits. ECF No. 349 at 34. However, the effect of a duty to defend on a settled suit is fact specific. *See Am. States Ins. Co. v. State Auto Ins. Co.*, 721 A.2d 56, 64 (Pa. Super. Ct. 1998). The duty to indemnify a settled lawsuit may follow from the duty to defend when the settlement makes it "impossible to determine if the [insurance] policy provided coverage" for the underlying suit—for instance, where a settlement both makes it impossible "to determine on what theories of liability" a plaintiff would have prevailed at trial and that issue is relevant to coverage. *Id.* (citation omitted); *see Pac. Indem. Co. v. Linn*, 766 F.2d 754, 759 (3d Cir. 1985); *Liberty Mut. Ins. Co. v. Penn Nat'l Mut. Cas. Ins. Co.*, No. 20-3468, 2021 WL 5401543, at \*4 (3d Cir. Nov. 18, 2021).

In this case, it is premature to determine the effect of any duty to defend government suits, where it exists, on indemnification. Only limited discovery has been taken in the instant action, and the parties have not briefed the issue, or introduced evidence, of the scope of the settlements in the underlying lawsuits.

With the above principles in mind, the Court turns to the Parties' bodily injury arguments.

   2. *Interpretation of the 2013–2014 Policy Language under Pennsylvania Law*

The 2013–2014 policies cover, in relevant part, "all damages that the insured becomes legally obligated to pay for bodily injury" and "all defense costs to defend a claim seeking such damages." ECF No. 315-1 at 39.[11] Though Defendants concede that some government complaints

---

[11] The Parties agree that this is the applicable language for all 2013–2014 policies at issue now. *See* ECF No. 349 at 38 (the Trustee, identifying this as the applicable language for all 2013–2014 policies); ECF No. 316-1 at 23 (Defendants, doing the same).

discuss bodily injuries, *see* ECF No. 368 at 45–47, they argue that the complaints do not seek damages "for" those injuries. *See* ECF No. 316-1 at 22. In particular, they assert that the policies provide coverage only for suits seeking damages for "personal injur[ies] suffered by specific individuals," a requirement which they argue is unmet here. ECF No. 316-1 at 7; *see also id.* at 23.

Pennsylvania law governs the interpretation of the Parties' policies, except that Defendant Aspen's policy is governed by New York law, as discussed below. *See infra* Section III.B.3. Under Pennsylvania law, insurance policies are contracts governed by "traditional principles of contract interpretation." *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). These principles require the court to interpret the policy as a whole and "give unambiguous terms [in the policy] their plain meaning," unless there is evidence of a contrary trade usage or industry custom. *See Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, 687 F.3d 620, 623 (3d Cir. 2012). If a term is ambiguous, courts may rely on extrinsic evidence to resolve the ambiguity. *See Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001). Any terms which remain ambiguous must be construed in favor of the insured. *See Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 322 (3d Cir. 2011).

The Court begins with the plain meaning of the word "for," in the phrase "damages . . . for bodily injury," *see ECF* No. 315-1 at 39. But that word can have varying meanings depending on context, *see Greenwood Cemetery, Inc. v. Travelers Indem. Co.*, 232 S.E.2d 910, 913 (Ga. 1977), so reading it in isolation is of limited value. For instance, one dictionary defines "for" as "a word to indicate purpose," or "because of," among other definitions. *For*, Merriam-Webster, https://www.merriam-webster.com/dictionary/for#dictionary-entry-1 [https://perma.cc/28UK-8J3 M] (last visited Feb. 7, 2026). These definitions reflect that there must be a relationship between the damages sought and bodily injury being alleged, but they shed little light on how closely

connected the bodily injuries and damages must be.

Other policy language clarifies the meaning of "damages for bodily injury." To start, one section of the policy—dealing with when claims are deemed to be made—assumes "organization[s]" may seek bodily injuries damages.[12] ECF No. 315-1 at 49 ("All claims for damages because of . . . bodily injury to the same person, including damages claimed by any person or organization for care, loss of services, or death . . . will be deemed to have been made at the time the first of those claims is made"); *see also id.* at 54 (stating insurance limits apply "regardless of the number of . . . [p]ersons or organizations making claims or bringing suits"). But that provision specifically contemplates claims "for care, loss of services, or death." *Id.* at 49 (deeming all such claims to be made when the first such claim is made). This type of language commonly refers to subrogation and loss of consortium claims. *See Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 335–36 (5th Cir. 2023) ("[T]he inclusion of damages 'for care, loss of services or death' was meant to include claims 'like loss of consortium claims by family members, and subrogation claims.'" (citation omitted)); *Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*, 57 F.4th 558, 566 (6th Cir. 2023) (same); *State Farm Fire & Cas. Co. v. Cabalis*, 80 F. Supp. 3d 1116, 1124 (D. Haw. 2015) (referring to "claims for loss of society, companionship, and consortium" as exactly the type of claims that fall under a provision covering damages for "care, loss of services and death" resulting from bodily injury). Such claims envision a close relationship between a bodily injury and damages, such as the kind embodied in a derivative action seeking to recover for specific bodily injuries. *See Westfield Nat'l Ins. Co.*, 57 F.4th at 566 (concluding that similar policy language was used "to include derivative claims").

---

[12] For ease of reference, the Court refers to the primary policy's language. *See* ECF No. 315-1 at 39. The Parties do not argue that the excess policies contain differing language or fail to incorporate the primary policy's terms regarding coverage for bodily injuries.

The policy's requirements regarding the timing of bodily injuries reinforce that "damages for bodily injury" means redress for specific bodily injuries. For the policy to cover either the defense costs or liability associated with a suit seeking damages for bodily injury, the bodily injury at issue must occur within a specific period. *See* ECF No. 315-1 at 39 (requiring the bodily injury to occur "on or after the retroactive date" and "before the end of the policy period " or any extended coverage period). It must therefore be possible for an insurer, through the complaint or discovery, to determine when the bodily injuries being alleged occurred. *See id.* And, in particular, it is the bodily injury for which damages are claimed that must be timely, meaning that a suit must make it possible to attribute damages to specific bodily injuries. Where damages are based on the aggregate effects of a population-wide crisis, or are too attenuated from any individual injuries, it would not be possible to do so. *Cf. Vt. Mut. Ins. Co. v. Poirier*, 189 N.E.3d 306, 311–12 (Mass. 2022) ("damages caused by bodily injury refer to the physical injuries and the money damages required to compensate them[,]" in other words, money to "compensat[e] for loss or injury" (citation omitted)); *Discover Prop. & Cas. Ins. Co.*, 73 F.4th at 334 (shareholder derivative action that alleged a breach of fiduciary duty in connection with a listeria outbreak did not seek damages because of bodily injuries, since it "d[id] not seek to recover any damages on behalf of customers who may have suffered 'bodily injury' from the *L[i]steria* outbreak").

Reading the primary policy as a whole, and with the above in mind, suits seeking "damages . . . for bodily injury," ECF No. 315-1 at 39, are suits by individuals or organizations to redress specific bodily injuries, and such suits include derivative claims like subrogation and loss of consortium.

3. *The 2013–2014 Policy Language Has the Same Meaning Under New York Law, as Relevant to Defendant Aspen*

Defendant Aspen's policy has a New York choice-of-law clause, ECF No. 315-4 at 13,

24

and New York law therefore governs the meaning of Aspen's policy. But this does not change the Court's conclusion. The language "damages . . . for bodily injury," ECF No. 315-1 at 39; *accord* ECF No. 315-4 at 24, has the same meaning under New York and Pennsylvania law.

Like Pennsylvania law, New York law interprets insurance policies according to their plain meaning and gives meaning to the policy as a whole. *See W. Waterproofing Co. v. Zurich Am. Ins. Co.*, 685 F. Supp. 3d 157, 167 (S.D.N.Y. 2023). Accordingly, the Court's analysis of the plain meaning of the policy and the effect of the surrounding policy language on the meaning of "for . . . bodily injury" carries equal weight under New York law. *See supra* Section III.B.2. And the growing number of cases reaching similar conclusions across different jurisdictions lends additional support to the Court's reading, whether as a matter of New York law, Pennsylvania law, or otherwise. *See ACE Am. Ins. Co. v. Rite Aid Corp.*, 270 A.3d 239, 244–45, 249 (Del. 2022) (Delaware and Pennsylvania law); *Acuity v. Masters Pharm., Inc.*, 205 N.E.3d 460, 469 (Ohio 2022); *Westfield Nat'l Ins. Co.*, 57 F.4th at 560 (Kentucky law); *Publix Super Mkts., Inc. v. ACE Prop. & Cas. Ins. Co.*, No. 8:22-CV-2569, 2024 WL 4605991, at *10–13 (M.D. Fla. Oct. 29, 2024) (Florida law).[13]

---

[13] The Trustee attempts to distinguish *Rite Aid*, which he first states was not in actuality decided under Pennsylvania law. *See* ECF No. 349 at 65. But nothing in *Rite Aid* suggests this was the case—to the contrary, the court compared Delaware's and Pennsylvania's principles of contract interpretation and concluded that they did not conflict. *Rite Aid Corp.*, 270 A.3d at 245. The Trustee next states that *Rite Aid* conflicts with two other cases interpreting Pennsylvania law— *Amerisourcebergen Drug Corp. v. ACE Am. Ins. Co.*, No. 17-C-36, 2020 W.V. Cir. LEXIS 3 (W. Va. Cir. Ct. Nov. 23, 2020) (applying Pennsylvania law), and *Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.*, 499 F. Supp. 3d 147 (W.D. Pa. 2020), *vacated on other grounds on recons.*, 2021 WL 6276267, at *25 (W.D. Pa. May 25, 2021). *See* ECF No. 349 at 65. But neither case's interpretation of Pennsylvania law binds this Court. The Trustee also states that the plaintiffs in *Rite Aid* disclaimed "recovery for personal injury or any specific treatment damages." *Id.* at 66 (quoting *Rite Aid Corp.*, 270 A.3d at 241). However, disclaimers in the underlying suits do not bear on *Rite Aid*'s interpretation of the policy; they are instead relevant to *Rite Aid*'s application of the policy, once it was interpreted, to specific suits. The application of the policy to the underlying suits is discussed separately below. *See infra* Section III.B.6.

No principle of New York law merits a different conclusion. Though not defining the word "for," "[c]ourts in [New York], and in other states construing policies governed by New York law, have consistently recognized that the words 'because of,' when used in an insurance policy, have a 'more circumscribed meaning,'" and that they require more than "being a sequential link in the chain of events." *See W. Waterproofing Co.*, 685 F. Supp. at 169 (quoting *Long Island Lighting Co. v. Hartford Accident & Indem. Co.*, 350 N.Y.S.2d 967, 972 (N.Y. Sup. Ct. 1973)). And courts have similarly under New York law rejected expansive readings of the word "for." *See, e.g.*, *Certain Underwriters at Lloyd's, London v. Convergys Corp.,* No. 12 CIV. 08968, 2014 WL 3765550, at *5 (S.D.N.Y. Mar. 25, 2014) (rejecting a "strained" reading of the word "for" that alleged that a suit was for "a violation of a privacy policy" if "it allege[d] actions or events" that would constitute a privacy policy violation).

The authority on which the Trustee relies does not suggest otherwise. Some cases that the Trustee cites involve damages that were closely tied to individual property damage or injuries. *See,*

---

The Trustee's attempts to distinguish *Westfield National Insurance Co.* and *Acuity* similarly fail. With respect to *Westfield National Insurance Co.*, the Trustee points out that the parties agreed "that the underlying lawsuits 'allege no particular injury" to a person and "instead broadly describe societal harms." ECF No. 349 at 70 (quoting 57 F.4th at 564). And with respect to *Acuity*, the Trustee argues that the underlying suits "had to disclaim damages for [individualized bodily] injuries" in order to participate in multidistrict litigation. *Id.* As an initial matter, not all suits discussed in *Acuity* disclaimed bodily injuries. 205 N.E.3d at 401–02, 473 (noting only that "the majority of the governments disclaim" bodily injuries and ultimately reinstating a grant of summary judgment based on the "plain language of the policies" and because the government suits "d[id] not tie their alleged economic losses to particular bodily injuries"). Regardless, as discussed in connection with *Rite Aid*, these distinctions concern specific underlying suits and not the threshold issue of interpreting the policy.

The Trustee's discussion of *Publix* likewise does not move the needle. The Trustee points out that *Publix* relied on Florida's narrow definition of "'because of' as a direct causal connection." *See* ECF No. 349 at 71. While *Publix* certainly relies on Florida law, it concludes that other parts of the insurance policy support its reading of the bodily-injury clause and surveys case law from other courts, both of which support the Court's interpretation of Defendants' policies here. *See*, 2024 WL 4605991, at *12–14.

26

*e.g.*, *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1187 1208–09 (2d Cir. 1995) (where individual building owners alleged asbestos-containing materials had damaged "the structures into which [they] were incorporated," and sought to recover costs attributable to removing and replacing the materials, the claims were for property damage), *opinion modified on denial of reh'g*, 85 F.3d 49 (2d Cir. 1996). Other cases give little consideration to the meaning of the policy language at all. *See N.A.A.C.P. v. Acusport Corp.*, 253 F. Supp. 2d 459, 463 (E.D.N.Y. 2003) (summarily concluding that a "connection, however remote" could establish "damages because of 'bodily injury'"); *Certain Underwriters at Lloyd's, London v. NL Indus., Inc.*, 203 A.D.3d 595, 596 (N.Y. App. Div. 2022) (without explanation, concluding that a suit alleging "widespread bodily injury" sought damages "'for,' 'because of,' or 'on account of' 'property damage' or 'bodily injury'"). And regardless, these cases generally do not share the same policy structure as the policies here, which this Court analyzed above.

Under New York law, like under Pennsylvania law, suits seeking "damages . . . for bodily injury," ECF No. 315-1 at 39, are suits by individuals or organizations to redress specific bodily injuries, and such suits include derivative actions like subrogation and loss of consortium actions.

### 4. *The Trustee's Arguments about Extrinsic Evidence Fail*

The Trustee points to two pieces of extrinsic evidence to support his reading of the policy: (1) that Defendants' initial coverage letters "denied or reserved rights on coverage . . . but not on the grounds that the claims failed to allege bodily injury," and (2) that Defendants added express exclusions to later iterations of the policies for suits brought by governments. ECF No. 349 at 45–46. First, the Court may consider extrinsic evidence only if it decides a term is ambiguous upon applying the traditional tools of interpretation. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995). Here, "damages for bodily injury," when interpreted in

27

light of other sections of the policy, is unambiguous. Even if this policy language was ambiguous, evidence of the parties' conduct in hindsight after the contract was formed—like the evidence to which the Trustee points—is generally unhelpful in ascertaining the parties' intent during contract formation. *See Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 727 (S.D.N.Y. 2020) (collecting cases); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 n.11 (Del. 1997) ("[B]ackward-looking evidence gathered after the time of contracting is not usually helpful."). And regardless, with respect to later-added exclusions for government suits, "the fact that one contract is even clearer than another does not make the other contract ambiguous." *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 93 n.17 (2d Cir. 2013). The fact that an explicit exclusion was later added for government suits does not render the language of the 2013–2014 policies ambiguous.

5.  *Case Law from Outside the Opioid Context Does Not Demand a Broader Reading of the Policy*

To argue for a broader reading of "damages for bodily injury," the Trustee also points to cases involving insurance coverage for gun violence litigation and mass torts. *See* ECF No. 349 at 51–53 (citing cases). But the Trustee's reliance on this line of cases is misplaced. In some of cases cited by the Trustee, courts addressed materially different policy language than the language at issue here. *See, e.g.*, *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 539–40 (Fla. 2005) (interpreting a policy excluding coverage for "bodily injury . . . *arising out of* your product," and emphasizing that "arising out of" is much broader than other causal language (emphasis added)). Another case cited by the Trustee devotes less than a paragraph to interpreting the policy language, addresses a different issue—whether only the injured individual can bring suit because of bodily injury—and its cursory treatment of the issues does not govern. *See Scottsdale Ins. Co. v. Nat. Shooting Sports Found.*, No. 99-31046, 2000 WL 1029091, at *2 (5th Cir. July 11, 2000) (per curiam). In yet another case, though it contains similar policy language, it does not consider

28

how the policy's requirement for bodily injuries to occur in a specific period may bear on the meaning of its coverage provisions. *See SIG Arms Inc. v. Emps. Ins. of Wausau*, 122 F. Supp. 2d 255, 260–61 (D.N.H. 2000). Regardless, most of these cases involved both interpreting policy language and applying it to the allegations of underlying suits. And, to the extent these cases turned on the allegations of the underlying suits, that analysis is case-specific. The Court turns to the underlying suits at issue here now.

6. *Many Government Suits Fall Outside the 2013–2014 Tower's Coverage*

With the above policy language in mind, the Court turns to the government suits. Though state and local governments brought numerous suits against Endo, Defendants identify six exemplar suits. *See* ECF No. 316-1 at 8–9. The Trustee challenges the representativeness of these suits, and argues that, regardless, these suits seek damages for bodily injuries. *See* ECF No. 349 at 55–58. The Trustee also points to additional government suits, for which he asserts there is coverage. *See id.* at 58–60.

The Court has reviewed the complaints in the suits highlighted by the Parties. These complaints typically allege, among other things, that Endo and other pharmaceutical industry players contributed to an epidemic of opioid abuse by misrepresenting the addictiveness of opioids, promoting opioids notwithstanding addiction risks, and declining to report suspicious opioid use. *See generally, e.g.*, ECF No. 315-11 (California suit); ECF No. 315-12 (Chicago suit); ECF No. 315-15 (Lansing suit). The complaints assert claims for public nuisance, *see, e.g.*, ECF No. 315-11 ¶¶ 147–57; ECF No. 315-14 ¶¶ 313–35; ECF No. 315-15 ¶¶ 485–94; ECF No. 341-8 ¶¶ 231–37, ECF No. 341-9 ¶¶ 231–37, and violations of state deceptive practices, false advertising, and consumer protection laws, *see, e.g.*, ECF No. 315-11 ¶¶ 129–37; ECF No. 315-12 ¶¶ 904–15; ECF No. 341-8 ¶¶ 225–30; ECF No. 341-9 ¶¶ 225–30. They also generally involve some combination of claims for unjust enrichment, fraud, and negligence, and claims under the Racketeer Influenced

29

and Corrupt Organizations Act ("RICO"). *See, e.g.*, ECF No. 315-14 ¶¶ 336–95 (claims, among others, for unjust enrichment, fraud, negligence, and violations of RICO); ECF No. 315-16 ¶¶ 787–846, 892–967, 977–1012 (same); ECF No. 315-15 ¶¶ 507–613 (claims, among others, for negligence and RICO).

Many of these complaints do not seek damages "for bodily injury." Instead, they link the defendants to a broader public health crisis, rather than specific bodily injuries, and seek to recover the cost of social services provided to combat the opioid epidemic as a whole. *See Acuity*, 205 N.E.3d at 468 (rejecting coverage where "the governments' theories of relief are that [the defendants'] alleged failure to prevent the improper diversion of prescription opioids was a 'direct and proximate cause of the opioid epidemic' and the 'economic damages' sought are based on that public-health crisis"). Such complaints are neither directly nor derivatively seeking to redress specific bodily injuries and plead theories of causation and recovery based on aggregate proof.

Take, for instance, the lawsuit brought by California for public nuisance, false advertising, and unfair competition. *See generally* ECF No. 315-11. California alleges that the defendants substantially contributed to the public nuisance that is the opioid epidemic. *Id.* ¶¶ 155–56. To establish a public nuisance, a defendant must show that the defendants unreasonably and substantially interfered with a common public right. *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 552 (Cal. Ct. App. 2017); *see Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 223 (3d Cir. 2020). Public nuisance claims like California's therefore do not turn on the defendants causing specifically identifiable bodily injuries but instead on causing a common public intrusion. *Baptiste*, 965 F.3d at 223 (noting that "the critical difference" between public and private nuisance "is not the number of persons harmed but the nature of the right affected: a public nuisance requires interference with common or public right"); *State ex rel. Turner v. Younker Bros., Inc.*, 210

30

N.W.2d 550, 564 (Iowa 1973) (when a government brings a public nuisance claim, the claim "is thus unlike the private nuisance of tort law where specific injury to a[] [particular] individual must be shown." (citation omitted)); *Rite Aid Corp.*, 270 A.3d at 247 (citing approvingly a case that held that government claims for public nuisance and negligence were not covered under similar policy language because these claims did not require alleging harm from specific bodily injuries to show that the defendants "caused a public nuisance—or to show that they were negligent in their distribution of controlled substances, causing the State . . . to incur excessive costs" (citation omitted)).

California's false advertising and unfair competition, for which they seek an injunction and civil penalties, *see* ECF No. 315-11 ¶¶ 136–37, 145–46, likewise suffer from problems. The plaintiff alleges only that the defendants' actions were "likely to deceive California payors" writ large and, with respect to unfair competition, that this created an unfair business advantage for defendants—an economic harm. *Id.* ¶¶ 134, 142, 145. These claims therefore do not seek to recoup the costs of care associated with particular injuries. What is more, these claims do not appear to seek "damages," which the primary 2013–2014 policy defines to exclude penalties and injunctive relief. ECF No. 315-1 at 76.

Other suits similarly do not trigger the duty to defend. They require linking defendants to only a broader public health crisis—the opioid epidemic—and seek damages based on the aggregate costs of abating that epidemic, rather than for any citizen's individualized costs of treatment. *See Acuity*, 205 N.E.3d at 468 (rejecting coverage where "the governments seek damages for their own aggregate economic injuries caused by the opioid epidemic and *not* for any particular opioid-related bodily injury sustained by a citizen as a direct result of [the defendant's] alleged failures"). For instance, a lawsuit by Dutchess County, New York links the defendants to

31

"the public nuisance" of the opioid epidemic and alleges that it has "been required to spend millions of dollars each year in its efforts to combat [that] public nuisance." ECF No. 341-8 ¶ 26 (going on to assert claims for deceptive acts and practices, false advertising, public nuisance, violations of a state social services law, fraud, and unjust enrichment). Likewise, a lawsuit by Oswego County, New York sought to compensate the county for the costs of deceptive marketing, false advertising, and misrepresentations about opioids, and for the public nuisance created by the opioid crisis. *See* ECF No. 341-10 ¶¶ 245–91 & at 86. Some suits go even further, as the Trustee acknowledges, *see* ECF No. 349 at 55–56. Complaints filed by Ohio government actors and Schuyler County, Missouri expressly state that their suits are not "derivative of the rights of others" and that the harms suffered by the government plaintiffs are "of a different kind" than harms suffered by citizens. ECF No. 315-13 ¶¶ 1032–33; ECF No. 315-16 ¶¶ 884–85.

In response, the Trustee argues that the above suits identify specific injuries. *See* ECF No. 349 at 68–69. Certainly, a number of these suits provide examples of how the opioid epidemic has impacted their localities. They quantify, for instance, opioid overdoses, opioid-linked hospital visits, and admissions to treatment programs when discussing the ramifications of the opioid epidemic in their regions. *See, e.g.*, ECF No. 341-9 ¶ 24; ECF No. 341-10 ¶ 25; ECF No. 351-11. But Defendants' policies cover "damages" for specific bodily injuries. Mere discussion of injuries as background or as examples of the effects of a public health crisis—where damages do not depend on proving the specific injuries—does not suffice. *See Rite Aid Corp.*, 270 A.3d at 249 (Mere allegations of injury "do[] not transform the allegations into claims for damages 'because of' personal injury. The complaint must do more than relate to a personal injury—it must seek to recover for the personal injury or seek damages derivative of the personal injury."); *Acuity*, 205 N.E.3d at 469 ("[A]llegations of bodily injury alone do not automatically bring an action within

the coverage for 'damages because of bodily injury.'"); *Westfield Nat'l Ins. Co.*, 57 F.4th at 560, 564 (affirming grant of summary judgment to insurers where policies covered damages "because of bodily injury" and the underlying lawsuits "allege[d] no particular injury to any particular person" but instead "broadly describe societal harms caused by opioid addiction, such as diminished productivity and increased healthcare costs"); *see also W. Waterproofing Co.*, 685 F. Supp. 3d at 170 ("[T]he mere fact that a complaint in a lawsuit mentions, or even describes in copious detail, a bodily injury that occurred as part of a chain of events does not automatically mean that an insurer has a duty to defend."). Thus, many government suits do not seek damages for bodily injuries, given the causes of action they assert, the nature of the allegations, and the theories of causation they plead.

Nonetheless, that does not mean that a government suit could never seek damages "for bodily injury." After all, Defendants' policies state that damages for bodily injury include damages sought by "any person or organization for care." ECF No. 315-1 at 49. From that language, courts have concluded that if localities "ran public hospitals and sued" a defendant "to recover their actual, demonstrated costs of treating bodily injuries . . . the [] [p]olicy would most likely be triggered." *Rite Aid Corp.*, 270 A.3d at 253–54; *cf. Discover Prop. & Cas. Ins. Co.*, 73 F.4th at 335–36 (interpreting this language to include subrogation claims). Finding coverage in that instance makes good sense. A taxpayer, like an individual paying out of pocket or a private insurer, may sometimes bear the cost of treating a specific patient's care. Whether it is an individual paying out of pocket, a private insurer, or a government actor who sues to recover those costs, each would be seeking to recover damages "for care" of bodily injuries in that instance under the plain language of the policies.

Under the duty-to-defend standard, a claim may therefore survive Defendants' motion for

33

summary judgment if a government is "at least potentially" seeking to recover the demonstrated costs it paid to treat specific injuries. *Kramer*, 313 A.3d at 1039. And "any doubt . . . must be resolved in favor of coverage." *Moore*, 228 A.3d at 265. At least some government suits could in theory satisfy this standard. For instance, the Chicago complaint brings a count under municipal law to recover the cost of services "reasonably related" to Defendants' alleged violations of consumer protection laws. *See* ECF No. 315-12 ¶¶ 937–43. And one cost Chicago seeks to recover is the cost of emergency treatment for opioid "overdoses, addiction, and other injury," *id.* ¶ 943, with the complaint noting that Chicago's "workers' compensation program and health benefit plans" specifically spent "$2.4 million on addiction treatment services from May 2013 to May 2015," *id.* ¶ 882. These costs could "at least potentially" be connected to demonstrable bodily injuries, *Kramer*, 313 A.3d at 1039, and the complaint does not foreclose proceeding on a theory of individualized harm. *See Moore*, 228 A.3d at 265 ("[T]he insurer has a duty to defend until the claim is narrowed to one patently outside the policy coverage . . . .").

Some courts have held that a complaint's failure to name specific injuries or individuals is sufficient to defeat any duty to defend. *See In re CVS Opioid Ins. Litig.*, 346 A.3d 81, 98 (Del. 2025) (pointing to the failure of certain complaints to "allege actual specific and individualized damage). But the relevant inquiry is whether the suit seeks to recover damages for individual bodily injuries, not whether the complaint individually names each specific injury or injured person. That inquiry turns on the nature of the claims and the theory of causation being pled. And if it is ambiguous from the complaint whether a suit seeks to recover for individual bodily injuries or further facts are needed to resolve that inquiry, the duty to defend applies. *See Moore*, 228 A.3d at 265. A contrary interpretation would turn the duty to defend on its head and demand more from a complaint than pleading standards require. Accordingly, the mere fact that a complaint does not

name individual bodily injuries or injured persons is not dispositive of the duty to defend.

Nonetheless, even in suits where a duty to defend may have initially applied, the duty to defend may be short-lived. It appears that certain suits against pharmaceutical companies—even those that could have proceeded based on a theory of individual harm, including the Chicago suit—chose to proceed instead based on aggregate proof. *See City of Chicago v. Purdue Pharma, L.P.*, No. 14 CV 4361, 2020 WL 3578497, at *3 (N.D. Ill. July 1, 2020) (noting that the City of Chicago planned to "rely on aggregate data to prove causation[,]" and would use experts to show that Defendants' conduct "led to an increase in the number of prescriptions which in turn caused an epidemic of addiction"); *see also id.* at *4 ("[T]he City has made clear that it does not intend to point to or rely on a single example of medically unnecessary prescriptions . . . ."); *City of Huntington v. AmerisourceBergen Drug Corp.*, Nos. CV 3:17-01362 & CV 3:17-01665, 2021 WL 1711381, at *3 (S.D.W. Va. Apr. 29, 2021) (involving opioid suit by city where, although evidence of individual instances of opioid abuse was permitted, the city was ultimately proceeding on a theory of "aggregate proof"); *Cleveland Bakers & Teamsters Health & Welfare Fund v. Purdue Pharma L.P. (In re Nat'l Prescription Opiate Litig.)*, 440 F. Supp. 3d 773, 792 n.16 (N.D. Ohio 2020) (allowing the plaintiffs "to use aggregate evidence to attempt to prove causation" for RICO claims). The choice to proceed based on aggregate proof, rather than individualized bodily injuries, would render a government's claims "patently outside the policy coverage," thereby extinguishing Defendants' duty to defend. *Moore*, 228 A.3d at 265 (citation omitted).

Notwithstanding the above, in reaching a decision on the duty to defend, the Court is limited to comparing the "four corners of the insurance contract to the four corners of the complaint." *Id.* (citation omitted). In looking to the four corners of the government complaints, most complaints do not seek relief for treating individual injuries—indeed, some disclaim recovery

on this basis. But where a complaint seeks to recover the cost of treatment and pleads a theory of causation that could proceed based on individualized proof, the complaint "at least potentially," *Kramer*, 313 A.3d at 1039, seeks damages "for care" of individual bodily injuries, as required for the duty to defend. *See* ECF No. 315-1 at 39. However, to the extent such suits proceed based on a theory of aggregate harm, those suits fall outside the policy coverage, thereby extinguishing any duty. But little discovery has taken place in this case, and the Parties have not briefed which suits proceeded on a theory of aggregate harm. Thus, this Court concludes only that Defendants' policies—which cover damages "for bodily injury"—would not cover many government suits.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court will **GRANT** in part and **DENY** in part Defendants' Motion for Summary Judgment (ECF No. 316) on bellwether issues. The Court will grant the Motion (ECF No. 316) on the following issues: (1) Defendants' excess policies do not incorporate the basic extended reporting period of the primary policy and (2) the meaning of "damages for bodily injury" in the policies. The Court will deny the Motion (ECF No. 316) with respect to Defendants' argument at this stage that no government suits seek damages for bodily injuries. The Court will **DENY** the Trustee's Cross-Motion for Summary Judgment (ECF No. 341). An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

_____

**CHAD F. KENNEY, JUDGE**