IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEW DUNDON, AS THE TRUSTEE OF THE ENDO GENERAL UNSECURED CREDITORS' TRUST, | : : : | Civil Action |
| *Plaintiff*, | : | |
| | : | |
| v. | : | No. 24-4221 |
| | : | |
| ACE PROPERTY AND CASUALTY INSURANCE COMPANY, et al., | : : | |
| *Defendants.* | : | |

**MEMORANDUM**

**KENNEY, J.**                                                    **FEBRUARY 10, 2026**

Defendants Gemini Insurance Company, Ironshore Insurance Company, Those Underwriters that subscribed to the LSR 2016 excess policy (including Hiscox, Chaucer, RenaissanceRe, Amlin, and Catlin n/k/a AXA XL), TDC Specialty Insurance Company, Newline Corporate Named Limited, and Starstone Specialty Insurance Company (collectively, the "2016-17 Products Insurers") move for summary judgment on each count of Plaintiff Matthew Dundon's Amended Complaint as applied to the 2016–2017 insurance policy tower ("2016–2017 Products Policy Tower"). ECF Nos. 307, 308, 311; *see also* ECF No. 313 (joinder of Defendant TDC Specialty Insurance Company). Plaintiff Matthew Dundon cross moves for summary judgment (ECF No. 341). For the reasons set forth below, the Court will **GRANT** in part and **DENY** in part Defendants' Motions (ECF Nos. 307, 308, 311) and **DENY** Plaintiff's Cross-Motion for Summary Judgment (ECF No. 341), as set forth below.

## I. BACKGROUND

### A. General Factual Background

This is an insurance coverage dispute arising from litigation over prescription opioids. During the relevant period, non-party Endo International plc ("Endo") was a pharmaceutical

company that manufactured opioid products. ECF No. 341-5 ¶¶ 10–11. In connection with its business operations, Endo obtained insurance coverage, including multiple products insurance policies in each of the following years: 2013–2014, 2016–2017, and 2017–2018. *See* ECF No. 315 ¶¶ 4–12, 22–23, 25–30, 35–41. Endo's insurance policies in each of these years formed an insurance "tower," with one policy serving as the primary policy and others providing layers of excess coverage. *See* ECF No. 316-1 at 12 (chart identifying 2013–2014 tower); ECF No. 311-2 ¶ 38 (chart identifying 2016–2017 tower); ECF No. 312-2 ¶ 67 (chart identifying 2017–2018 tower); *see also Pharmacia Corp. v. Arch Specialty Ins. Co.*, No. 22-2586, 2024 WL 208146, at *1 n.1 (3d Cir. Jan. 19, 2024) (defining an insurance tower as a structure in which "a primary insurer respond[s] first to any covered loss, and excess insurers respond[ ] in a predetermined order if the loss exceeds the [primary policy's] coverage") (first and second alterations in original) (citation omitted). Endo also obtained multiple commercial general liability insurance policies from 2010–2022, in addition to the above products insurance policies. *See* ECF No. 319 ¶ 1.

### 1.  *The Underlying Litigation and Bankruptcy Action*

Based on Endo's role in manufacturing and promoting opioids, various state and local governments, third parties, and individuals sued Endo and its affiliates. *See* ECF No. 315 ¶¶ 1–3, 21, 42–49. Thousands of lawsuits were filed across the country against Endo and its affiliates. *See* ECF No. 319-10 at 50. A sample of the lawsuits naming Endo International plc and/or at least one of its affiliates as a defendant includes: *California v. Purdue Pharma*, No. 30-2014-00725287 (Cal. Super. Ct.); *Chicago v. Purdue Pharma*, No. 1:14-cv-4361 (N.D. Ill.); *UFCW, Local 23 and Employers Health Fund v. Endo Pharmaceuticals, Inc.*, No. 180403485 (Pa. Ct. Com. Pl.); *Iron Workers District Council of Philadelphia and Vicinity, Benefit Fund v. Abbott Laboratories, Inc.*, No. 180502442 (Pa. Ct. Com. Pl.); *St. Charles County, Missouri v. Purdue Pharma L.P.*, No. 4:18-

cv-1376 (E.D. Mo.); *Koechley v. Purdue Pharma, Inc.*, No. G-4801-CI-0201803741-000 (Ohio Ct. Comm. Pl.); *Riling v. Purdue Pharma L.P.*, No. 2:18-cv-1390 (S.D. W. Va.); *Florida v. Purdue Pharma L.P.*, No. 2018-CA-1438 (Fla. Cir. Ct.); *Estate of Brockel v. Couch*, No. 2017-CV-902787 (Ala. Cir. Ct.); *Georgia v. Purdue Pharma L.P.*, No. 19-A-00060-8 (Ga. Super. Ct.); *County of Walker v. Abbott Laboratories*, No. 1929076 (Tex. Dist. Ct., Walker Cnty.); *Mississippi v. Purdue Pharma L.P.*, No. 25CH1:15-cv-1814 (Miss. Ch. Ct.); *Brumbarger v. Purdue Pharma L.P.*, No. 1:19-op-45469 (N.D. Ohio); *Paul v. Purdue Pharma L.P.*, No. 1:19-op-45467 (N.D. Ohio); *Berzinski v. Purdue Pharma L.P.*, No. 1:19-op-45503 (N.D. Ohio); and *Alsup v. McKesson Corp.*, No. 1:20-op-45083 (N.D. Ohio). *See* ECF No. 317 ¶¶ 15–31.

Endo ultimately filed for Chapter 11 bankruptcy before the U.S. Bankruptcy Court for the Southern District of New York on August 16, 2022. *See* ECF No. 341-2 ¶ 1; *see also In re Endo Int'l plc*, No. 22-22549 (Bankr. S.D.N.Y. Aug. 16, 2022). The bankruptcy court confirmed a reorganization plan, which, in conjunction with a trust agreement, provided for the formation of a general unsecured creditors' trust and the appointment of Plaintiff Matthew Dundon as trustee. *See* ECF No. 341-2 ¶ 1; ECF No. 315 ¶¶ 54–55. The reorganization plan provides for "full and final satisfaction, settlement, release, and discharge of" numerous opioid claims. *See* Fourth Amended Plan at 99–102, *In re Endo Int'l plc*, No. 22-22549 (Bankr. S.D.N.Y. Mar. 18, 2024).

### 2. The Trustee's Instant Suit Against Certain Insurers

On August 15, 2024, Plaintiff, as trustee of the Endo General Unsecured Creditors' Trust (hereinafter, "the Trustee"), brought the instant action for a declaratory judgment and breach of contract against certain insurers that issued policies to Endo. ECF No. 1; *see also* ECF No. 113 (operative complaint). The Amended Complaint alleged that Defendants were obligated to cover

Endo's liability and defense costs arising from the above opioid litigation.[1] *See* ECF No. 113 ¶¶ 119, 139. Specifically, the Trustee alleged that three products policy towers and Endo's commercial general liability policies provided coverage for various opioid lawsuits:

1. The 2013–2014 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by state and local governments. *See id.* ¶ 122.

2. The 2016–2017 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by individuals. *See id.* ¶¶ 87, 122.

3. The 2017–2018 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by third-party payors. *See id.*

4. The commercial general liability policies issued from 2010–2022, which the Trustee alleged provided coverage for the opioid lawsuits in connection with "Unbranded Promotional Activities." *See id.* ¶¶ 112, 135, 139.

The 2016–2017 products insurance policies are most relevant to the 2016-17 Products Insurers' Motions (ECF Nos. 307, 308, 311) and are discussed in greater detail below.[2]

---

[1] The Amended Complaint also alleged that certain Defendants were obligated to cover Endo's liability and defense costs related to litigation over transvaginal surgical mesh products and products containing ranitidine. *See* ECF No. 113 ¶¶ 73, 107, 119. However, the instant Motion concerns only coverage for the cost of opioid litigation. The Trustee voluntarily dismissed coverage claims related to ranitidine, *see* ECF No. 249 at 2–3; ECF No. 250 at 2–3, and the claims seeking coverage for surgical mesh litigation are subject to a separate briefing scheduling. *See* ECF No. 346 at 1–3.

[2] Defendants filed separate summary judgment motions and briefing with respect to each of the above four categories of insurance coverage. *See infra* Section I.C. The Court likewise issues separate summary judgment rulings for each category of coverage. *See* Commercial General Liability Summary Judgment Order & Opinion; 2013–2014 Tower Summary Judgment Order & Opinion; 2017–2018 Tower Summary Judgment Order & Opinion.

### B. The 2016-2017 Products Insurance Policies

#### 1. *The Primary Policy*

Gemini Insurance Company ("Gemini") issued primary Products Insurance Policy Number GL_12089-4 for the September 26, 2016 to September 26, 2017 policy year (the "2016-17 Gemini Policy"), which has a limit of liability of $10 million and a self-insured retention of $25 million. ECF No. 310-6.

The 2016-17 Gemini Policy states in Coverage Part A – Products Completed Operations Liability that it will provide coverage for "all damages that the insured becomes legally obligated to pay for bodily injury or property damage included within the products completed operations hazard."[3] ECF No. 311-2 ¶ 40; ECF No. 310-6 at 37. Coverage applies only when the claim for bodily injury or property damage is first made during the policy period or extended reporting period and the injury occurs between the retroactive date and the policy end date or, if applicable, extended coverage period. ECF No. 311-2 ¶ 41.

#### 2. *The Excess Policies*

The first excess policy above the 2016-17 Gemini Policy is Ironshore Excess Policy No. 001160205, which was issued for the September 26, 2016 to September 26, 2017 policy year (the "2016-17 Ironshore Policy") and has a limit of liability of $15 million above $35 million in combined underlying limits and retentions. *Id.* ¶ 53; ECF No. 315-19. The 2016-17 Ironshore Policy follows form to the underlying 2016-17 Gemini Policy, subject to any additional terms, conditions of, and endorsements attached to the 2016-17 Ironshore Policy. ECF No. 311-2 ¶¶ 53–54.

---

[3] The policy marks defined words in bold. For readability, the Court omits the use of bold text.

The 2016-17 Ironshore Policy provides coverage for "those sums that the Insured becomes legally obligated to pay as Loss in excess of the Underlying Limits," but which "must be attributable to an Occurrence." *Id.* ¶ 55. Coverage applies only when the Claim is first made during the Policy Period and the injury takes place between the retroactive date and policy end date or, if applicable, extended coverage period. *Id.* ¶ 56. The second through fifth layer excess policies were issued by Underwriters, TDC, Newline, and Starstone. Like the 2016-17 Ironshore Policy, the 2016-17 Underwriters, TDC, Newline and Starstone Policies follow form to the 2016-17 Gemini Policy, subject to each of their own additional terms, conditions, and endorsements. *Id.* ¶ 57.

### 3. *The Underlying PI/NAS Opioid Claims*

As discussed, the Trustee alleges that the 2016–2017 products insurance policies provided coverage for lawsuits brought by or on behalf of individuals for personal injury claims and claims related to neo-natal abstinence syndrome that were allegedly caused by opioids ("PI/NAS Claims"). ECF No. 113 ¶¶ 87, 122. Three of the PI/NAS Claims were filed against Endo during the 2016-17 policy period:

### a. The *Hughes* Lawsuit

The first claim, filed on September 20, 2017, is titled *Linda Hughes, mother of decedent, Nathan Hughes v. Mallinckrodt Brand Pharmaceuticals, Inc., et al.*, Circuit Court of the City of St. Louis, State of Missouri, No. 1722-CC11044 (the "*Hughes* Lawsuit"). ECF No. 310-3. The claim alleges that plaintiff's son, Nathan Hughes, died of an opioid overdose on July 9, 2016. *Id.* at 2; ECF No. 311-2 ¶ 9. The complaint alleged that the defendants, including Endo, "employed and used deception in connection with the sale and advertisement of opioid medications," "falsely marketed their opioid medications to Nathan Hughes as safe for the treatment of chronic pain," and "conceal[ed], suppress[ed], or omitt[ed] the material fact that prolonged use of opioid medications carries an unreasonably high risk of addiction and death." ECF No. 311-2 ¶ 10; ECF

6

No. 310-3 at 17–18. Hughes asserts claims for strict products liability, negligence, violation of the Missouri Merchandising Practices Act, and fraudulent misrepresentation. ECF No. 311-2 ¶ 15; *see* ECF No. 310-3.

### b.   The *Staubus* Lawsuit

The second claim, filed on June 13, 2017, is titled *Barry Staubus, et al. v. Purdue Pharma, L.P., et al.*, Circuit Court for Sullivan County at Kingsport, Tennessee, Case No. C41916 (the "*Staubus* Lawsuit"). ECF No. 310-1. The lawsuit asserts a NAS claim on behalf of "Baby Doe," alleging that Baby Doe was born addicted to opioids as a result of a "concerted effort" by Endo and the other defendants "to mislead doctors and the public about the need for, and addictive nature of, opioid drugs." *Id.* at 3; ECF No. 311-2 ¶ 17. The claim sought damages under the Drug Dealer Liability Act, Tenn. Code Ann. § 29-38-106(a)(2), and for statutory and common law nuisance. ECF No. 311-2 ¶ 26; *see* ECF No. 310-1.

### c.   The *Lewis* Lawsuit

The third claim, filed on June 29, 2017, is titled *Michael Ray Lewis v. Purdue Pharma L.P., et al.*, United States District Court for the Western District of Arkansas, Docket No. 5:17-cv-05118 (the "*Lewis* Lawsuit"). ECF No. 310-2. Filed by Michael Ray Lewis, who alleges that he became addicted to opioids after being prescribed painkillers in 2005, the lawsuit sought class certification for two putative classes: one sought damages for individuals prescribed a defendant company's opioid who required medical treatment for overdose or addiction, and the other sought medical monitoring for all persons prescribed such opioids for any reason during a five-year period. *Id.* at 56; ECF No. 311-2 ¶¶ 27–28. The complaint alleges that, dating back to the late 1990s, Endo and the other defendants "began a marketing scheme designed to persuade doctors and patients that Opioids can and should be used for chronic pain, a far broader group of patients much more likely

to become addicted and suffer other adverse effects from the long-term use of Opioids." ECF No. 311-2 ¶ 29; ECF No. 310-2 at 3. As a result of the defendants' actions, Lewis alleged that he became addicted to opioids. ECF No. 311-2 ¶ 32; ECF No. 310-2 at 9. The claim alleges violations of Arkansas's Deceptive Trade Practices Act, unjust enrichment, and states a claim for medical monitoring and other injunctive relief. ECF No. 311-2 ¶ 33; *see* ECF No. 310-2.

## C. Procedural History

After the Trustee brought the above captioned action on August 15, 2024, the matter was stayed with respect to some Defendant-insurers—Endurance Specialty Insurance Ltd., Liberty Specialty Markets Bermuda Limited, and Markel International Insurance Company Limited—because these Defendants invoked arbitration clauses in their insurance policies. *See* ECF Nos. 138, 139, 140. Certain claims were also stayed against Defendant Ironshore Specialty Insurance Company because some of its policies contained arbitration clauses, which Ironshore invoked. *See* ECF No. 214 at 1 & n.1; *see also* ECF No. 213-1 at 2 n.1. With respect to all other claims and Parties, the case proceeded.

On June 10, 2025, the Court held an initial pretrial conference, at which the Parties identified certain key ("bellwether") issues in the litigation and agreed to propose early summary judgment briefing schedules on these issues. *See* ECF No. 281 at 1. The Parties subsequently identified bellwether issues and proposed summary judgment briefing deadlines, which the Court adopted. *See* ECF Nos. 286, 287, 288, 289. As relevant here, the bellwether issues identified for the 2016–2017 tower are as follows:

> **1. Claims-Made Requirement, Batching, and Extended Reporting.** Whether the individual opioid lawsuits were claims first made during the applicable policy period, including whether the lawsuits are subject to "batching" or other provisions that bring them within the policy period;

**2. Notice.** Whether notice of the individual opioid lawsuits was provided to the insurers "as soon as practicable" or otherwise as provided under the affected policies, and whether any deficient notice means that the insurers are not obligated to provide defense or indemnity for the opioid claims;

**3. Occurrence Requirement and Fortuity-Based Exclusions.** Whether the opioid lawsuits allege an "occurrence" within the meaning of the affected policies, and whether the lawsuits' allegations fall within the policies' exclusions for expected or intended injuries, intentional acts, or similar exclusions;

**4. Prior Knowledge.** Whether, based on the opioid lawsuits' allegations or prior reporting of claims, the insured knew of facts prior to the policy period that affect whether the insurers are obligated to provide defense or indemnity for the opioid claims.

ECF No. 288 at 2.

Pursuant to the briefing schedules, Defendants moved for summary judgment with respect to the bellwether issues on August 8, 2025. *See* ECF No. 314 (Defendants' motion regarding commercial general liability policies); ECF No. 316 (Defendants' motion regarding 2013–2014 tower); ECF No. 311 (Defendants' motion regarding 2016–2017 tower); ECF No. 312 (Defendants' motion regarding 2017–2018 tower); ECF No. 306 (Defendants the LSR Underwriters' motion); ECF No. 308 (Defendant Gemini Insurance Company's motion regarding 2016–2017 tower); ECF No. 309 (Defendant Gemini Insurance Company's motion regarding 2017–2018 tower). The Trustee filed its opposition briefs and cross-moved for summary judgment on October 6, 2025. *See* ECF No. 339 (cross-motion regarding commercial general liability policies); ECF No. 339-29 (accompanying opposition and cross-motion brief); ECF No. 341 (cross-motion regarding the three products policy towers); ECF No. 349 (accompanying opposition and cross-motion brief).[4] Defendants filed reply briefs on November 20, 2025 and

---

[4] The sealed version of the Trustee's opposition brief was originally filed at ECF No. 344, but that version of the brief did not contain complete pagination. A version with complete pagination was

November 25, 2025. *See* ECF Nos. 357, 358, 359, 360, 361, 362, 365, 368, 374, 375. The Trustee filed sur-reply briefs on December 19, 2025, *see* ECF No. 379 (sur-reply brief regarding the products policy towers); ECF No. 381 (sur-reply brief regarding commercial general liability policies), and Defendants filed responses to the sur-reply briefs on January 30, 2026, *see* ECF Nos. 388, 389.

Defendants' summary judgment motions regarding the 2016–2017 Products Policy Tower (ECF No. 307, 308, 311), and the Trustee's Cross-Motion (ECF No. 341), are now before this Court.

## II.    LEGAL STANDARD

Summary judgment is proper when the moving parties demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, "[s]ummary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (internal quotations omitted). The Court is not to engage in "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" as those are functions that are reserved for the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is considered "material" if it could "affect the outcome of the suit under the governing law." *Id.* at 248. Where applicable, a party may move for summary judgment on a claim based on a pure question of law. *See Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

---

refiled at ECF No. 349, and the Parties cite to this docket entry when referring to the Trustee's opposition brief.

The party seeking summary judgment has the initial burden "of informing the district court of the basis for its motion," and identifying the specific information on the record that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has satisfied its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). The nonmoving party must demonstrate more than a "mere existence of a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252. "Conjecture and speculation will not create a genuine issue of material fact." *Wiest v. Tyco Elec. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016). Indeed, the non-movant is not permitted to "rely on unsupported allegations, but must go beyond pleadings and provide some evidence" showing a genuine dispute exists for trial. *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). If the record, taken as a whole, would not "lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587 (internal quotations omitted).

## III.    DISCUSSION

### A. Any PI/NAS Claims Made After the 2016-17 Policy Period Are Not Covered Under the 2016-17 Products Policies

The 2016-17 Products Policies provide "claims made" coverage.[5] Under a "claims made" policy, coverage is available only for claims that were first made during the policy period or, if applicable, an extended reporting period and the injury occurs between the retroactive date and the

---

[5] The primary 2016-17 policy, issued by Gemini Insurance Company, provides "claims made" coverage, ECF No. 308 at 8; ECF No. 310-6, and the excess policies follow form to—or follow form to other policies that follow form to—the underlying 2016-17 Gemini Policy, ECF No. 311-1 at 11–12; ECF No. 315-19 at 3; ECF No. 315-20 at 5; ECF No. 315-21 at 9; ECF No. 315-22 at 25; ECF No. 315-23 at 6.

policy end date or, if applicable, the extended coverage period. ECF No. 310-6 at 37. "Claims made" policies are different than "occurrence" policies, which provide coverage for all claims arising from injuries that take place during the relevant policy period regardless of when the claim is actually made. *See Lehigh Valley Health Network v. Exec. Risk Indemn., Inc.*, No. 1999-cv-5916, 2001 WL 21505, at *7 (E.D. Pa. Jan. 10, 2001). Because there is a fixed date for the end of an insurer's exposure under a claims made policy, an insurer assumes less risk under a claims made policy than under an occurrence policy, allowing insurers to issue claims made policies for lower premiums. *Id.*

"The threshold issue under a claims-made policy is whether the claims were first made during the effective dates of the policies." *Home Ins. Co. v. Law Offices of Jonathan DeYoung, P.C.*, 32 F. Supp. 2d 219, 224 (E.D. Pa. 1998). Here, it is undisputed that only three PI/NAS claims were first made against Endo during the 2016-17 policy period: *Hughes, Staubus,* and *Lewis*. ECF No. 315 ¶ 21; ECF No. 308-1 ¶ 7; *see* ECF No. 349 at 85. All other PI/NAS claims do not qualify for coverage under the 2016-17 Products Policies because Endo did not elect to batch the PI/NAS Claims pursuant to the Batch Claims Coverage Endorsement and the extended reporting period provisions are not applicable. The 2016-17 Gemini Policy includes a Batch Claims Coverage Endorsement that allows Endo to designate future claims alleging "loss connected to" a "critical fact" first identified during the policy period as a "batch claim," thereby tethering such claims to the 2016-17 policy period. ECF No. 310-6 at 25–28. Endo never batched any PI/NAS or other opioid claims under the 2016-17 Gemini Policy.[6] ECF No. 308-1 ¶¶ 20–21. And none of the

---

[6] The Court notes that the Trustee does not develop an argument for batching in his opposition, stating instead that he cannot "rule out [the] possibility" of coverage based on batching "without further discovery," in light of the early nature of the summary judgment briefing. ECF No. 349 at 114 n.94. The Trustee points out, for instance, that Defendants have not produced correspondence with Endo regarding "notice of any batched claims under the Batch Coverage Endorsement." *Id.*

extended reporting periods provided for by the 2016-17 Gemini Policy were available to Endo to cover claims made after the policy period.

> 1. *The Basic Extended Reporting Period Does Not Provide Coverage for Claims Made After the 2016-17 Policy Period*

The 2016-17 Gemini Policy provides for a Basic Extended Reporting Period ("BERP") that allows coverage for certain claims made outside the policy period when one of three limited requirements is met. ECF No. 310-6 at 16. The BERP is part of an endorsement to the 2016-17 Gemini Policy (the "Extended Reporting Endorsement") that also provides for a Supplemental Extended Reporting Period ("SERP") that Endo may choose to purchase prior to the expiration of the policy period. *Id.* at 17. The Extended Reporting Endorsement contains three sections: Section 1 details "When Extended Reporting Periods Apply," Section 2 describes the "Basic Extended Reporting Period," and Section 3 describes the "Supplemental Extended Reporting Period." *Id.* at 16–17. Section 1 states that:

a. Extended reporting periods apply to all claims-made coverages where:

(1) This Policy is canceled or not renewed by you or by us;

(2) We renew or replace this Policy with insurance that:

(a) Has a retroactive date later than the date shown in the Declarations; or

(b) Does not apply to loss covered on a claims-made basis; or

(3) The First Named Insured purchases EXTENDED COVERAGE as set forth above.

---

at 129. Given the current posture of the case, further briefing on batching may be required after more discovery is completed. As set forth in the accompanying Order, the Parties shall confer and address the impact of the Court's summary judgment rulings.

*Id.* at 16. The plain language of Section 1 clearly delineates that there are only three circumstances under which an extended reporting period will apply to cover claims made after the policy period. Under Pennsylvania law,[7] insurance policies are contracts governed by "traditional principles of contract interpretation." *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). Courts must interpret the policy as a whole and "give unambiguous terms [in the policy] their plain meaning," unless there is evidence of a contrary trade usage or industry custom. *See Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, 687 F.3d 620, 623 (3d Cir. 2012).

The Trustee attempts to argue that Section 1 of the Extended Reporting Endorsement acts only as a limitation upon Section 3 and not upon Section 2. ECF No. 349 at 101–07. The Trustee's primary basis for this argument is that Section 2 states that "[a] basic extended reporting period is *automatically* provided without additional charge." *Id.* at 102–03; ECF No. 310-6 at 16 (emphasis added). According to the Trustee, because the word "automatic" is not defined in the insurance policy, it takes on its ordinary meaning, which, as defined by the Oxford English Dictionary, is "self-acting; having the power of motion within itself." ECF No. 349 at 102–03; *Automatic*, Oxford English Dictionary, https://www.oed.com/dictionary/automatic_adj (last visited Jan. 13, 2026). The Trustee goes on to argue that Section 2 "does not state that the BERP applies only if the policy is canceled or non-renewed, among other triggering events," and so, "the BERP stands alone and must be construed according to its terms, clearly stating that a BERP goes into effect automatically upon the expiration of the policy period." ECF No. 349 at 103.

However, Section 2 did not need to state that the BERP applies only under certain conditions because Section 1 supplied the conditions under which both the BERP and the SERP

---

[7] The Parties agree that the 2016-17 Products Policies are governed by Pennsylvania law. *See* ECF No. 311-1 at 22 n.7.

are available. The Trustee contends that while Section 2 stands alone solely because of the word "automatically," Section 3 remains subject to the limitations of Section 1 because Section 3 does not state that the SERP applies "automatically." *Id.* at 104. This argument is unavailing because reading Section 2 in conjunction with the other sections in the Extended Reporting Endorsement, it is clear that the statement "[a BERP] is automatically provided without additional charge" means that unlike the SERP, which is an extended reporting period that would only be available if Endo elects to pay for it, the BERP is available to Endo for free. Because the SERP requires an additional payment in order to be available to Endo, the SERP is not "automatically provided." Both the BERP and the SERP, however, are subject to the limitations of Section 1 and as such, both extended reporting periods are only available to Endo when certain conditions are met. This interpretation of the word "automatically" in Section 2 allows the Extended Reporting Endorsement to be read "as a whole and give[s] effect to the whole [endorsement]." *See Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 143 (3d Cir. 2023). Indeed, even the Trustee seems to endorse this meaning of the word "automatically" in Section 2, stating that "neither [the SERP nor the Extended Coverage Period] applies automatically but [are policies] that Endo instead could have opted to purchase." ECF No. 349 at 104.

The Trustee's other arguments that Section 1 does not apply as a limitation to Section 2 are similarly unpersuasive. For example, the Trustee notes that there is no mention of limitations or conditions in Section 2 regarding the applicability of the BERP and states that Gemini could have included language to explicitly link the BERP in Section 2 to Section 1 if it had intended to restrict the BERP by Section 1's limitations. *Id.* at 103. However, as Gemini points out in its sur-reply, there is no language in Section 3 linking the SERP to Section 1 yet the Trustee nonetheless maintains that Section 1 applies in full force to the SERP. ECF No. 374 at 9; ECF No. 349 at 104.

15

The Trustee also argues that the definitions section of the 2016-17 Gemini Policy proves that the BERP operates independently of the other sections in the Extended Reporting Endorsement. ECF No. 349 at 104. This argument is a bit difficult to follow, and an examination of the definitions of the various terms used in the Extended Reporting Endorsement—including "basic extended reporting period," "supplemental extended reporting period," "extended reporting period," and "extended coverage period"—does not show that the BERP is intended to always be available upon expiration of the policy period. The definitions are consistent with a BERP that is only available when one of the conditions specified in Section 1 is satisfied.[8]

Thus, the BERP is only available if (1) the 2016-17 Gemini Policy is canceled or not renewed; (2) the 2016-17 Gemini Policy is replaced with a policy that has a retroactive date later than the one specified in the 2016-17 Policy or that is not a claims made policy; or (3) Endo purchases extended coverage. None of the three conditions was met with respect to the 2016-17 Gemini Policy, and so the Trustee cannot use the BERP to save the PI/NAS Claims that were first made after the 2016-17 Policy Period.

---

[8] Section 1 of the Extended Reporting Endorsement states that "extended reporting period**s** apply to all claims-made coverage" under the three conditions listed. ECF No. 310-6 at 16 (emphasis added). Section 1 uses the plural form for "extended reporting periods." The 2016-17 Gemini Policy defines "extended reporting period" as "the period of time commencing immediately following the expiration of the policy period or, if applicable, the extended coverage period, and extending until the expiration date of the extended reporting period set forth in the Policy or as amended by endorsement." *Id.* at 75. "Basic extended reporting period" is defined as "the period of time commencing immediately following the policy period and lasting for sixty (60) days." *Id.* at 71. "Supplemental extended reporting period" means "the period of time commencing upon the expiration of the basic extended reporting period and lasting until the end of the supplemental extended reporting period as set forth in the Policy or by endorsement." *Id.* at 80. The definitions of both the "basic extended reporting period" and "supplemental extended reporting period" clearly fall within the definition of the general "extended reporting period"; if anything, the definition of "basic extended reporting period" matches up better with that of "extended reporting period" than that of "supplemental extended reporting period." Thus, the definitions provided for in the 2016-17 Gemini Policy help prove that Section 1 of the Extended Reporting Endorsement was intended to apply to both Sections 2 and 3.

## 2. *The 2017-18 Gemini Policy Was a Renewal of the 2016-17 Gemini Policy*

The Trustee does not dispute that the renewal policy, the 2017-18 Gemini Policy, has the same retroactive date as the 2016-17 Gemini Policy and provides claims made coverage, or that Endo never purchased extended coverage under the 2016-17 Gemini Policy. ECF No. 315 ¶ 22; *compare* ECF No. 310-7 (2017-18 Gemini Policy), *with* ECF No. 310-6 (2016-17 Gemini Policy); ECF No. 310 ¶ 67. Even so, the Trustee argues in the alternative that under Pennsylvania law, the 2016-17 Gemini Policy was not "renewed" because Gemini "substantially altered the scope of coverage available under" the 2017-18 Gemini Policy such that it should not be deemed a "renewal." ECF No. 349 at 108. The term "renewal policy" is defined in the 2016-17 Gemini Policy as "a life science liability policy issued to you by us where we have provided continuous, uninterrupted, substantially similar coverage to you from the initial coverage date to the commencement of the policy period." ECF No. 310-6 at 79. There are only two notable changes between the 2016-17 Gemini Policy and the 2017-18 Gemini Policy: the later policy (1) offered $5 million in limits, down from $10 million under the prior policy, and (2) changed the premium. ECF No. 341-5 ¶¶ 96–98; *compare* ECF No. 310-7, *with* ECF No. 310-6. The premium price of the renewal policy went down from that of the earlier policy, ECF No. 341-5 ¶ 98, which makes sense given the lower policy limits of the 2017-18 Gemini Policy. Although the coverage limit was reduced under Endo's primary policy, the Gemini Policy, for the 2017-18 policy year, the same total limit of coverage was nonetheless maintained in Endo's overall tower of insurance through follow-form excess policies. ECF No. 315 ¶¶ 22–30, 35–41. Thus, while notable, the two changes to the 2017-18 Gemini Policy are not material and the 2017-18 Gemini Policy satisfies the definition of "renewal policy" under the 2016-17 Gemini Policy because it provides "continuous, uninterrupted, substantially similar coverage." *See* ECF No. 310-6 at 79.

The Trustee's reliance on *Indian Harbor Insurance Co. v. F & M Equipment, Ltd.*, 804 F.3d 310 (3d Cir. 2015), to support its argument that the 2017-18 Gemini Policy was not a "renewal" is misplaced. The "renewal" policy at issue in *Indian Harbor* contained four significant changes that materially altered the terms of the policy: (1) reducing the length of coverage offered from ten years to one year; (2) reducing the policy limits from $14 million to $5 million; (3) eliminating coverage for one of twelve previously insured sites; and (4) changing the premium. *Id.* at 312, 315. In contrast, the 2017-18 Gemini Policy included only two minor changes that did not curtail the scope and length of coverage in the way that the policy in *Indian Harbor* did. *See id.* at 315. And although the 2017-18 Gemini Policy provided for a lower coverage limit, Endo still received the same overall amount of coverage through a tower of excess policies. The Third Circuit in *Indian Harbor* stated that "it is clear under our precedent that a renewal need not be identical to the original." *Id.* While the Trustee faults the 2017-18 Gemini Policy for not containing the exact same terms as the previous policy, it does contain terms that are substantially similar to those in the previous policy, and as such, constitutes a "renewal" of the 2016-17 Gemini Policy.

In any case, Endo's acceptance of the 2017-18 Gemini Policy, including the changed terms, constitutes a renewal. Circuit courts across the country have held that "the knowing acceptance of a successor policy with different terms constitutes a renewal of the prior policy." *Am. Cas. Co. of Reading, Pa. v. Baker*, 22 F.3d 880, 893 (9th Cir. 1994) (collecting cases from the 1st, 3rd, 8th, and 10th circuits reaching the same conclusion). "Even in a state where 'renewal' is strictly defined as 'continuation of coverage on the same, or nearly the same, terms as the policy being renewed,' acceptance of new terms constitutes a renewal." *Am. Cas. Co. of Reading, Pa. v. Continisio*, 17 F.3d 62, 66 (3d Cir. 1994) (applying New Jersey law). The Court in *Indian Harbor* ruled that "for a contract to be considered a renewal, it must contain the same, or nearly the same, terms as the

18

original contract," applying Pennsylvania law. 804 F.3d at 311, 313. Because Endo accepted the terms of the 2017-18 Gemini Policy, the 2017-18 policy constituted a renewal of the 2016-17 Gemini Policy and as such, none of the conditions of Section 1 of the Extended Reporting Endorsement was met and the BERP is not applicable to the PI/NAS Claims made outside the 2016-17 policy period.

### 3. PI/NAS Claims Filed After the 2016-17 Policy Period Do Not Qualify as Losses "Associated With" a Critical Fact

Even if the changes in the 2017-18 Gemini Policy were material enough such that the 2017-18 Gemini Policy would be considered a non-renewal, the BERP would still not save the later-filed PI/NAS Claims because those claims are not "losses" "associated with" a "critical fact." The Extended Reporting Endorsement provides that when available, a BERP lasts for six years "for loss associated with a critical fact provided that the critical fact is reported to [Gemini] within sixty (60) days of the expiration of the policy period." ECF No. 310-6 at 16. "Loss" is defined in the 2016-17 Gemini Policy as "bodily injury, . . . personal injury . . . or any other loss, injury, damage or expense covered by this Policy." *Id.* at 77. A "critical fact" is defined, in relevant part, as "a verbal or written demand for any damages which would be covered under this Policy." *Id.* at 72. Following from these definitions, a six-year BERP would apply to injuries "associated with" a demand for damages if that demand is reported to the insurer within sixty days of the end of the policy period.

During the 2016-17 Policy Period, Endo reported one PI/NAS Claim to Gemini, the *Staubus* Lawsuit. ECF No. 341-5 ¶ 46; ECF No. 349 at 110. Using the *Staubus* Lawsuit as the reported critical fact, the Trustee seeks coverage for all PI/NAS Claims filed after the 2016-17 Policy Period because the later-filed claims are "associated with" the *Staubus* Lawsuit in that the later claims and *Staubus* all assert "a common set of facts, circumstances, or events." ECF No. 349

at 113. The Trustee's interpretation of the BERP provision contravenes the plain meaning of the terms in the BERP. As discussed above, the BERP applies to injuries "associated with" a single demand for damages. Injuries asserted in the later-filed PI/NAS Claims are not associated with the *Staubus* Lawsuit because the later claims allege distinct bodily injuries suffered by individual plaintiffs who are not the plaintiffs named in *Staubus.* The Trustee attempts to circumvent this straightforward meaning of the BERP by claiming that the phrase "associated with" is broad enough to sweep in all later-filed claims involving injuries that were caused by the same facts and circumstances that caused the injuries alleged in *Staubus*. *Id.* at 112–113. That sweeping meaning of "associated with" is in tension with the use of "associated with" in other parts of the policy— namely, the exclusions section. That section states that "[w]here an exclusion applies to loss, it shall also apply to any covered defense costs associated with such loss." ECF No. 310-6 at 56. The exclusions section envisions a close relationship between a "loss" and corresponding "defense costs." *See id.* The ordinary meaning of the exclusions language is that where an exclusion applies, it bars coverage both for the liability stemming from a loss and the cost of defending against the loss.

According to the Trustee, though, the phrase "associated with" means something far broader. *See* ECF No. 349 at 112–13. As the Trustee sees it, defense costs could be associated with a loss, even if they were not "directly tied" to the loss, if they are connected by the same general factual backdrop—for instance, if the defense costs were incurred in an entirely different suit involving the opioid epidemic. *See id.* Such a reading of the exclusions clause is strained, would sweep in numerous loosely connected defense costs, and defies the ordinary meaning of the exclusions section. And because the exclusions clause's use of "associated with" envisions a close relationship between a loss and defense costs, the basic extended reported period's use of

"associated with" does too. *See Volk v. Ace Am. Ins. Co.*, 748 F.3d 827, 829 (8th Cir. 2014) (stating that a term used multiple times in a contract must generally be given the same meaning throughout). To support his argument that "associated with" is broad enough to sweep in subsequent injuries caused by the same facts and circumstances that caused the injuries alleged in an earlier claim, the Trustee cites cases finding that "associated with" is equivalent to the phrases "relating to" and "in connection with."[9] ECF No. 349 at 112. Yet, the injuries suffered by individuals in later claims are still not "related to" or "connected with" separate injuries suffered by separate individuals in an earlier lawsuit.

In conclusion, the BERP cannot be used to extend coverage to PI/NAS Claims filed after the 2016-17 Policy Period because those claims do not involve losses associated with the *Staubus* Lawsuit, which is the only critical fact reported during the 2016-17 Policy Period. In any event, the BERP was not even available to Endo following the end of the 2016-17 Policy Period because

---

[9] The cases cited by the Trustee interpret language other than the phrase "associated with." *See CAMICO Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP*, No. 11-cv-4753, 2013 U.S. Dist. LEXIS 91649, at *25 (E.D. Pa. June 27, 2013) (interpreting "arising from, related to or in connection with," and noting that the different parts of this phrase should be interpreted to have different meaning); *ACE Cap. Ltd. v. Morgan Waldon Ins. Mgmt., LLC*, 832 F. Supp. 2d 554, 570–71 (W.D. Pa. 2011) (interpreting phrase "based upon, arising out of, directly or indirectly relating to or in any way involving"); *Phoenix Leasing, Inc. v. Sure Broad., Inc.*, 843 F. Supp. 1379, 1388 (D. Nev. 1994) (interpreting "with respect to" in the phrase "any action brought on or with respect to this agreement," and making no mention of "associated with" at all), *aff'd*, 89 F.3d 846 (9th Cir. 1996) (summarily affirming). And to the extent these cases mention the phrase "associated with," they do so in passing by quoting the same excerpt of the same case—*Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123 (2d Cir. 2001). *See Ace Cap. Ltd.*, 832 F. Supp. 2d at 570–71 (quoting *Coregis Ins. Co.*, 241 F.3d at 128–29); *Camico Mut. Ins. Co.*, 2013 U.S. Dist. LEXIS 91649, at *25 (quoting *Ace Cap. Ltd.*, 832 F. Supp. 2d at 570–71 (quoting *Coregis Ins. Co.*, 241 F.3d at 128–29)). But in *Coregis*, the court interpreted the phrase, "[a]rising out of, based upon or related to," and it relied on the fact that each part of this phrase should be given independent meaning. 241 F.3d at 124, 128; *cf. Witzke v. Femal*, 376 F.3d 744, 753 (7th Cir. 2004) (concluding that the Prison Litigation Reform Act's use of multiple terms in a list reflected an intent to broaden the reach of the statute). Moreover, it mentioned the phrase "associated with" only in passing and to shed light on the meaning of "related to." *Coregis*, 241 F.3d at 128–29. Neither *Coregis*, nor other authority cited by the Trustee, tips the scales toward the Trustee's reading.

the 2016-17 Gemini Policy was renewed, so none of the conditions set forth in the Extended Reporting Endorsement for triggering the BERP was met. Having found that all PI/NAS Claims made after the 2016-17 Policy Period are not covered under the BERP, or any other provision of the 2016-17 Gemini Policy, the Court declines to comment on any other arguments made by the Parties pertaining to the availability of or scope of the BERP.

### B. The Three PI/NAS Claims First Made During the 2016-17 Policy Period Are Covered Under the 2016-17 Products Policies

There are three PI/NAS claims that were first made against Endo during the 2016-17 policy period: *Hughes, Staubus,* and *Lewis*. ECF No. 315 ¶ 21; ECF No. 308-1 ¶ 7. The Products Insurers attempt to avoid coverage for these three claims by arguing that the claims do not fit the definition of an "occurrence" and are subject to a number of exclusions under the 2016-17 Products Policies. ECF No. 311-1 at 22–31; ECF No. 308 at 19–22; ECF No. 307 at 10–15. For the reasons stated below, these arguments are unavailing.

#### 1. *Hughes, Staubus, and Lewis Allege Covered "Occurrences"*

For claims to be covered, the 2016-17 excess policies require that the damages "must be attributable to an occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." ECF No. 311-2 ¶¶ 42, 55; ECF No. 315-19 at 6; ECF No. 310-6 at 78. Under Pennsylvania law, "the term 'accident' within insurance policies refers to an unexpected and undesirable event occurring unintentionally." *Busby v. Steadfast Ins. Co.*, 420 F. Supp. 3d 289, 292 (E.D. Pa. 2019) (citing *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 292 (Pa. 2007)). "[I]t is well established that the test of whether the injury or damage is caused by an accident must be determined *from the perspective of the insured*." *Nationwide Mut. Fire Ins. Co. of Columbus v. Pipher*, 140 F.3d 222, 226 (3d Cir. 1998).

So, to determine whether the damages alleged in *Hughes, Staubus,* and *Lewis* stem from

22

accidents, the Court must reason from the perspective of Endo whether the injuries asserted by plaintiffs in the three cases were "unexpected and entirely fortuitous." *See Baumhammers*, 938 A.2d at 293. As explained in the Trustee's sur-reply, as a manufacturer of opioids, Endo could not have expected that its "lawful and regulated sale of opioid products" would lead to an unprecedented public health crisis resulting in injuries like those suffered by the plaintiffs in *Hughes, Staubus,* and *Lewis. See* ECF No. 379 at 21–22. Moreover, each of the three lawsuits alleges negligent conduct by Endo, and "injuries caused by negligence are considered to be the result of 'accidents' within the meaning of insurance policies." *Allstate Prop. & Cas. Ins. Co. v. Fischer*, No. 12-cv-6946, 2013 WL 6145248, at *4 (E.D. Pa. Nov. 20, 2013).

The Products Insurers focus on the lawsuits' allegations of Endo's "deliberate business conduct" to argue that Endo's actions were intentional and not accidental. ECF No. 311-1 at 25. The Products Insurers assert that other courts have found that similar allegations do not describe "accidents" but only cite to cases from the Ninth Circuit and California. *Id.* at 23–27. In emphasizing the allegations detailing deliberate actions by Endo, the Products Insurers disregard the allegations describing negligent or unintentional actions by Endo, which appear in each of the three lawsuits. The complaint in *Hughes* states a claim for negligence and alleges that "[a]s a direct and proximate result of one, several, or all of the foregoing acts of *negligence* on the part of Defendant Drug Companies, Plaintiff claims such damages as the trier of fact may deem fair and just." ECF No. 310-3 at 16 (emphasis added). The complaint in *Staubus* alleges that "[t]he Manufacturer Defendants knowingly, intentionally, recklessly, and/or *negligently* disseminated massive quantities of prescription opioids." ECF No. 310-1 at 78 (emphasis added). The complaint in *Lewis* also alleges unintentional conduct because it involves a cause of action for violation of the Arkansas Deceptive Trade Practice Act ("ADTPA"), which does not require knowledge or

23

intent to establish. *See Curtis Lumber Co. v. La. Pac. Corp.*, 618 F.3d 762, 776, 780 (8th Cir. 2010) ("[C]laims pursuant to [the ADTPA] do not require knowing or intentional deception. . . . The ADTPA claims are viable despite the lack of evidence regarding [defendant's] knowledge of a false or deceptive practice or it's specific intent to deceive.").

Because *Hughes, Staubus,* and *Lewis* all involve allegations of negligence or unintentional conduct, the three lawsuits allege "occurrences" covered by the 2016-17 excess policies. "[A]n insurer's duty to defend an action brought against its insured is to be determined solely by the allegations contained in the plaintiff's pleadings." *Pipher*, 140 F.3d at 225. Even when a complaint asserts a cause of action sounding in intentional conduct, such as an intentional tort, as long as the complaint also asserts a theory of recovery sounding in negligence, the duty to defend is triggered for an insurance policy that covers occurrences. *State Farm Fire & Cas. Co. v. Corry*, 324 F. Supp. 2d 666, 672–73 (E.D. Pa. 2004) (finding that insurer owed a duty to defend where a complaint alleged both intentional conduct and negligent acts by insured); *Britamo Underwriters, Inc. v. Emerald Abstract Co., Inc.*, 855 F. Supp. 793, 798 (E.D. Pa. 1994) ("[A]n insurer is obliged to defend the entire claim if some of the allegations in the complaint fall within the terms of coverage and others do not.") (internal quotation marks and citation omitted). Thus, to the extent the 2016-17 excess policies are triggered (if the Trustee can show that Endo has exhausted its self-insured retention and the underlying policies), the *Hughes, Staubus,* and *Lewis* Lawsuits are covered under the 2016-17 excess policies.

### 2. The Intentional, Fraudulent or Criminal Acts Exclusion Does Not Bar Coverage of the PI/NAS Claims

The 2016-17 Products Insurers argue that coverage for the three PI/NAS Claims made during the 2016-17 Policy Period is barred by the "Intentional, Fraudulent or Criminal Acts"

24

exclusion in the 2016-17 Gemini Policy. ECF No. 311-1 at 27–29; ECF No. 308 at 22.[10] This exclusion bars coverage for loss "based upon or arising out of" any criminal or fraudulent acts, intentional non-compliance with the law, or "[a]ny other act intended by the insured to cause loss." ECF No. 310-6 at 60. As discussed above, each of the three timely-filed PI/NAS Claims asserts causes of action sounding in negligence or unintentional conduct, and "negligence claims do not fall within policy exclusions for injuries 'expected or intended' by the insured." *Fischer*, 2013 WL 6145248, at *4. Moreover, Pennsylvania law provides that an insurance policy's exclusion for intended loss "applies only when the insured intended to cause a harm. Insurance coverage is not excluded because the insured's actions are intentional unless he also intended the resultant damage." *Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 432 F. Supp. 2d 488, 511 (E.D. Pa. 2006) (citation omitted). "An insured intended to cause harm if it desired to cause the consequences of his act or if [it] acted knowing that such consequences were substantially certain to result." *Id.* (alteration in original) (internal quotation marks and citation omitted).

Here, the *Hughes, Staubus,* and *Lewis* Lawsuits allege negligent conduct by Endo that resulted in the plaintiffs' injuries, and to the extent the three lawsuits allege intentional acts by Endo, the lawsuits do not allege that Endo desired to cause the plaintiffs' injuries or knew that the plaintiffs' injuries were substantially certain to result from its actions. As for the 2016-17 Products Insurers' argument that the criminal acts exclusion applies because Endo pled guilty to engaging in criminal misconduct in its marketing activities, ECF No. 311-1 at 29, Endo's admission in its plea agreement with the Department of Justice was limited to admitting that certain sales representatives made false statements about one of Endo's opioid products to prescribers during

---

[10] Gemini incorporates the arguments in the 2016-17 Products Insurers' brief in support of their motion for summary judgment (ECF No. 311-1) by reference.

sales calls and that certain sales managers were aware that the sales representatives were making such false statements, ECF No. 311-2 ¶ 52. Endo's sales representatives and sales managers do not qualify as "Insured Representatives," which is defined by the 2016-17 Gemini Policy as "the insured's executive officers; the members of the legal department and risk management departments of the insured; and any person(s) designated by the insured as responsible for claims reporting or insurance matters." ECF No. 310-6 at 76. According to the "Intentional, Fraudulent or Criminal Acts" exclusion, only acts by an "Insured Representative" trigger the application of the exclusion against Endo. *Id.* at 60. Thus, this exclusion does not bar coverage for the *Hughes, Staubus,* and *Lewis* Lawsuits.

### 3. The Consumer Fraud Exclusion Does Not Bar Coverage of the PI/NAS Claims

Gemini argues that coverage for the *Hughes, Staubus,* and *Lewis* Lawsuits is barred by the 2016-17 Gemini Policy's "Consumer Fraud" exclusion. ECF No. 308 at 19–22. This exclusion eliminates coverage for loss based upon allegations of antitrust violation, unfair competition, piracy, unfair trade practices, consumer fraud, or violation of consumer protection laws. ECF No. 310-6 at 56. And if a lawsuit alleges antitrust violation, unfair competition, or piracy, among other causes of action, then the entire lawsuit is precluded from coverage by the exclusion, even if some of the causes of action would have otherwise been covered by the policy. *Id.* at 56–57. Gemini points to another opioid case in a different district court in which it succeeded in denying coverage based on this exclusion. ECF No. 308 at 20. The case, *Travelers Property Casualty Co. of America. v. Anda, Inc.*, involved an underlying suit by the State of West Virginia against Anda, a distributor of prescription drugs, that contained a count for unfair competition for "Violations of the West Virginia Consumer Credit and Protection Act (WVCCPA)—Unfair Methods of Competition or Unfair or Deceptive Acts or Practices." 90 F. Supp. 3d 1308, 1315 (S.D. Fla. 2015). The underlying

complaint in *Anda* included a cause of action for unfair competition, which distinguishes the case from the three PI/NAS Claims at issue in the instant case.

The *Hughes, Staubus,* and *Lewis* Lawsuits do not allege unfair competition as a distinct cause of action. *See* ECF Nos. 310-3, 310-1, 310-2. And the lawsuits do not concern antitrust violations or piracy. In an attempt to shoehorn allegations in the lawsuits into the unfair competition category of the Consumer Fraud exclusion, Gemini identifies allegations from each lawsuit dealing primarily with deceptive marketing and misleading advertising, which are different from allegations of unfair competition. As such, the Consumer Fraud exclusion does not bar coverage of the three timely-filed PI/NAS Claims in full. To the extent that the three lawsuits involve loss based upon the other three categories listed in the Consumer Fraud exclusion—unfair trade practices, consumer fraud, or violation of consumer protection laws—coverage for such losses may be barred by the exclusion, but that remains an issue to be investigated in discovery.

    4.   *The Known Critical Facts Reporting Requirement, the Previous Claim Exclusion, and the Prior Event Exclusion Do Not Bar Coverage of the PI/NAS Claims*

The 2016-17 Products Insurers argue that the 2016-17 Gemini Policy's Known Critical Facts Reporting Requirement excludes coverage for the three timely-filed PI/NAS Claims based on a lawsuit against Endo filed in 2014, *Brown v. Endo Pharms., Inc.*, 38 F. Supp. 3d 1312 (S.D. Ala. 2014). ECF No. 311-1 at 30–31. The Known Critical Facts Reporting Requirement bars coverage for "any loss connected to a critical fact known by an Insured Representative prior to the inception date of this Policy" unless the critical fact is "set forth in an endorsement listing covered known critical facts" or the critical fact first became known after the initial coverage date and was reported to Gemini prior to the policy's inception date. ECF No. 310-6 at 47. Pursuant to the Requirement, "[l]oss is connected to a critical fact if such loss arises out of the critical fact, or if the facts and circumstances resulting in the critical fact also resulted in the loss." *Id.* As discussed

27

in Part III.A.3, *supra,* a "critical fact" is defined as "a verbal or written demand for any damages which would be covered under this Policy." *Id.* at 72. The 2016-17 Products Insurers maintain that *Brown v. Endo* was a critical fact known by Endo and therefore bars coverage for the later-filed PI/NAS Claims. ECF No. 361 at 12–15.

The six-page complaint in *Brown* alleges a wrongful death action against Endo and a nurse who allegedly sold Opana to the decedent and brings claims solely under Alabama's wrongful death statute. ECF No. 315-27. The *Brown* complaint alleges that Endo knew its Opana product was defective because it was susceptible to tampering and failed to remove it from distribution. *Id.* at 5. *Brown* did not involve other opioid products and contains no allegations about Endo's efforts "to flood the statewide market with opioids or conceal from the public the attendant risks of addiction, abuse, and fatal overdose." ECF No. 379 at 24. The *Hughes, Staubus,* and *Lewis* Lawsuits involved multiple defendants and opioid products and alleged claims beyond wrongful death, including infant injury and death resulting from NAS, medical malpractice, products liability, public nuisance, and violations of various state laws. *See* ECF Nos. 310-3, No. 310-1, 310-2. Comparing the allegations in *Brown* to those in the *Hughes, Staubus,* and *Lewis* Lawsuits, it is evident that the narrow facts and circumstances surrounding *Brown*—Endo's negligence regarding the sale of one of its products—did not result in the injuries suffered by the plaintiffs in the later-filed lawsuits, which the lawsuits contend resulted from the distribution of additional opioid products and targeted marketing campaigns by Endo. Accordingly, *Brown* does not suffice as a known critical fact that would bar coverage of later-filed PI/NAS claims.

The Underwriters at Lloyd's London separately argue that their policy contains a "Previous Claim" exclusion and a "Prior Event" exclusion, both of which bar coverage. ECF No. 307 at 10–15. Defendant TDC's 2016-2017 excess policy incorporates the Underwriters' policy, ECF No.

315-21 at 9, and TDC joins in the Underwriters' arguments, ECF No. 313 at 2. Neither exclusion in the Underwriters' policy prohibits coverage here. The "Previous Claim" exclusion bars coverage for claims "arising out of or related to a claim" that "was reported to [the insurer] or any other insurer under any previous policy." ECF No. 315-20 at 35. The Underwriters argue that the personal injury lawsuits "relate to" a government lawsuit by the State of Mississippi because the Mississippi suit includes the same general allegations "about the conduct of Endo and other opioid manufacturers" that the subsequent personal injury suits also contain. ECF No. 307 at 14. Such suits are not "related" for the purposes of the "previous claims" exclusion. Claims by a state like Mississippi, seeking to recover budgetary losses linked to opioid abuse in its state, have nothing to do with claims of personal injuries alleged by individual plaintiffs. Thus, the Underwriters have failed to show that the "previous claim" exclusion applies here.

Under the Underwriters' "Prior Event" exclusion, claims are excluded from coverage when they involve (1) "'[i]njury or damage' arising out of an event; (2) when that event "was first discovered or known before the policy period" by the insured; and the event (3) "[s]hould reasonably have been expected . . . to result in a claim against you or any other insured," "[i]s covered by other insurance or would have been covered but for the exhaustion of [the policy]," "[w]as reported by any insured to another insurance company prior the policy period," or "[i]s listed" on the insured's insurance application. ECF No. 315-20 at 35–36. And an event is defined by the Underwriters' policy, in relevant part, as "an occurrence, offense, accident, act, or other event." *Id.* at 12.

The Underwriters argue only that the prior event here "is the 'opioid epidemic.'" ECF No. 307 at 10. But an epidemic is not a single event, unlike an "occurrence," "accident," "act" or "offense." *See* ECF No. 315-20 at 12. The opioid epidemic therefore does not qualify as an event

29

under the plain language of the exclusion. *Cf. Allen v. Boeing Co.*, 784 F.3d 625, 629 (9th Cir. 2015) (interpreting the phrase "event or occurrence" under the Class Action Fairness Act to "appl[y] only where all claims arise from a *single* event or occurrence"). Accordingly, neither exclusion applies.

### 5. *Public Policy Does Not Bar Coverage of the PI/NAS Claims*

Finally, Gemini argues that allowing coverage for the PI/NAS Claims would be against Pennsylvania public policy. ECF No. 374 at 21–23. "Pennsylvania bars insurance coverage where relieving an insured of personal accountability for their wrongdoing would contravene a clear mandate of Pennsylvania public policy." *Rosenberg v. Hudson Ins. Co.*, 638 F. Supp. 3d 510, 521 (W.D. Pa. 2022). Courts applying Pennsylvania law have refused to enforce insurance contracts on public policy grounds for claims based upon intentional torts and criminal acts. *See, e.g.*, *Cigna Corp. v. Exec.. Risk Indem., Inc.*, 111 A.3d 204 (Pa. Super. 2015) (barring coverage for intentional acts); *Fed. Ins. Co. v. Sandusky*, No. 11-02375, 2012 WL 1988971, at *3-4 (M.D. Pa. June 4, 2012) (barring coverage for claim of child abuse); *Nautilus Ins. Co. v. Motel Mgmt. Servs., Inc.*, 320 F. Supp. 3d 636, 643 (E.D. Pa. 2018), *aff'd on other grounds*, 781 F. App'x 57 (3d Cir. 2019) (barring coverage for human trafficking allegations); *Germantown Ins. Co. v. Martin*, 595 A.2d 1172, 1175 (Pa. Super. Ct. 1991) (barring coverage where underlying complaint alleged murder). The case cited by Gemini, *Mutual Benefit Insurance Co. v. Haver*, involved allegations against a pharmacist for distributing controlled substances to individuals without prescriptions, which the court characterized as "evil or illegal conduct." 725 A.2d 743, 747 (Pa. 1999).

The types of claims for which courts have excluded coverage on the basis of public policy involve intentional harm or criminal acts, which are not at issue in the PI/NAS Claims. As discussed earlier when assessing the applicability of the Intentional, Fraudulent or Criminal Exclusion, Endo's actions as alleged in the *Hughes, Staubus,* and *Lewis* Lawsuits do not rise to the

30

level of intentional acts as defined by the case law. Therefore, permitting coverage of the three PI/NAS Claims filed during the 2016-17 Policy Year is not contrary to Pennsylvania public policy.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** in part and **DENY** in part Defendants' Motions for Summary Judgment (ECF Nos. 307, 308, 311) on bellwether issues. The Court will grant the Motions (ECF Nos. 307, 308, 311) as to Defendants' argument that all PI/NAS Claims first made after the 2016-17 policy period are not covered under the 2016-17 Products Policies. The Court will deny the Motions (ECF Nos. 307, 308, 311) with respect to Defendants' argument that the three PI/NAS Claims first made during the 2016-17 policy period (the *Hughes, Staubus,* and *Lewis* Lawsuits) are not covered under the 2016-17 Products Policies. The Court will **DENY** the Trustee's Cross-Motion for Summary Judgment (ECF No. 341). An appropriate order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**