## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEW DUNDON, AS THE TRUSTEE OF THE ENDO GENERAL UNSECURED CREDITORS' TRUST, | : : : | Civil Action |
| *Plaintiff*, | : | |
| v. | : | |
| | : | No. 24-4221 |
| ACE PROPERTY AND CASUALTY INSURANCE COMPANY, et al., | : : | |
| *Defendants*. | : | |

### MEMORANDUM

**KENNEY, J.**                                                          **February 10, 2026**

Defendants Gemini Insurance Company, Ironshore Specialty Insurance Company, certain Underwriters at Lloyd's London (Catlin Syndicate Limited a/k/a AXA XL Syndicate Limited, Atrium Corporate Capital Limited, Chaucer Corporate Capital (No. 3) Limited, Hiscox Dedicated Corporate Member Limited, RenaissanceRe Corporate Capital (UK) Limited, and MS Amlin Corporate Member Limited), TDC Specialty Insurance Company, and Illinois Union Insurance Company move for summary judgment on each count of Plaintiff Matthew Dundon's Complaint as applied to the 2017–2018 insurance policy tower ("2017–2018 Products Policy Tower"). ECF Nos. 306, 309, 312; *see also* ECF No. 313 (joinder of Defendant TDC Specialty Insurance Company). Plaintiff Matthew Dundon cross moves for summary judgment (ECF No. 341). For the reasons set forth below, the Court will **GRANT** in part and **DENY** in part Defendants' Motions (ECF Nos. 306, 309, 312) and **DENY** Plaintiff's Cross-Motion for Summary Judgment (ECF No. 341).

### I.    BACKGROUND

#### A.  General Factual Background

This is an insurance coverage dispute arising from litigation over prescription opioids.

During the relevant period, non-party Endo International plc ("Endo") was a pharmaceutical company that manufactured opioid products. ECF No. 341-5 ¶¶ 10–11. In connection with its business operations, Endo obtained insurance coverage, including multiple products insurance policies in each of the following years: 2013–2014, 2016–2017, and 2017–2018. *See* ECF No. 315 ¶¶ 4–12, 22–23, 25–30, 35–41. Endo's insurance policies in each of these years formed an insurance "tower," with one policy serving as the primary policy and others providing layers of excess coverage. *See* ECF No. 316-1 at 12 (chart identifying 2013–2014 tower); ECF No. 311-2 ¶ 38 (chart identifying 2016–2017 tower); ECF No. 312-2 ¶ 67 (chart identifying 2017–2018 tower); *see also Pharmacia Corp. v. Arch Specialty Ins. Co.*, No. 22-2586, 2024 WL 208146, at *1 n.1 (3d Cir. Jan. 19, 2024) (defining an insurance tower as a structure in which "a primary insurer respond[s] first to any covered loss, and excess insurers respond[] in a predetermined order if the loss exceeds the [primary policy's] coverage" (first and second alterations in original) (citation omitted)). Endo also obtained multiple commercial general liability insurance policies from 2010–2022, in addition to the above products insurance policies. *See* ECF No. 319 ¶ 1.

### 1. *The Underlying Opioid Litigation and Bankruptcy Action*

Based on Endo's role in manufacturing and promoting opioids, various state and local governments, third parties, and individuals sued Endo and its affiliates. *See* ECF No. 315 ¶¶ 1–3, 21, 42–49. By 2023, there were over 3,500 such suits. *See* ECF No. 319-10 at 50. Most relevant to the instant Motion are lawsuits brought by third-party payors. These include suits, among others, brought by unions such as IBEW Local 38 Health and Welfare Fund; hospitals such as Baptist Hospital, Inc. and Jay Hospital, Inc.; and insurers such as American Resources Insurance Company. *See Local No. 38 IBEW Health & Welfare Fund v. Purdue Pharma L.P.*, No. 17-op-45002 (N.D. Ohio); *Baptist Hosp., Inc. v. McKesson Corp.*, No. 17-cv-816 (N.D. Fla.); *Am. Res.*

2

*Ins. Co. v. Purdue Pharma. L.P.*, No. 18-cv-00145 (S.D. Ala.). The Parties agree that approximately 100 or fewer lawsuits were filed by third-party payor against Endo from 2017–2018 and that others were filed outside this period. *See* ECF No. 312-1 at 21; ECF No. 349 at 60–61.

After the above lawsuits were initiated, Endo filed for Chapter 11 bankruptcy before the U.S. Bankruptcy Court for the Southern District of New York on August 16, 2022. *See* ECF No. 341-3 ¶ 1; *see also In re Endo Int'l plc*, No. 22-22549 (Bankr. S.D.N.Y. Aug. 16, 2022). The bankruptcy court confirmed a reorganization plan, which, in conjunction with a trust agreement, provided for the formation of the Endo General Unsecured Creditors' Trust and the appointment of Plaintiff Matthew Dundon as trustee. *See* ECF No. 341-3 ¶ 1; ECF No. 315 ¶¶ 54–55. The reorganization plan provides for "full and final satisfaction, settlement, release, and discharge of" numerous opioid claims. *See* Fourth Amended Plan at 99–102, *In re Endo Int'l plc*, No. 22-22549 (Bankr. S.D.N.Y. Mar. 18, 2024).

2. *The Trustee's Instant Suit Against Certain Insurers*

On August 15, 2024, Plaintiff, as trustee of the Endo General Unsecured Creditors' Trust (hereinafter, "the Trustee"), brought the instant action for a declaratory judgment and breach of contract against certain insurers that issued policies to Endo. ECF No. 1; *see also* ECF No. 113 (operative complaint). The Complaint alleged that Defendants were obligated to cover Endo's liability, defense costs, and settlement payments arising from the above opioid litigation.[1] *See* ECF No. 113 ¶¶ 119, 139. Specifically, the Trustee alleged that three products policy towers and Endo's

---

[1] The Complaint also alleged that certain Defendants were obligated to cover Endo's liability and defense costs related to litigation over transvaginal surgical mesh products and products containing ranitidine. *See* ECF No. 113 ¶¶ 73, 107, 119. However, the instant Motions concern only coverage for the cost of opioid litigation. The Trustee voluntarily dismissed coverage claims related to ranitidine, *see* ECF No. 249 at 2–3; ECF No. 250 at 2–3, and the claims seeking coverage for surgical mesh litigation are subject to a separate briefing scheduling. *See* ECF No. 346 at 1–3.

commercial general liability policies provided coverage for various opioid lawsuits:

1. The 2013–2014 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by state and local governments. *See id.* ¶ 122.

2. The 2016–2017 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by individuals. *See id.* ¶¶ 87, 122.

3. The 2017–2018 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by third-party payors. *See id.*

4. The commercial general liability policies issued from 2010–2022, which the Trustee alleged provided coverage for the opioid lawsuits in connection with "Unbranded Promotional Activities." *See id.* ¶¶ 112, 135, 139.

The 2017–2018 products insurance policies are most relevant to the instant Motions (ECF Nos. 306, 309, 312) and are discussed below. [2]

**B. The 2017–2018 Products Insurance Policies**

1. *The Primary Policy*

The primary policy for the 2017–2018 year was issued by Gemini Insurance Company and ran from September 26, 2017 to September 26, 2018. *See* ECF No. 315-28 at 2, 4. That policy (No. GL 12089-5) covers, in relevant part, "all damages that the insured becomes legally obligated to pay for bodily injury or property damage" and "all defense costs to defend a claim seeking such damages." *Id.* at 28.[3] And it defines bodily injury to mean physical injuries, sicknesses, or diseases

---

[2] Defendants filed separate summary judgment motions and briefing with respect to each of the above four categories of insurance coverage. *See infra* Section I.B. The Court likewise issues separate summary judgment rulings for each category of coverage. *See* Commercial General Liability Summary Judgment Order & Opinion; 2013–2014 Tower Summary Judgment Order & Opinion; 2016–2017 Tower Summary Judgment Order & Opinion.

[3] The policy marks defined words in bold. For readability, the Court omits the use of bold text.

"sustained by a person," as well as any resulting "[m]ental anguish, shock or humiliation" or death. *Id.* at 62. The policy also explicitly recognizes that an "organization" or another person can claim damages "for care, loss of services, or death resulting . . . from the bodily injury." *Id.* at 38.

The primary policy contains certain notice and timing requirements. Among them, a claim for bodily injury must be "first made against the insured during the policy period," or any applicable "extended reporting period." *Id.* at 28. And the bodily injury itself has to take place either "before the end of the policy period or, if applicable, the extended coverage period." *Id*. Another section of the policy, which specifies the duties of the policyholder, requires the policyholder to include in its notice of "an occurrence, offense, critical fact or loss" the "names and addresses of any injured persons" to "the extent possible." *See id.* at 59.

The primary policy also has an extended reporting period endorsement, which is comprised of three sections: "1. When Extended Reporting Periods Apply," "2. Basic Extended Reporting Period," and "3. Supplemental Extended Reporting Period." *Id.* at 11–12. As relevant here, the first section, "When Extended Reporting Periods Apply," identifies certain criteria, such as policy cancellation or non-renewal, under which "[e]xtended reporting periods apply to all claims-made coverage." *Id.* at 11. The second section, "Basic Extended Reporting Period," states that a basic extended reporting period "is automatically provided without additional charge" and lasts (1) for six years "for loss associated with a critical fact," if the insured reports the critical fact within sixty days of the policy's expiration, or (2) for sixty days "for any other loss."[4] *Id.* The third section, "Supplemental Extended Reporting Period" provides an additional extended reporting period if it is purchased or where the insured has purchased an extended coverage period. *Id.* at 11–12. The Trustee does not argue that Endo is entitled to a supplemental extended reporting period here. *See*

---

[4] A "critical fact" is defined in relevant part by the policy as "[a] verbal or written demand for any damages which would be covered under this Policy." ECF No. 315-28 at 63.

5

*generally* ECF No. 349.

2.  *The Excess Policies*

Following the primary policy, there are six excess layers of coverage. These layers, in order, were issued by the following Defendants:

- Ironshore Specialty Insurance Co., which issued Policy No. 001160206. ECF No. 315-29 at 3.
- Gemini Insurance Company, which in addition to the primary policy, issued Policy No. EX_15281-1. ECF No. 315-30 at 2.
- Certain Underwriters at Lloyd's London, which issued Policy No. LSR-XS-00285-17. ECF No. 315-31 at 5.
- TDC Specialty Insurance Company, which issued two excess policies: Policy No. LSX-00024-17-00, ECF No. 315-32 at 2, and Policy No. LSX-00001-17-01, ECF No. 315-33 at 2.
- Illinois Union Insurance Company, which issued Policy No. XSP G46817837 001. ECF No. 315-34 at 3.

The excess policies default to incorporating the terms of the primary policy or of policies that follow the primary policy, but the excess policies state that their own provisions prevail over another policy's terms. *See* ECF No. 315-29 at 3, 5; ECF No. 315-30 at 10, 17; ECF No. 315-31 at 5, 8; ECF No. 315-32 at 6, 10; ECF No. 315-33 at 6, 10; ECF No. 315-34 at 9–11.

3.  *Exclusions Specific to the Underwriters at Lloyd's London*

As relevant here, the excess policy issued by the Underwriters at Lloyd's London contains exclusions for previous claims and prior events. *See* ECF No. 315-31 at 33. The previous claims provision excludes coverage for any (1) "[n]ew or additional claims, plaintiffs[,] or new (or subsequent) 'injury or damage'" when (2) "arising out of or related to a claim" that (3) "was reported to [the insurer] or any other insurer under any previous policy." *Id.*

The prior events provision excludes coverage for (1) "'[i]njury or damage' arising out of an 'event'"; (2) when that event "was first discovered or known before the policy period" by the insured; and the event (3) "[s]hould reasonably have been expected . . . to result in a claim against

you or any other insured," "[i]s covered by other insurance or would have been covered but for the exhaustion of [the policy]," "[w]as reported by any insured to another insurance company prior to the policy period," or "[i]s listed" on the insured's insurance application. *Id.* at 33–34. The policy defines event as "an occurrence, offense, accident, act, or other event, to which the applicable 'controlling underlying insurance' applies." *Id.* at 12.

### C. Procedural History

After the Trustee brought the instant action on August 15, 2024, the matter was stayed with respect to some Defendant-insurers—Endurance Specialty Insurance Ltd., Liberty Specialty Markets Bermuda Limited, and Markel International Insurance Company Limited—because these Defendants invoked arbitration clauses in their insurance policies. *See* ECF Nos. 138, 139, 140. Certain claims were also stayed against Defendant Ironshore Specialty Insurance Company because some of its policies contained arbitration clauses, which Ironshore invoked. *See* ECF No. 214 at 1 & n.1; *see also* ECF No. 213-1 at 2 n.1. With respect to all other claims and Parties, the case proceeded.

On June 10, 2025, the Court held an initial pretrial conference, at which the Parties identified certain key ("bellwether") issues in the litigation and agreed to propose early summary judgment briefing schedules on these issues. *See* ECF No. 281 at 1. The Parties subsequently identified bellwether issues and proposed summary judgment briefing deadlines, which the Court adopted. *See* ECF Nos. 286, 287, 288, 289. As relevant here, the bellwether issues identified for the 2017–2018 tower are as follows:

1. **Damages "Because of Bodily Injury."** Whether the underlying third-party payor opioid lawsuits seek to recover damages "for" or "because of bodily injury," or as otherwise specified in the insurance policies;

2. **Claims-Made Requirement, Batching, and Extended**

**Reporting.** Whether the third-party payor opioid lawsuits were claims first made during the applicable policy period, including whether the lawsuits are subject to "batching" or other provisions that bring them within the policy period; and

3. **Notice.** Whether notice of the third-party payor opioid lawsuits was provided to the insurers "as soon as practicable" or otherwise as provided under the affected policies, and whether any deficient notice means that the insurers are not obligated to provide defense or indemnity for the opioid claims.

ECF No. 289 at 2.

Pursuant to the briefing schedules, Defendants moved for summary judgment with respect to the bellwether issues on August 8, 2025. *See* ECF No. 314 (Defendants' motion regarding commercial general liability policies); ECF No. 316 (Defendants' motion regarding 2013–2014 tower); ECF No. 311 (Defendants' motion regarding 2016–2017 tower); ECF No. 312 (Defendants' motion regarding 2017–2018 tower); ECF No. 306 (Defendants the Underwriters at Lloyd's London's motion); ECF No. 308 (Defendant Gemini Insurance Company's motion regarding 2016–2017 tower); ECF No. 309 (Defendant Gemini Insurance Company's motion regarding 2017–2018 tower). The Trustee filed his opposition briefs and cross-moved for summary judgment on October 6, 2025. *See* ECF No. 339 (cross-motion regarding commercial general liability policies); ECF No. 339-29 (accompanying opposition and cross-motion brief); ECF No. 341 (cross-motion regarding the three products policy towers); ECF No. 349 (accompanying opposition and cross-motion brief).[5] Defendants filed reply briefs on November 20, 2025 and November 25, 2025. *See* ECF Nos. 357, 358, 359, 360, 361, 362, 365, 368, 374, 375. The Trustee filed sur-reply briefs on December 19, 2025, *see* ECF No. 379 (sur-reply brief regarding products

---

[5] The sealed version of the Trustee's opposition brief was originally filed at ECF No. 344, but that version of the brief did not contain complete pagination. A version with complete pagination was refiled at ECF No. 349, and the Parties cite to this docket entry when referring to the Trustee's opposition brief.

policy towers); ECF No. 381 (sur-reply brief regarding commercial general liability policies), and Defendants filed responses to the sur-reply briefs on January 30, 2026, *see* ECF Nos. 388, 389.

Defendants' summary judgment motions regarding the 2017–2018 Products Policy Tower (ECF Nos. 306, 309, 312), and the Trustee's cross-motion (ECF No. 341), are now before this Court.

## II.    <u>LEGAL STANDARD</u>

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In making such a showing, the movant bears the initial burden "of informing the district court of the basis for its motion," and identifying specific parts of the record that establish "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied this burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)). Likewise, where applicable, a party may move for summary judgment on a claim based on a pure question of law. *See Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

While district courts should not "needlessly" encourage "piecemeal litigation," motions for summary judgment may be limited to certain issues in the case, such as only certain claims or "part[s] of [a] claim or defense." *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 606 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). Such a motion "can serve [as]a useful brush-clearing" of the case and "facilitate the resolution of the remainder of the case through settlement" under appropriate circumstances. *Id.*

### III.    DISCUSSION

The 2017–2018 Tower Defendants move for summary judgment on certain bellwether issues relevant to insurance coverage for third-party payor lawsuits. ECF Nos. 306, 309, 312. Defendants argue that many third-party payor suits are not covered because they were filed after the 2017–2018 policy period and do not meet the requirements of the policies' basic extended reporting periods. *See* ECF No. 312-1 at 21–25. They also argue that none of the third-party payor lawsuits seek "damages . . . for bodily injury," as required by the insurance policies. *Id.* at 25–27. The Underwriters at Lloyd's London also argue that their policy's exclusions for previous claims and prior events apply here, defeating coverage under their policy. *See* ECF No. 307 at 10–15. The Trustee cross-moves for summary judgment on the issue of the basic extended reporting period and on whether the third-party payor lawsuits seek damages for bodily injury. *See* ECF No. 341 at 1.

These arguments require interpreting the 2017–2018 insurance policies, which the Parties agree are governed by Pennsylvania law. *See* ECF No. 312-1 at 6 n.2. Under Pennsylvania law, insurance policies are contracts governed by "traditional principles of contract interpretation." *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). These principles require courts to interpret the policy as a whole and "give unambiguous terms [in the policy] their plain meaning," unless there is evidence of a contrary trade usage or industry custom. *See Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, 687 F.3d 620, 623 (3d Cir. 2012). If a term is ambiguous, courts may rely on extrinsic evidence to resolve the ambiguity. *See Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001). Any terms which remain ambiguous must be construed in favor of the insured. *See Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 322 (3d Cir. 2011).

With this framework in mind, the Court turns to the Parties' arguments.

## A. Basic Extended Reporting Period

The 2017–2018 policies are claims made policies, which cover claims "made against the insured during the policy period." *See* ECF No. 315-28 at 3 (capitalization omitted); ECF No. 312-1 at 5 ("[T]he 2017-18 Products Policies only apply to claims made against Endo and reported to Endo's insurers between September 26, 2017 to September 26, 2018."). It is undisputed that the Trustee seeks coverage for claims filed after the 2017–2018 policy period. *See* ECF No. 349 at 99. To overcome that hurdle, the Trustee points to the policy's basic extended reporting period, ECF No. 315-28 at 11, which extends coverage under certain circumstances. *See* ECF No. 349 at 99–100. But because the Trustee does not meet the basic extended reporting period's requirements, coverage for suits filed after the policy period is unwarranted.

The specific section of the basic extended reporting period at issue here is its requirement for a "loss" to be "associated with a critical fact," *see* ECF No. 315-28 at 11. The basic extended reporting period applies, among other circumstances, when the "Policy is . . . not renewed by you or by us," and it extends coverage to claims made against the insured within (1) six years after the end of the policy period "for loss associated with a critical fact,"[6] and (2) 60 days "for any other loss." *Id.* Defendants concede that the 2017–2018 primary policy was not renewed, thereby satisfying the threshold requirement for the basic extended reporting period to apply. *See* ECF No. 362 at 5 & n.3. However, Defendants argue that the Trustee cannot benefit from the basic extended reporting period's six-year window because claims filed after the policy period are not "for loss associated with a critical fact." *See* ECF No. 312-1 at 23–25; *see also* ECF No. 315-28 at 11. In

---

[6] There is an additional requirement for the six-year window to apply, which is that the "critical fact" must be reported within 60 days of the policy period. ECF No. 315-28 at 11. However, Defendants do not argue that the Trustee failed to meet the 60-day reporting requirement.

particular, Defendants argue that claims filed after the policy period do not involve loss "associated with" third-party payor suits filed during the policy period, which are the critical facts to which the Trustee points here. *See* ECF No. 312-1 at 23–25.

The phrase "loss associated with a critical fact" requires a close relationship between a "loss" and a "critical fact." To interpret this phrase, the Court begins with the text of the basic extended reporting period. Though "associated with" is not defined by the policy, the meaning of "critical fact"—which is defined by the policy—is significant. *See* ECF No. 315-28 at 11; *cf. Pa. Lab. Rels. Bd. v. Altoona Area Sch. Dist.*, 389 A.2d 553, 557 (Pa. 1978) ("'Associated with' must be interpreted within the context of the statute in which it appears."). It requires a loss asserted by a claim filed outside the policy period to be linked in some capacity to a specific "demand for damages" made during the policy period. *See* ECF No. 315-28 at 63 (defining "critical fact" as a "demand for any damages which would be covered under this Policy"). The policy's focus, therefore, is not on whether a loss is linked to some common problem or set of facts. Rather, a loss must be "associated with" a specific request for relief.[7] *See id.* at 11, 63. And the relief sought by each third-party payor suit is circumscribed: The third-party payor suits seek to recover specific costs, such as the cost of union members' opioid prescriptions or hospital patients' treatments. *See, e.g.*, ECF No. 315-35 at 65; ECF No. 315-38 ¶ 251. To prevail, the plaintiffs in these suits must establish that the Defendants caused harm to their organizations and in their localities. An opioid epidemic elsewhere affecting some other persons would not suffice for any such individual demand for damages.

As the Trustee would interpret it, though, each later-filed third-party payor suit—for instance by a hospital operator in Maine, ECF No. 315-42—alleges losses associated with an

---

[7] The policy also defines loss, which it states is any "injury, damage or expense" or "other loss" that is "covered by this Policy." ECF No. 315-28 at 68.

12

earlier, unrelated suit—such as a class action on behalf of Ohio unions to recover the cost of unnecessary opioid prescriptions, ECF No. 315-35 ¶ 17 & at 65—because the suits stem from one nationwide opioid epidemic. *See* ECF No. 349 at 113. That sweeping meaning of "associated with" is in tension with the use of "associated with" in other parts of the policy—namely, the exclusions section. That section states that "[w]here an exclusion applies to loss, it shall also apply to any covered defense costs associated with such loss." ECF No. 315-28 at 47. The exclusions section envisions a close relationship between a "loss" and corresponding "defense costs." *See id.* The ordinary meaning of the exclusions language is that where an exclusion applies, it bars coverage both for the liability stemming from a loss and the cost of defending against the loss.

According to the Trustee, though, the phrase "associated with" means something far broader. *See* ECF No. 349 at 112–13. As the Trustee sees it, defense costs could be associated with a loss, even if they were not "directly tied" to the loss, if they are connected by the same general factual backdrop—for instance, if the defense costs were incurred in an entirely different suit involving the opioid epidemic. *See id.* Such a reading of the exclusions clause is strained, would sweep in numerous loosely connected defense costs, and defies the ordinary meaning of the exclusions section. And because the exclusions clause's use of "associated with" envisions a close relationship between a loss and defense costs, the basic extended reported period's use of "associated with" does too. *See Volk v. Ace Am. Ins. Co.*, 748 F.3d 827, 829 (8th Cir. 2014) (stating that a term used multiple times in a contract must generally be given the same meaning throughout).

The policy's batch claims endorsement further disfavors the Trustee's reading of "loss associated with a critical fact." Like the basic extended reporting period, the batch claims endorsement addresses "loss" and "critical facts" but it uses different language to link these terms.

It extends coverage to "batch claims" which the policy defines as claims "that allege[] a loss connected to a batched critical fact."[8] ECF No. 315-28 at 16, 18. The Court presumes that "associated with a critical fact" and "connected to a [] critical fact" have different meanings under the policy. *See Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156–57 (10th Cir. 2007) ("When a contract uses different language in proximate and similar provisions, we commonly understand the provisions to illuminate one another and assume that the parties' use of different language was intended to convey different meanings."); *Owners Ins. Co. v. Fid. & Deposit Co.*, 41 F.4th 956, 959 (8th Cir. 2022); *cf. Commonwealth v. Berryman*, 649 A.2d 961, 969 (Pa. Super. Ct. 1994) (referring to "the rule that different language has different meaning" as a principle of "statutory construction"). And the policy defines "connected to a [] critical fact" broadly, stating that "[a] loss is connected to a batched critical fact if": (1) the loss "arises out of the batched critical fact," or (2) "the facts and circumstances resulting in the batched critical fact also resulted in the loss." [9] ECF No. 315-28 at 18. Had the parties intended for third-party payor claims resulting from the same facts and circumstances to qualify under the basic extended reporting period, they could have used the phrase "connected to" in that section. *See id.* However, the policy's broad use of "connected to" in the batch claims endorsement and narrower use of

---

[8] A batched critical fact is simply "a critical fact for which the [insured] has elected batch claims coverage" by following the policy's notice requirements. ECF No. 315-28 at 18.

[9] Defendants also argue that the Trustee cannot rely on "batching" provisions in the policies to invoke coverage for later-filed suits. *See* ECF No. 312-1 at 21–22. However, the Trustee does not develop an argument for batching in his opposition, stating instead that he cannot "rule out [the] possibility" of coverage based on batching "without further discovery," in light of the early nature of the summary judgment briefing. ECF No. 349 at 114 n.94. The Trustee notes, for instance, that Defendants have not produced correspondence with Endo regarding "notice of any batched claims under the Batch Coverage Endorsement." *Id.* at 129.

In light of the Court's ruling on bodily injuries *infra* Section III.B, further briefing on batching may not be required. Nonetheless, the Parties shall confer and address the impact of the Court's summary judgment rulings, as set forth in the accompanying Order.

"associated with" in the exclusions section establishes that "loss associated with a critical fact" has a more restrictive meaning under the policy.

On this point, the Trustee argues that the basic extended reporting and batch claims periods cover different claims. *See* ECF No. 349 at 113 (arguing that these provisions "serve distinct and complimentary purposes"). As the Trustee notes, the basic extended reporting period covers losses occurring within the policy period (but for which claims are filed later), while the batch claims endorsement covers losses occurring after the policy period. *Compare* ECF No. 315-28 at 11 (stating that claims made "during the basic extended reporting period are covered provided that . . . [t]he loss takes place before the expiration of the policy period . . . .), *with id.* at 16, 18 (stating that batch claims are covered provided the injury or damage occurs "before the end of the batch claims period," defined as the five years after the policy expires). But that makes little difference. Because these provisions use different language to link similar terms—"loss" and "critical fact"— that language is presumed to have a different meaning. *See Penncro Assocs., Inc.*, 499 F.3d at 1156–57; *Owners Ins. Co.*, 41 F.4th at 959; *cf. Berryman*, 649 A.2d at 969. That is true even if the coverage afforded by those endorsements differs.

A narrower reading of "loss associated with a critical fact" than the one the Trustee advances is further reinforced by how "associated with" is used in other contexts and by judicial opinions. *See United States v. Schuster*, No. 24-2942, --- F.4th ----, 2026 WL 100043, at *5 (3d Cir. Jan. 14, 2026) (stating that courts can look to how language is "used in statutes and judicial opinions" for evidence of how it should be interpreted). Courts have used "associated with" to convey a more direct relationship between two things. *See, e.g.*, *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 870 (3d Cir. 2022) (referring to "a list of numbers associated with student loan accounts"—that is, numbers directly pertaining to those accounts); *Sullivan v. Holy Redeemer*

15

*Hosp. & Med. Ctr.*, 263 A.3d 1159, 1164 (Pa. Super. Ct. 2021) (referring to a shoulder injury as "associated with the tetanus vaccine" when its symptoms occur within 48 hours of vaccination); *cf. Schuster*, --- F.4th ----, 2026 WL 100043, at *5 (noting that Third Circuit decisions and decisions of other courts of appeals use the term "relate" to describe a "direct relationship between two things"). So, too, in other contexts, "associated with" has been interpreted to require something closer than a mere connection. *See, e.g.*, *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 134 (2d Cir. 2005) (whether an attorney is "associated with" a firm for purposes of imputing conflicts "depends in part on the . . . extent of screening between the attorney and the firm," and whether that screening is adequate "depends in part on the closeness and extent" of the attorney's relationship with the firm). These cases reinforce that "loss associated with a critical fact" requires a direct relationship and not just some shared factual linkage.

The cases cited by the Trustee do not compel a different interpretation. *See* ECF No. 349 at 112 (citing cases). These cases interpret language other than the phrase "associated with." *See CAMICO Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP*, 2013 U.S. Dist. LEXIS 91649, at *25 (E.D. Pa. June 27, 2013) (interpreting "arising from, related to or in connection with," and noting that the different parts of this phrase should be interpreted to have different meaning); *ACE Cap. Ltd. v. Morgan Waldon Ins. Mgmt., LLC*, 832 F. Supp. 2d 554, 570–71 (W.D. Pa. 2011) (interpreting phrase "based upon, arising out of, directly or indirectly relating to or in any way involving"); *Phoenix Leasing Inc. v. Sure Broad., Inc.*, 843 F. Supp. 1379, 1388 (D. Nev. 1994) (interpreting "with respect to" in the phrase "any action brought on or with respect to this agreement," and making no mention of "associated with" at all), *aff'd on other grounds*, 89 F.3d 846 (9th Cir. 1996). And to the extent these cases mention the phrase "associated with," they do so in passing by quoting the same excerpt of the same case—*Coregis Ins. Co. v. Am. Health*

16

*Found., Inc.*, 241 F.3d 123 (2d Cir. 2001). *See ACE Cap. Ltd.*, 832 F. Supp. 2d at 570–71 (quoting *Coregis Ins. Co.*, 241 F.3d at 128–29); *CAMICO Mut. Ins. Co.*, 2013 U.S. Dist. LEXIS 91649, at *25–26 (quoting *ACE Cap. Ltd.*, 832 F. Supp. 2d at 570–71 (quoting *Coregis Ins. Co.*, 241 F.3d at 128–29)). But in *Coregis*, the court interpreted the phrase, "[a]rising out of, based upon or related to," and it relied on the fact that each part of this phrase should be given independent meaning. 241 F.3d at 126, 128; *cf. Witzke v. Femal*, 376 F.3d 744, 753 (7th Cir. 2004) (concluding that the Prison Litigation Reform Act's use of "multiple generic terms" in a list that was preceded by the word "any" reflected an intent to broaden the reach of the statute). Moreover, it mentioned the phrase "associated with" only in passing and to shed light on the meaning of "related to." *See Coregis*, 241 F.3d at 128–29. Neither *Coregis*, nor other authority cited by the Trustee, tips the scales toward the Trustee's reading.

Accordingly, later-filed third-party payor suits—such as by a hospital operator in Maine—do not allege losses "associated with" third-party payor suits filed during the policy period—such as a suit brought on behalf of Ohio unions. These suits involve different locales, different entities, and seek to recover different damages. Later-filed third-party payor suits therefore do not satisfy the requirements of the basic extended reporting period.[10] Third-party payor suits falling outside the policy period are thus not entitled to coverage.[11] And many suits falling inside the policy period

---

[10] Several Defendants make additional arguments about the basic extended reporting period that the Court need not reach. First, Defendant Gemini Insurance Company argues that "claims that were already made during the policy period" cannot serve as "critical facts" for the purposes of the basic extended reporting period. *See* ECF No. 309 at 12 (arguing that because the policy defines a critical fact as a "demand for any 'damages' which *would be covered* under this Policy," prior suits that are already covered cannot serve as critical facts (citation omitted)). Second, Defendants Ironshore Specialty Insurance Company and Illinois Union Insurance Company argue that their policies contain extended reporting period provisions that are more restrictive than that of the primary policy. *See* ECF No. 312-1 at 22–23. The Court declines to reach these arguments, in light of its above conclusions regarding the basic extended reporting period.

[11] Defendants Underwriters at Lloyd's London separately argue that their 2017–2018 policy was

are not entitled to coverage either because they do not seek damages for bodily injury, as discussed below.

### B. Damages "For Bodily Injury"

Defendants argue that the third-party payor lawsuits do not seek "damages . . . for bodily injury," as required by Endo's insurance policies, ECF No. 315-28 at 28.[12] *See* ECF No. 312-1 at 25–27. The Court first addresses which coverage standard—the duty to defend or duty to indemnify—governs this coverage dispute. It then turns to whether the underlying third-party payor suits seek damages for bodily injuries. Many of these suits do not seek damages for bodily injury, and Defendants have no duty to defend—and consequently no duty to indemnify—these

---

renewed and therefore no extended reporting period applies on this ground. *See* ECF No. 307 at 17. The Trustee does not directly dispute this argument. *See* ECF No. 349 at 117 & n.96 (addressing only the argument that the extended reporting period under the Underwriters' policy is five years rather than six years). However, the Trustee argues generally that non-renewal of the primary policy, or of policies that follow the primary policy—contained in a section of the primary policy titled "1. When Extended Reporting Periods Apply," is not a requirement for the basic extended reporting period, which appears in the subsection that immediately follows, titled "2. Basic Extended Reporting Period," *see* ECF No. 315-28 at 11. *See* ECF No. 349 at 101–03. Instead, according to the Trustee, because the policy states that the basic extended reporting period is "automatically provided without additional charge," ECF No. 315-28 at 11, the renewal and cancellation requirements of section 1 do not apply. *See* ECF No. 349 at 101–03, 117–18.

This argument fails. The plain language of section 1 is broad: It identifies "When Extended Reported Periods Apply." ECF No. 315-28 at 11. And it repeatedly uses the plural form of "extended reporting periods," while the following sections—"2. Basic Extended Reporting Period" and "3. Supplemental Extended Reporting Period"—use the singular. *See id.* This suggests that section 1 establishes requirements for both sections 2 and 3. The Trustee's reliance on the fact that the basic extended reporting period is provided "automatically . . . without additional charge," *id.*, is misplaced. *See* ECF No. 349 at 101. In this context, automatic is best read to mean without having to take additional steps, such as the notice requirements set forth for the supplemental extended reporting period. *See* ECF No. 315-28 at 12; *Berkley Assurance Co. v. Hunt Constr. Group*, 465 F. Supp. 3d 370, 378–79 (S.D.N.Y. 2020) (holding that an "automatic" reporting period still required cancellation or non-renewal of a policy and noting that "something can be 'automatic' without always being in effect").

[12] The insurance policies also establish coverage for claims for "property damage," ECF No. 315-28 at 28, but the Trustee does not argue that this language establishes coverage here, *see* ECF No. 349 at 37–99.

suits. However, some complaints would at least "potentially" seek damages for bodily injury, which suffices to trigger the duty to defend, as identified below.

1.  *The Duty to Defend Standard Applies*

The duty to defend, as opposed to the duty to indemnify, governs the Parties' coverage arguments at this stage.[13] *See* ECF No. 316-1 at 10 & n.7; ECF No. 349 at 34. An insurer must defend an insured's suit, or reimburse defense costs, "when [the underlying] complaint, on its face, alleges an injury that is at least *potentially* within an insurance policy's scope of coverage." *See Kramer v. Nationwide Prop. & Cas. Ins. Co.*, 313 A.3d 1031, 1039 (Pa. 2024) (emphasis added). In making that determination, courts must accept the allegations of the underlying complaint as true and compare the "four corners of the insurance contract to the four corners of the complaint." *Erie Ins. Exch. v. Moore*, 228 A.3d 258, 265 (Pa. 2020) (citation omitted). "[I]f any doubt or ambiguity exists, it must be resolved in favor of coverage." *Id.* And ordinarily, "to the extent there are undetermined facts that might [have an] impact on coverage, the insurer has a duty to defend until the claim is narrowed to one patently outside the policy coverage, for example through discovery [in the underlying suit]." *Id.* (citation omitted).

The Trustee argues that where an insurer has a duty to defend, and "the underlying lawsuits [are] settled," the insurer must also indemnify the suits. ECF No. 349 at 34. However, the effect of a duty to defend on a settled suit is fact specific. *See Am. States Ins. Co. v. State Auto Ins. Co.*,

---

[13] The 2017–2018 Tower Defendants briefly argue that the standard for determining whether there is a duty to indemnify applies because "the Trustee did not demand a defense" with respect to the underlying suits. ECF No. 312-1 at 20–21. However, it appears that the Trustee tendered a number of suits to insurers, and any issue of whether a particular suit was tendered is premature to decide on this early motion for summary judgment. *See* ECF No. 349 at 34–35 (listing example suits that were tendered). In any case, Defendants appear to abandon the argument about the duty to indemnify in their reply brief. *See* ECF No. 362 at 18 (stating only that "the 2017-18 Products Insurers have no duty to defend and therefore no duty to indemnify the TPP Opioid Claims under the 2017-18 Products Policies").

721 A.2d 56, 64 (Pa. Super. Ct. 1998). The duty to indemnify a settled lawsuit may follow from the duty to defend when the settlement makes it "impossible to determine if the [insurance] policy provided coverage" for the underlying suit—for instance, where a settlement both makes it impossible "to determine on what theories of liability" a plaintiff would have prevailed at trial and that issue is relevant to coverage. *Id.* (citation omitted); *see Pac. Indem. Co. v. Linn*, 766 F.2d 754, 759 (3d Cir. 1985); *Liberty Mut. Ins. Co. v. Penn Nat'l Mut. Cas. Ins. Co.*, No. 20-3468, 2021 WL 5401543, at *4 (3d Cir. Nov. 18, 2021).

In this case, it is premature to determine the effect of any duty to defend third-party payor suits, where it exists, on indemnification. Only limited discovery has been taken in the instant action, and the Parties have not briefed the issue, or introduced evidence, of the scope of the settlements in the underlying lawsuits.

With the above principles in mind, the Court turns to the Parties' bodily injury arguments.

2. *Interpretation of the 2017–2018 Policies*

The 2017–2018 policies cover, in relevant part, "all damages that the insured becomes legally obligated to pay for bodily injury" and all defense costs for "a claim seeking such damages." ECF No. 315-28 at 28.[14] Defendants argue that the third-party payor suits do not seek damages "for" bodily injuries. *See* ECF No. 312-1 at 25–27; ECF No. 316-1 at 22.[15] In particular, they assert that the policies provide coverage only for suits seeking damages for "personal injuri[es] suffered by specific individuals," a requirement which they argue is unmet here. ECF

---

[14] The Parties agree that this is the applicable language for all 2017–2018 policies at issue now. *See* ECF No. 349 at 38 (the Trustee, identifying this as the applicable language for all 2017–2018 policies); ECF No. 312-1 at 25 (Defendants, doing the same).

[15] The 2017–2018 Tower Defendants "incorporate by reference the arguments on this issue set forth in the separate brief filed today by the [2013–2014 Tower Defendants]," and therefore the Court also references arguments raised in the 2013–2014 Tower Defendants' briefs. *See* ECF No. 312-1 at 25–26.

No. 316-1 at 7; *see also id.* at 23.

The Court begins with the plain meaning of the word "for," in the phrase "damages . . . for bodily injury," *see* ECF No. 315-28 at 28. But that word can have varying meanings depending on context, *see Greenwood Cemetery, Inc. v. Travelers Indem. Co.*, 232 S.E.2d 910, 913 (Ga. 1977), so reading it in isolation is of limited value. For instance, one dictionary defines "for" as a "word to indicate purpose," or "because of," among other definitions. *For*, Merriam-Webster, https://www.merriam-webster.com/dictionary/for#dictionary-entry-1 [https://perma.cc/28UK-8J3 M] (last visited Feb. 7, 2026). These definitions reflect that there must be a relationship between the damages sought and bodily injury being alleged, but they shed little light on how closely connected the bodily injuries and damages must be.

Other policy language clarifies the meaning of "damages for bodily injury." To start, one section of the policy—dealing with when claims are deemed to be made—assumes "organization[s]" may seek bodily injuries damages.[16] ECF No. 315-28 at 38 ("All claims for damages because of . . . bodily injury to the same person, including damages claimed by any person or organization for care, loss of services, or death . . . will be deemed to have been made at the time the first of those claims is made"); *see also id.* at 43 (stating insurance limits apply "regardless of the number of . . . [p]ersons or organizations making claims or bringing suits"). But that provision specifically contemplates claims "for care, loss of services, or death." *See id.* at 38 (deeming all such claims to be made when the first such claim is made). This type of language commonly refers to subrogation and loss of consortium claims. *See Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 335–36 (5th Cir. 2023) ("[T]he inclusion of

---

[16] For ease of reference, the Court refers to the primary policy's language. *See* ECF No. 315-28 at 28. The Parties do not argue that the excess policies contain differing language or fail to incorporate the primary policy's terms regarding coverage for bodily injuries.

damages 'for care, loss of services or death' was meant to include claims 'like loss of consortium claims by family members, and subrogation claims.'" (citation omitted)); *Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*, 57 F.4th 558, 566 (6th Cir. 2023) (same); *State Farm Fire & Cas. Co. v. Cabalis*, 80 F. Supp. 3d 1116, 1124 (D. Haw. 2015) (referring to "claims for loss of society, companionship, and consortium" as exactly the type of claims that fall under a provision covering damages for "care, loss of services and death" resulting from bodily injury). Such claims envision a close relationship between a bodily injury and damages, such as the kind embodied in a derivative action seeking to recover for specific bodily injuries. *See Westfield Nat'l Ins. Co.*, 57 F.4th at 566 (concluding that similar policy language was used "to include derivative claims").

The policy's requirements regarding the timing of bodily injuries reinforce that "damages for bodily injury" means redress for specific bodily injuries. For the policy to cover either the defense costs or liability associated with a suit seeking damages for bodily injury, the bodily injury at issue must occur within a specific period. *See* ECF No. 315-28 at 28 (requiring the bodily injury to occur "on or after the retroactive date" and "before the end of the policy period" or any extended coverage period). It must therefore be possible for an insurer, through the complaint or discovery, to determine when the bodily injuries being alleged occurred. *See id.* And, in particular, it is the bodily injury for which damages are claimed that must be timely, meaning that a suit must make it possible to attribute damages to specific bodily injuries. Where damages are based on the aggregate effects of a population-wide crisis, or are too attenuated from any individual injuries, it would not be possible to do so. *Cf. Vt. Mut. Ins. Co. v. Poirier*, 189 N.E.3d 306, 311–12 (Mass. 2022) ("damages caused by bodily injury refer to the physical injuries and the money damages required to compensate them[,]" in other words, money to "compensat[e] for loss or injury" (citation omitted)); *Discover Prop. & Cas. Ins. Co.*, 73 F.4th at 334 (shareholder derivative action

that alleged a breach of fiduciary duty in connection with a listeria outbreak did not seek damages because of bodily injuries, since it "d[id] not seek to recover any damages on behalf of customers who may have suffered 'bodily injury' from the *L[i]steria* outbreak").

Reading the primary policy as a whole, and with the above in mind, suits seeking "damages . . . for bodily injury," ECF No. 315-28 at 28, are suits by individuals or organizations to redress specific bodily injuries, and such suits include derivative claims like subrogation and loss of consortium.

### 3. *The Trustee's Arguments about Extrinsic Evidence Fail*

The Trustee points to two pieces of extrinsic evidence to support his reading of the policy: (1) that Defendants' initial coverage letters "denied or reserved rights on coverage . . . but not on the grounds that the claims failed to allege bodily injury," and (2) that Defendants added express exclusions to later iterations of the policies for suits brought by governments. ECF No. 349 at 45–46. First, the Court may consider extrinsic evidence only if it decides a term is ambiguous upon applying the traditional tools of interpretation. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995). Here, "damages for bodily injury," when interpreted in light of other sections of the policy, is unambiguous. Even if this policy language was ambiguous, evidence of the parties' conduct in hindsight after the contract was formed—like the evidence to which the Trustee points—is generally unhelpful in ascertaining the parties' intent during contract formation. *See Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 727 (S.D.N.Y. 2020) (collecting cases); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 n.11 (Del. 1997) ("[B]ackward-looking evidence gathered after the time of contracting is not usually helpful."). And regardless, with respect to later-added exclusions for government suits, "the fact that one contract is even clearer than another does not make the other contract ambiguous." *Ali v.*

23

*Fed. Ins. Co.*, 719 F.3d 83, 93 n.17 (2d Cir. 2013). The fact that an explicit exclusion was later added for government suits does not render the language of the 2017–2018 policies, which in any case are relevant here to third-party payor suits, ambiguous.

4. *Case Law from Outside the Opioid Context Does Not Demand a Broader Reading of the Policy*

To argue for a broader reading of "damages for bodily injury," the Trustee also points to cases involving insurance coverage for gun violence litigation and mass torts. *See* ECF No. 349 at 51–53 (citing cases). But the Trustee's reliance on this line of cases is misplaced. In some of cases cited by the Trustee, courts addressed materially different policy language than the language at issue here. *See, e.g.*, *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 539–40 (Fla. 2005) (interpreting a policy excluding coverage for "bodily injury . . . *arising out of* your product," and emphasizing that "arising out of" is much broader than other causal language (emphasis added)). Another case cited by the Trustee devotes less than a paragraph to interpreting the policy language, addresses a different issue—whether only the injured individual can bring suit because of bodily injury—and its cursory treatment of the issues does not govern. *See Scottsdale Ins. Co. v. Nat. Shooting Sports Found.*, No. 99-31046, 2000 WL 1029091, at *2 (5th Cir. July 11, 2000) (per curiam). In yet another case, though it contains similar policy language, it does not consider how the policy's requirement for bodily injuries to occur in a specific period may bear on the meaning of its coverage provisions. *See SIG Arms Inc. v. Emps. Ins. of Wausau*, 122 F. Supp. 2d 255, 260–61 (D.N.H. 2000). Regardless, most of these cases involved both interpreting policy language and applying it to the allegations of underlying suits. And, to the extent these cases turned on the allegations of the underlying suits, that analysis is case-specific. The Court turns to the underlying suits at issue here now.

5. *Many Third-Party Payor Suits Fall Outside the 2017–2018 Tower's Coverage*

With the above policy language in mind, the Court turns to the third-party payor suits. Though third-party payors brought numerous suits against Endo, Defendants identify eight exemplar suits, five of which were filed during and three of which were filed after the policy period. *See* ECF No. 312-1 at 7. The Trustee challenges the representativeness of these suits, and argues that, regardless, these suits seek damages for bodily injuries. *See* ECF No. 349 at 60–62. The Trustee also points to additional third-party payor suits, for which he asserts there is coverage. *See id.* at 63–64.

The Court has reviewed the complaints in the suits highlighted by the Parties. The complaints typically allege, among other things, that Endo and other pharmaceutical industry players contributed to an epidemic of opioid abuse by misrepresenting the addictiveness and exaggerating the benefits of opioids, promoting opioids notwithstanding addiction risks, and failing to monitor for suspicious opioid use. *See generally, e.g.*, ECF No. 315-35 (suit by IBEW Local 38 Health and Welfare Fund); ECF No. 315-36 (suit by Baptist Hospital, Inc. and Jay Hospital, Inc.); ECF No. 315-37 (suit by American Resources Insurance Company); ECF No. 315-38 (suit by Bon Secours Health System, Inc. and other healthcare providers); ECF No. 315-39 (suit by Family Practice Clinic of Booneville, Inc., and Family Health Care Clinic, PSC). These complaints generally assert some combination of claims for fraud, negligence, gross negligence, unjust enrichment, violations of state consumer protection laws, and claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), among other claims. *See, e.g.*, ECF No. 315-35 ¶¶ 162–201 (claims for fraud, unjust enrichment, negligence, and violations of the Ohio Consumer Sales Practices Act); ECF No. 315-38 ¶¶ 253–442 (claims for negligence, negligence per se, gross negligence, fraud, public nuisance, and violations of RICO); ECF No. 341-23 ¶¶ 310–

97 (claims for deceptive acts and practices, false advertising, negligence, fraud, unjust enrichment, and violations of RICO). Additionally, some of these suits are brought as putative class actions. *See, e.g.*, ECF No. 315-35 ¶ 17 (IBEW Local 38 Health and Welfare Fund, filing "on behalf of itself and all other Ohio unions and/or health and welfare funds that are third party payors of medical costs"); ECF No. 315-37 ¶ 242 (American Resources Insurance Company, filing on behalf of "[a]ll third-party payor commercial property and casualty/worker's compensation insurance carriers" who "incurred costs for prescription opioid drugs" linked to the defendants "and who during the same class period incurred costs for treatment related to the misuse, addiction and/or overdose of opioid drugs"); ECF No. 315-39 ¶ 256 (suit by two rural health clinics on behalf of "[a]ll . . . Rural Health Clinics located within the United States which treated patients with opioid conditions, or which served patient populations with opioid conditions" during a certain timeframe, and on behalf of certain sub-classes).

Many of these suits do not seek damages "for bodily injury." Some suits, such as the one brought by IBEW Local 38 Health and Welfare Fund, allege that the defendants caused the overprescription of opioids and seek to recover the cost of the unnecessary opioid prescriptions. *See, e.g.*, ECF No. 315-35 ¶¶ 152, 176, 201 & at 65 (identifying the harm as "overpayments for Defendants' opioid drugs" and seeking to recover "damages in an amount equal to the amount paid for opioid prescriptions for chronic, non-cancer pain"). These suits do not seek damages to treat bodily injuries that resulted from Defendants' opioid products. They instead seek to recover the amounts paid for the opioid products themselves. Because a complaint like the one filed by IBEW Local 38 Health and Welfare Fund does not directly or derivatively seek to redress bodily injuries related to opioids, but rather seeks to recover for the distinct harm of overpayment for opioids, it does not seek damages for bodily injury. *See Discover Prop. & Cas. Ins. Co.*, 73 F.4th at 334

(shareholders' suit did not seek damages "because of bodily injury" where it sought to recover shareholders' own financial losses caused by a listeria outbreak, rather than "damages on behalf of customers who may have suffered 'bodily injury' from the . . . outbreak").

Other suits likewise are not covered because they do not seek damages for individual bodily injuries. They instead allege that Defendants caused a broader public health crisis—the opioid epidemic—and seek damages attributable to the epidemic as a whole. *See Acuity v. Masters Pharm., Inc.*, 205 N.E.3d 460, 468 (Ohio 2022) (rejecting coverage where "the governments' theories of relief are that [the defendant's] alleged failure to prevent the improper diversion of prescription opioids was a 'direct and proximate cause of the opioid epidemic' and the 'economic damages' sought are based on that public-health crisis").[17] Take, for instance, the complaint filed by Bon Secours Health System, Inc. and other healthcare providers. ECF No. 315-38. It alleges that the defendants caused an "opioid epidemic," that "patients' opioid conditions [we]re the direct and proximate results of the opioid epidemic," and that the plaintiffs would not have had to treat patients "but for the opioid epidemic created and engineered by Defendants." *Id.* ¶¶ 1, 240, 251; *see also id.* ¶ 252 (stating that "it was foreseeable to Defendants that the opioid epidemic would result in a corresponding epidemic of patients with opioid conditions"). The theory of causation advanced by the *Bon Secours* complaint is based on connecting the defendants to an opioid epidemic writ large rather than individual bodily injuries. And the corresponding damages Bon Secours seeks to recover are based on the aggregate costs of abating that epidemic, rather than individualized cost of treating any specific injuries. The complaint is thus designed to proceed on

---

[17] The Trustee argues that *Acuity* is distinguishable because the underlying suits at issue there "disclaim[ed] damages for [individualized bodily] injuries" in order to participate in multidistrict litigation. ECF No. 349 at 70 (emphasis omitted). However, not all suits discussed in *Acuity* disclaimed bodily injuries. *See* 205 N.E.3d at 473 (noting only that "the majority of the governments disclaim" injuries). Regardless, the court ultimately based its conclusion on the fact that the suits "d[id] not tie their alleged economic losses to particular bodily injuries." *Id.*

a theory of aggregate proof. Such a suit does not seek damages for bodily injuries.

Nonetheless, that does not mean that a third-party payor suit could never seek damages "for bodily injury." After all, Defendants' policies state that damages for bodily injury include those sought by "any person or organization for care." ECF No. 315-28 at 38. And whether an individual pays out of pocket for their treatment or their treatment is paid for by a third-party like an insurer, each seeks to recover damages "for care" of bodily injuries under the plain language of the policies. *Cf. ACE Am. Ins. Co. v. Rite Aid Corp.*, 270 A.3d 239, 253–54 (Del. 2022) (stating that if localities "ran public hospitals and sued" a defendant "to recover their actual, demonstrated costs of treating bodily injuries . . . the [] [p]olicy would most likely be triggered"); *Discover Prop. & Cas. Ins. Co.*, 73 F.4th at 335–36 (interpreting the phrase "for care, loss of services or death" in a similar policy to include subrogation claims).

Under the duty-to-defend standard, a claim may therefore survive Defendants' motion for summary judgment if a third-party payor is "at least potentially" seeking to recover the demonstrated costs it paid to treat specific injuries. *Kramer*, 313 A.3d at 1039. And "any doubt . . . must be resolved in favor of coverage." *Moore*, 228 A.3d at 265. At least some third-party payor suits satisfy this standard. One example is a suit by the union Northeast Carpenters Fund ("Carpenters"). ECF No. 341-24. According to its complaint, Carpenters "provides health insurance coverage for approximately 10,000 union members, retirees and their dependents" and "funds its own health insurance plan . . . through which it pays part or all of its beneficiaries' health care costs." *Id.* ¶ 2. Carpenters' complaint brings claims for fraud, negligence, and civil conspiracy, alleging, among other things, that Carpenters "was injured . . . in that Defendants' ongoing concerted actions in marketing opioids caused doctors and other health care providers to prescribe to [Carpenters'] members . . . longterm opioid treatment using opioids manufactured by

28

Defendants." *Id.* ¶ 268. The Complaint further asserts that because the defendants caused opioids to be distributed excessively, Carpenters paid for "diagnosis, treatment, and cure of [opioid] addiction" for its members, for which it is entitled to "direct and consequential damages." *Id.* ¶ 323; *see also id.* ¶ 30 (noting that Carpenters paid for "substance abuse treatment services and inpatient hospital services" for its members). These costs could "at least potentially" be traceable to demonstrable bodily injuries, *Kramer*, 313 A.3d at 1039, and the complaint does not foreclose proceeding on a theory of individualized harm. *See Moore*, 228 A.3d at 265 ("[T]he insurer has a duty to defend until the claim is narrowed to one patently outside the policy coverage . . . ." (internal quotation marks and citation omitted)). Such a complaint potentially seeks damages "for care" of bodily injuries under the plain language of the policies.

Some courts have held that a complaint's failure to name specific injuries or individuals is sufficient to defeat any duty to defend. *See In re CVS Opioid Ins. Litig.*, 346 A.3d 81, 98 (Del. 2025) (pointing to the failure of certain complaints to "allege actual specific and individualized damage"). But the relevant inquiry is whether the suit seeks to recover damages for individual bodily injuries, not whether the complaint individually names each specific injury or injured person. That inquiry turns on the nature of the claims and the theory of causation being pled. And if it is ambiguous from the complaint whether a suit seeks to recover for individual bodily injuries or further facts are needed to resolve that inquiry, the duty to defend applies. *See Moore*, 228 A.3d at 265. A contrary interpretation would turn the duty to defend on its head and demand more of a complaint than pleading standards require. Accordingly, the mere fact that a complaint does not name individual bodily injuries or injured persons is not dispositive of the duty to defend.

Nonetheless, even in suits where a duty to defend may have initially applied, the duty to defend may be short-lived. It appears that a number of opioid suits filed by governments and third-

29

party payors against pharmaceutical companies have chosen to proceed based on aggregate proof. *See City of Chicago v. Purdue Pharma, L.P.*, No. 14 CV 4361, 2020 WL 3578497, at *3 (N.D. Ill. July 1, 2020) (noting that the City of Chicago planned to "rely on aggregate data to prove causation[,]" and would use experts to show that Defendants' conduct "led to an increase in the number of prescriptions which in turn caused an epidemic of addiction"); *see also id.* at *4 ("[T]he City has made clear that it does not intend to point to or rely on a single example of medically unnecessary prescriptions . . . ."); *City of Huntington v. AmerisourceBergen Drug Corp.*, Nos. CV 3:17-01362 & CV 3:17-01665, 2021 WL 1711381, at *3 (S.D.W. Va. Apr. 29, 2021) (involving opioid suit by city where, although evidence of individual instances of opioid abuse was permitted, the city was ultimately proceeding on a theory of "aggregate proof"); *Cleveland Bakers & Teamsters Health & Welfare Fund v. Purdue Pharma L.P. (In re Nat'l Prescription Opiate Litig.)*, 440 F. Supp. 3d 773, 792 n.16 (N.D. Ohio 2020) (allowing the plaintiffs "to use aggregate evidence to attempt to prove causation" for RICO claims). The choice to proceed based on aggregate proof, rather than individualized bodily injuries, would render claims "patently outside the policy coverage," thereby extinguishing Defendants' duty to defend. *Moore*, 228 A.3d at 265 (citation omitted). And in fact, Carpenters itself appears to have subsequently filed an amended complaint that sued various defendants for "directly caus[ing] the worst man-made epidemic in modern medical history" and seeks relief on this basis—a theory of recovery based on the opioid epidemic writ large and not on individualized bodily injuries. *See, e.g.*, First Amended Short Form for Supplementing Complaint ¶ 147 & at 1, 48, *E. Atl. States Carpenters Health Fund v. Purdue Pharma, L.P.* (N.D. Ohio Feb. 27, 2023) (after suit was removed and transferred, amending complaint and separately incorporating the common factual allegations and relief alleged in a complaint filed by Summit County).

Notwithstanding the above, in reaching a decision on the duty to defend, the Court is limited to "comparing the four corners of the insurance contract to the four corners of the complaint." *Moore*, 228 A.3d at 265 (citation omitted). In looking to the four corners of the third-party payor complaints presented to the Court, a number of complaints do not seek relief for treating individual injuries. But where a complaint seeks to recover the cost of treatment and pleads a theory of causation that could proceed based on individualized proof, the complaint "at least potentially," *Kramer*, 313 A.3d at 1039, seeks damages "for care" of individual bodily injuries, as required for the duty to defend. *See* ECF No. 315-28 at 38. However, to the extent such suits proceed based on a theory of aggregate harm, those suits fall outside the policy coverage, thereby extinguishing any duty. But little discovery has taken place in this case, and the Parties have not briefed which suits proceeded on a theory of aggregate harm. Thus, this Court concludes only that Defendants' policies—which cover damages "for bodily injury"—would not cover a number of third-party payor suits for the reasons set forth above.[18]

---

[18] The Trustee argues that summary judgment is premature because further discovery is warranted on the "dozens of" underlying suits that are not before this Court. ECF No. 349 at 61. After Defendants argued that the Trustee could not raise this argument without "an affidavit or declaration under [Federal Rule of Civil Procedure] 56(d)," ECF No. 362 at 10 n.9, the Trustee attached a Rule 56(d) declaration to his sur-reply brief. ECF No. 379-1. Defendants now argue that the Rule 56(d) declaration is untimely. ECF No. 388 at 11.

The Court need not consider the Rule 56(d) declaration given the unique procedural posture of the case. Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). The purpose of Rule 56(d) declarations is to alert courts that additional time for discovery is needed before a motion for summary judgment is ruled upon. *See Jenkins v. Woodard*, 109 F.4th 242, 250–51 (4th Cir. 2024).

Here, in June 2025, the Parties agreed to limited summary judgment briefing on bellwether issues prior to most discovery, in order to streamline the case. *See* ECF No. 291 at 53. The Parties then proposed orders which identified these issues, and the Court adopted these orders. These issues were selected because they largely turn on matters of contract interpretation and could possibly eliminate hundreds or thousands of the underlying suits for which the Trustee seeks coverage.

**C.  Exclusions in the Policy Issued by the Underwriters at Lloyd's London**

The Underwriters at Lloyd's London separately argue that their policy contains a "Previous Claim" exclusion and a "Prior Event" exclusion, both of which bar coverage. ECF No. 307 at 10–15. One of Defendant TDC's excess policies incorporates the Underwriters' policy, ECF No. 315-33 at 10, and TDC joins in the Underwriters' arguments, ECF No. 313 at 2. Neither exclusion in the Underwriters' policy prohibits coverage here, beginning with the previous claim exclusion.

The "Previous Claim" exclusion bars coverage for claims "arising out of or related to a claim" that "was reported to [the insurer] or any other insurer under any previous policy." ECF No. 315-31 at 33. The purpose of this exclusion is to exclude from coverage "pending claims . . . that the insured may know about, but which have not yet been asserted formally." *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 528 (7th Cir. 2022); *see also Fed. Ins. Co. v. Raytheon Co.*, 426 F.3d 491, 499 (1st Cir. 2005) ("[P]rior and pending litigation exclusions 'promote the giving of prompt notice and [] avoid stacking the limits of successive policies to cover essentially the same or very closely related claims.'" (alteration in original) (citation omitted)). And that purpose aligns with the nature of claims-made policies, like those here, which limit coverage to "claims asserted within a specific time period." *USA Gymnastics*, 27 F.4th at

---

*See* ECF No. 291 at 17.

The Parties therefore have been on notice since June 2025 that discovery may be warranted, given the limited nature of this summary judgment briefing and the early stage at which it occurred. Strict compliance with Rule 56(d) was therefore unnecessary. *See United States v. Rohner*, 634 F. App'x 495, 504 (6th Cir. 2015); *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994). Here, the Court has issued a ruling on the meaning of the policy and articulated a framework for determining whether the underlying suits seek damages for bodily injury based on its review of the exemplar suits identified by the Parties. As Defendants note, "the parties can [now] confer regarding the effect of the order on the remaining lawsuits—indeed, that is the whole point of using exemplars—and the parties can then propose an implementing order or orders that resolve those additional suits, seeking further assistance from the Court only if needed." ECF No. 362 at 10 n.9.

528.

The Court turns to the text of the exclusion. The Underwriters' policy does not define "claim" but appears to use this word in a manner similar to the primary policy, which defines a claim as "a demand for damages," ECF No. 315-28 at 62. *See* ECF No. 315-31 at 9, 19, 24, 33 (referring multiple times to a "claim or suit alleging damages" and similar language). A later suit "aris[es] out of" an earlier suit, *see* ECF No. 315-31 at 33, when the earlier suit caused or otherwise resulted in the later litigation. *See Phillips v. Audio Active, Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007); *see also USMoney Source, Inc. v. Am. Int'l Speciality Lines Ins. Co.*, 288 F. App'x 558, 560 (11th Cir. 2008); *Roman Mosaic & Tile Co. v. Aetna Cas. & Sur. Co.*, 704 A.2d 665, 669 (Pa. Super. Ct. 1997) ("The phrase 'arising out of,' has been equated with 'but for' causation." (citation omitted)).

Because the Underwriters' policy uses the phrase "arising out of or related to," ECF No. 315-31 at 33, "related to"—a phrase which is broader than "arises out of"—is presumed to have a distinct meaning. *See Penncro Assocs., Inc.*, 499 F.3d at 1156–57; *Owners Ins. Co.*, 41 F.4th at 959; *cf. Berryman*, 649 A.2d at 969. But the fact that "related to" has a distinct meaning does not imply that its meaning is limitless. *See Schuster*, --- F.4th ----, 2026 WL 100043, at *5 (surveying cases and statutes in which "relate" describes a "direct relationship between two things"); *USA Gymnastics*, 27 F.4th at 524 ("At some point, of course, a logical connection may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of broad language would come into play." (citation omitted)); *cf. Anderson v. Hansen*, 47 F.4th 711, 718 (8th Cir. 2022) (finding persuasive the proposition that, in the context of employment arbitration agreements, "'[r]elatedness' could not encompass everything that touched employment in any way" (alteration in original) (citation omitted)). This is supported by the "well-settled" principle under Pennsylvania law that "exclusions to an insurer's general liability are narrowly construed against the insurer."

33

*Pecorara v. Erie Ins. Exch.*, 596 A.2d 237, 239 (Pa. Super. Ct. 1991).

This Court need not identify the exact boundaries demarcating the types of claims that would be "related to" earlier claims for damages, because the specific claims identified by the Underwriters are not related. Here, it is the Underwriters' burden to establish that the previous claims exclusion applies. *McEwing v. Lititz Mut. Ins. Co.*, 77 A.3d 639, 646 (Pa. Super. Ct. 2013). And the Underwriters argue only that the third-party payor lawsuits "relate to" a lawsuit by the State of Mississippi (and similar government lawsuits) because Mississippi's suit, like the third-party payor suits, includes the same general allegations "about the conduct of Endo and other opioid manufacturers." ECF No. 307 at 14.

Such suits are not "related" for the purposes of the previous claims exclusion. Pending claims by a state like Mississippi, seeking to recover budgetary losses linked to opioid abuse in its state, would not give the insured notice of claims by unions or hospitals in other parts of the country. *See USA Gymnastics*, 27 F.4th at 524. And the Trustee's reliance on the 2017–2018 policy to cover third-party payor claims filed in 2017 onward, after Mississippi has filed suit, does not amount to "stacking the limits of successive policies to cover essentially the same or very closely related claims." *Fed Ins. Co.*, 426 F.3d at 500 (citation omitted). Whether two third-party payor lawsuits would be "related" is a different question and one this Court need not address here. The Underwriters have not met their burden to show that the previous claim exclusion applies here.

The Underwriters cite *Slaughter v. Charter Oak Insurance Co.* as an example case in which claims in one lawsuit were "related to a prior lawsuit" because they were connected by common "facts, circumstances or events." ECF No. 307 at 13 (citing No. 22-2179, 2024 U.S. App. LEXIS 11728 (3rd Cir. May 15, 2024)). But the policy language in *Slaughter* is distinguishable. There, coverage turned on whether there were "related employment practice offenses." 2024 U.S. App.

34

LEXIS 11728, at *5. And the policy in *Slaughter* expressly defined related employment practice offenses "broadly" as offenses "that have as a common connection, tie or link any fact, circumstance, situation, event, transaction, cause, or series of related facts, circumstances, situations, events, transactions or causes." *Id.* at *5–6 (citation omitted). The Underwriters' policy does not contain similarly expansive language.

The Court turns next to the "Prior Event" exclusion. Under the "Prior Event" exclusion, claims are excluded from coverage when they involve (1) "'[i]njury or damage' arising out of an 'event'"; (2) when that event "was first discovered or known before the policy period" by the insured; and the event (3) "[s]hould reasonably have been expected . . . to result in a claim against you or any other insured," "[i]s covered by other insurance or would have been covered but for the exhaustion of [the policy]," "[w]as reported by any insured to another insurance company prior to the policy period," or "[i]s listed" on the insured's insurance application. ECF No. 315-31 at 33–34. And an "event" is defined by the Underwriters' policy, in relevant part, as "an occurrence, offense, accident, act, or other event." *Id.* at 12.

The Underwriters argue only that the prior event here "is the 'opioid epidemic.'" ECF No. 307 at 10. But an epidemic is not a single event, unlike an "occurrence," "accident," "act" or "offense." *See* ECF No. 315-31 at 12. The opioid epidemic therefore does not qualify as an event under the plain language of the exclusion. *Cf. Allen v. Boeing Co.*, 784 F.3d 625, 629 (9th Cir. 2015) (interpreting the phrase "event or occurrence" under the Class Action Fairness Act to "appl[y] only where all claims arise from a *single* event or occurrence" (citation omitted)). Accordingly, neither exclusion applies.

IV.    **CONCLUSION**

For the foregoing reasons, this Court will **GRANT** in part and **DENY** in part Defendants' Motions for Summary Judgment (ECF Nos. 306, 309, 312) on bellwether issues. The Court will grant the Motions (ECF No. 306, 309, 312) on the following issues: (1) third-party payor claims made during the six-year basic extended reporting period are not entitled to coverage and (2) the meaning of "damages for bodily injury" in the policies. The Court will deny Defendants' Motions (ECF No. 306, 309, 312) with respect to Defendants' argument at this stage that no third-party payor suits seek damages for bodily injuries. The Court will likewise deny the Motions with respect to the separate exclusions raised by the Underwriters at Lloyd's London. The Court will **DENY** the Trustee's Cross-Motion for Summary Judgment (ECF No. 341). An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**