IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MATTHEW DUNDON, AS THE TRUSTEE     :
OF THE ENDO GENERAL UNSECURED       :      Civil Action
CREDITORS' TRUST,                   :
                    *Plaintiff*,    :
                                    :
        v.                          :      No. 24-4221
                                    :
ACE PROPERTY AND CASUALTY           :
INSURANCE COMPANY, et al.,          :
                    *Defendants*.   :

MEMORANDUM

KENNEY, J.                                          FEBRUARY 10, 2026

Defendants The Phoenix Insurance Company, St. Paul Fire and Marine Insurance Company, Travelers Indemnity Company of America, Travelers Property Casualty Company of America, ACE Property and Casualty Insurance Company, Everest National Insurance Company, Greenwich Insurance Company, XL Insurance America, Inc., Liberty Insurance Underwriters Inc., and The Ohio Casualty Insurance Company (collectively, the "CGL Insurers") move for summary judgment on Count One of Plaintiff Matthew Dundon's Amended Complaint based on two issues: (1) Late Notice and (2) the Products Exclusion in their commercial general liability insurance policies, ECF No. 314 (the "CGL Insurers' Motion"). The CGL Insurers also move for partial summary judgment and join in part the Product Insurers' motions for summary judgment, ECF No. 323. Plaintiff Matthew Dundon cross-moves for partial summary judgment, ECF No. 339. For the reasons set forth below, the Court will **GRANT** in part and **DENY** in part the CGL Insurers' Motion for Summary Judgment (ECF No. 314), **GRANT** in part and **DENY** in part the CGL Insurers' Motion for Partial Summary Judgment (ECF No. 323), and **DENY** Plaintiff's Cross-Motion for Partial Summary Judgment (ECF No. 339).

## I.    BACKGROUND

### A.  General Factual Background

This is an insurance coverage dispute arising from litigation over prescription opioids. During the relevant period, non-party Endo International plc ("Endo") was a pharmaceutical company that manufactured opioid products. *See* ECF No. 319-10 at 28–29; ECF No. 339-1 ¶¶ 2–3. In connection with its business operations, Endo obtained insurance coverage, including multiple products insurance policies in each of the following years: 2013–2014, 2016–2017, and 2017–2018. *See* ECF No. 315 ¶¶ 4–12, 22–23, 25–30, 35–41. Endo's insurance policies in each of these years formed an insurance "tower," with one policy serving as the primary policy and others providing layers of excess coverage. *See* ECF No. 316-1 at 12 (chart identifying 2013–2014 tower); ECF No. 311-2 ¶ 38 (chart identifying 2016–2017 tower); ECF No. 312-2 ¶ 67 (chart identifying 2017–2018 tower); *see also Pharmacia Corp. v. Arch Specialty Ins. Co.*, No. 22-2586, 2024 WL 208146, at *1 n.1 (3d Cir. Jan. 19, 2024) (defining an insurance tower as a structure in which "a primary insurer respond[s] first to any covered loss, and excess insurers respond[ ] in a predetermined order if the loss exceeds the [primary policy's] coverage" (first and second alterations in original) (citation omitted)). Endo also obtained multiple commercial general liability insurance policies from 2010–2022, in addition to the above products insurance policies. *See* ECF No. 317 ¶ 1.

### 1.  The Underlying Litigation and Bankruptcy Action

Based on Endo's role in manufacturing and promoting opioids, various state and local governments, third parties, and individuals sued Endo and its affiliates, beginning at least as early as 2014. *See id.* ¶¶ 15–31; ECF No. 319-10 at 50. By 2023, there were over 3,500 such suits. *See id.* A sample of the lawsuits naming Endo International plc and/or at least one of its affiliates as a

defendant includes: *The People of the State of California v. Purdue Pharma L.P.*, No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct.); *City of Chicago v. Purdue Pharma L.P.*, No. 14-cv-4361 (N.D. Ill.); *UFCW, Local 23 & Employers Health Fund v. Endo Pharmaceuticals, Inc.*, No. 180403485 (Pa. Ct. Com. Pl.); *Iron Workers District Council of Philadelphia and Vicinity, Benefit Fund v. Abbott Laboratories, Inc.*, No. 180502442 (Pa. Ct. Com. Pl.); *St. Charles County, Missouri v. Purdue Pharma L.P.*, No. 18-cv-1376 (E.D. Mo.); *Koechley v. Purdue Pharma, Inc.*, No. G-4801-CI-0201803741-000 (Ohio Ct. Comm. Pl.); *Riling v. Purdue Pharma L.P.*, No. 18-cv-1390 (S.D. W. Va.); *Florida v. Purdue Pharma L.P.*, No. 2018-CA-1438 (Fla. Cir. Ct.); *Estate of Brockel v. Couch*, No. 2017-CV-902787 (Ala. Cir. Ct.); *Georgia v. Purdue Pharma L.P.*, No. 19-A-00060-8 (Ga. Super. Ct.); *County of Walker v. Abbott Laboratories*, No. 1929076 (Tex. Dist. Ct.); *Mississippi v. Purdue Pharma L.P.*, No. 25CH1:15-cv-1814 (Miss. Ch. Ct.); *Brumbarger v. Purdue Pharma L.P.*, No. 1:19-op-45469-DAP (N.D. Ohio); *Paul v. Purdue Pharma L.P.*, No. 1:19-op-45467 (N.D. Ohio); *Berzinski v. Purdue Pharma L.P.*, No. 1:19-op-45503 (N.D. Ohio); and *Alsup v. McKesson Corp.*, No. 1:20-op-45083 (N.D. Ohio). *See* ECF No. 317 ¶¶ 15–31.

After the above lawsuits were initiated, Endo filed for Chapter 11 bankruptcy before the U.S. Bankruptcy Court for the Southern District of New York on August 16, 2022. *See id.* ¶ 7; ECF No. 319-9; *see also In re Endo Int'l plc*, No. 22-22549 (Bankr. S.D.N.Y. Aug. 16, 2022). But prior to filing for bankruptcy, Endo allegedly "settled numerous Opioid Suits for approximately $242 million and incurred defense expenses of approximately $344 million." ECF No. 339-1 ¶ 19; ECF No. 319-10 at 51–52. On March 22, 2024, the bankruptcy court confirmed a reorganization plan, which, in conjunction with a trust agreement, provided for the formation of a general unsecured creditors' trust and the appointment of Plaintiff Matthew Dundon as trustee. *See* ECF No. 317 ¶¶ 9–11, 13–14. The reorganization plan provided that "the Distributions, rights, and treatment that

3

are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge to the fullest extent permitted . . . of all Claims, Interests, and Causes of Action of any nature whatsoever." *Id.* ¶ 12; ECF No. 319-11 at 216. The bankruptcy court also found that the "Debtors and their Estates [we]re entitled to a discharge of all Claims, Interests, and Causes of Action to the full extent permitted by section 1141(d) of the Bankruptcy Code." ECF No. 317 ¶ 12; ECF No. 319-12 at 10.

### 2. The Trustee's Instant Suit Against Certain Insurers

On August 15, 2024, Plaintiff, as trustee of the Endo General Unsecured Creditors' Trust (hereinafter, "the Trustee"), brought the instant action for a declaratory judgment and breach of contract against certain insurers that issued policies to Endo. ECF No. 1; *see also* ECF No. 113 (operative complaint). The Complaint alleged that Defendants were obligated to cover Endo's liability and defense costs arising from the above opioid litigation.[1] *See id.* ¶¶ 119, 139. Specifically, the Trustee alleged that three products policy towers and Endo's commercial general liability policies provided coverage for various opioid lawsuits:

1. The 2013–2014 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by state and local governments. *See id.* ¶ 122.

2. The 2016–2017 products insurance policies, which the Trustee alleged provided coverage for lawsuits brought by individuals. *See id.* ¶¶ 87, 122.

3. The 2017–2018 products insurance policies, which the Trustee alleged provided

---

[1] The Complaint also alleged that certain Defendants were obligated to cover Endo's liability and defense costs related to litigation over transvaginal surgical mesh products and products containing ranitidine. *See* ECF No. 113 ¶¶ 73, 107, 119, 122. However, the instant Motion concerns only coverage for the cost of opioid litigation. The Trustee voluntarily dismissed coverage claims related to ranitidine, *see* ECF No. 249 at 2–3; ECF No. 250 at 2–3, and the claims seeking coverage for surgical mesh litigation are subject to a separate briefing schedule. *See* ECF No. 346 at 1–3.

coverage for lawsuits brought by third-party payors. *See id.*

4. The commercial general liability policies issued from 2010–2022, which the Trustee alleged provided coverage for the opioid lawsuits in connection with "Unbranded Promotional Activities." *See id.* ¶¶ 112, 135, 139.

The 2010–2022 commercial general liability insurance policies are most relevant to the CGL Insurers' Motion (ECF No. 314) and are discussed in greater detail below.[2]

## B. The CGL Insurers' Insurance Policies

The relevant provisions of the CGL Insurers' insurance policies at issue here are those dealing with (1) the circumstances under which Endo must provide the CGL Insurers with notice of "an 'occurrence' or an offense which may result in a claim"; and (2) an exclusion for "products-completed operations hazard." ECF No. 317-31 at 28–29, 57–58.[3]

**Notice.** As part of the commercial general liability conditions, the CGL Insurers' policies laid out certain duties that Endo must undertake in the event of an occurrence, offense, claim or suit. *See id.* at 28. Specifically, the Travelers Indemnity Company of America's policy provides:

> 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit
>
> a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

---

[2] Defendants filed separate summary judgment motions and briefing with respect to each of the above four categories of insurance coverage. *See infra* Section I.B. The Court likewise issues separate summary judgment rulings for each category of coverage. *See* 2013–2014 Tower Summary Judgment Order & Opinion; 2016–2017 Tower Summary Judgment Order & Opinion, 2017–2018 Tower Summary Judgment Order & Opinion.

[3] In the CGL Insurers' Motion, the CGL Insurers used the Travelers Indemnity Company of America's commercial general liability policy as an exemplar, *see* ECF No. 317-31, so the Court's discussion focuses on that policy in particular. *See also* ECF No. 322-16 (containing a chart of other excerpts of relevant policy language from the CGL Insurers' policies).

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.  If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.  You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

*Id.* at 28–29.[4]

---

[4] The policy contained certain provisions marked in bold. For readability, the Court omits the use of bolded text.

6

**Products Exclusion.** The parties also added an exclusion to the Travelers Indemnity Company of America's policy for "Products-Completed Operations Hazard – Medical And Biotechnology" (the "Products Exclusion"). *Id.* at 57. The Products Exclusion precludes coverage for: "'Bodily injury' or 'property damage' included in the 'products-completed operations hazard.'" *Id.* The "[p]roducts-completed operations hazard" is defined as including "all 'bodily injury' and 'property damage' occurring away from premises owned by or rented or loaned to you and arising out of 'your product' or 'your work'", subject to exceptions. *Id.* "Your product" is, in turn, defined as follows:

"Your product":

    a. Means:

        (1) Any goods or products, including any of "your biotechnology products" and any of "your medical products", other than real property, manufactured, sold, handled, distributed or disposed of by:

            (a) You;

            (b) Others trading under your name; or

            (c) A person or organization whose business or assets you have acquired; and

        (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    b. Includes:

        (1) Warranties or representations made at any time, or that should have been made, with respect to the fitness, quality, durability, performance, handling, maintenance, operation, safety, or use of such goods or products;

        (2) The providing of, or failure to provide, warnings or instructions with respect to such goods or products; and

> (3) Any such goods or products that are or were being
> tested or used by you or on your behalf in any "clinical
> trial."

*Id.* at 57–58.

### C.  Procedural History

After the Trustee brought the above captioned action on August 15, 2024, the matter was stayed with respect to some Defendant-insurers—Endurance Specialty Insurance Ltd., Liberty Specialty Markets Bermuda Limited, and Markel International Insurance Company Limited— because these Defendants invoked arbitration clauses in their insurance policies. *See* ECF Nos. 138, 139, 140. Certain claims were also stayed against Defendant Ironshore Specialty Insurance Company because some of its policies contained arbitration clauses, which Ironshore invoked. *See* ECF No. 214 at 1 & n.1; *see also* ECF No. 213-1 at 2 n.1. With respect to all other claims and Parties, the case proceeded.

On June 10, 2025, the Court held an initial pretrial conference, at which the Parties identified certain key ("bellwether") issues in the litigation and agreed to propose early summary judgment briefing schedules on these issues. *See* ECF No. 281 at 1. The Parties subsequently proposed summary judgment briefing deadlines. *See* ECF Nos. 286, 287, 288, 289. As relevant here, the bellwether issues identified for the Defendants who issued insurance policies in the 2010– 2022 commercial general liability insurance policy towers are as follows:

1. **Products-Completed   Operations   Hazard   ("PCOH") Exclusions.** Whether the allegations in the opioid claims asserted against the CGL towers fall within the PCOH exclusions in the affected policies; and

2. **Notice.** Whether the opioid lawsuits were noticed to the insurers under the CGL policies as provided under the affected policies, and whether any deficient notice means that the insurers are not obligated to provide defense or indemnity for the opioid claims.

ECF No. 286 at 2.

Pursuant to the briefing schedules, Defendants moved for summary judgment with respect to the bellwether issues on August 8, 2025. *See* ECF No. 314 (Defendants' motion regarding commercial general liability policies); ECF No. 323 (CGL Insurers' motion for partial summary judgment and joinder)[5]; ECF No. 316 (Defendants' motion regarding 2013–2014 tower); ECF No. 311 (Defendants' motion regarding 2016–2017 tower); ECF No. 312 (Defendants' motion regarding 2017–2018 tower); ECF No. 306 (Defendants the LSR Underwriters' motion); ECF No. 308 (Defendant Gemini Insurance Company's motion regarding 2016–2017 tower); ECF No. 309 (Defendant Gemini Insurance Company's motion regarding 2017–2018 tower). The Trustee filed its opposition briefs and cross-moved for summary judgment on October 6, 2025. *See* ECF No. 339 (cross-motion regarding commercial general liability policies); ECF No. 339-29 (accompanying opposition and cross-motion brief); ECF No. 341 (cross-motion regarding the three products policy towers); ECF No. 349 (accompanying opposition and cross-motion brief).[6] Defendants filed reply briefs on November 20, 2025 and November 25, 2025. *See* ECF Nos. 357, 358, 359, 360, 361, 362, 365, 368, 374, 375. The Trustee filed sur-reply briefs on December 19, 2025, *see* ECF No. 379 (sur-reply brief regarding products policy towers); ECF No. 381 (sur-reply brief regarding commercial general liability policies), and Defendants filed responses to the sur-reply briefs on January 30, 2026, *see* ECF Nos. 388, 389.

---

[5] The CGL Insurers filed a motion for partial summary judgment and joinder in the Products Insurers' motions for summary judgment, joining in argument section II of the 2013–2014 Products Insurers' opening brief and section III.C of the 2017–2018 Products Insurers' opening brief. *See* ECF No. 323 at 1–2.

[6] The sealed version of the Trustee's opposition brief was originally filed at ECF No. 344, but that version of the brief did not contain complete pagination. A version with complete pagination was refiled at ECF No. 349, and the Parties cite to this docket entry when referring to the Trustee's opposition brief.

The CGL Insurers' Motion for Summary Judgment based on (1) Late Notice and (2) the Products Exclusion, regarding the 2010–2022 CGL Insurers' policies (ECF No. 314), and the CGL Insurers' Motion for Partial Summary Judgment and Joinder in part in the Products Insurers' Motions for Summary Judgment (ECF No. 323) are before this Court. In addition, the Trustee's Cross-Motion for Partial Summary Judgment (ECF No. 339) is before this Court.

## II.    LEGAL STANDARD

Summary judgment is proper when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, "[s]ummary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (internal quotations and citation omitted). The Court is not to engage in "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" as those are functions that are reserved for the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is considered "material" if it could "affect the outcome of the suit under the governing law." *Id.* at 248. Genuine disputes over material facts exist "if a reasonable jury could return a verdict for the nonmoving party." *Wiest v. Tyco Elec. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016) (internal quotations and citation omitted). Where applicable, a party may move for summary judgment on a claim based on a pure question of law. *See Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

The movant bears the initial burden "of informing the district court of the basis for its motion," and identifying specific parts of the record that establish "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied

10

this burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). The nonmoving party must demonstrate more than a "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "[C]onjecture and speculation will not create a genuine issue of material fact." *Wiest*, 812 F.3d at 328. Indeed, the non-movant is not permitted to "rely on unsupported allegations, but must go beyond pleadings and provide some evidence" showing a genuine dispute exists for trial. *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). While the "non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in his favor in determining whether a genuine factual question exists, summary judgment should be granted unless there is sufficient evidence for a jury to reasonably find for the nonmovant." *Butler v. Homesite Ins. Co.*, 809 F. App'x 112, 114 (3d Cir. 2020) (internal quotations and citation omitted). If the record, taken as a whole, would not "lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587 (internal quotations and citation omitted).

While district courts should not "needlessly" encourage "piecemeal litigation," motions for summary judgment may be limited to certain issues in the case, such as only certain claims or "part[s] of [a] claim or defense." *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund.*, 778 F.3d 593, 606 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). Such a motion "can serve [as] a useful brush-clearing" of the case and "facilitate the resolution of the remainder of the case through settlement" under appropriate circumstances. *See id.*

11

### III.    DISCUSSION

The CGL Insurers move for summary judgment on certain bellwether issues regarding coverage for the Opioid Suits. ECF No. 314. First, the CGL Insurers argue that Endo breached the notice provisions of the Parties' insurance policies by failing to provide them with notice until after Endo had settled its liability with respect to the Opioid Suits, and that such post-settlement notice was prejudicial as a matter of law. *Id.* at 18–22. Second, they argue that the Products Exclusion within their insurance policies precludes coverage of the underlying Opioid Suits because those suits arise out of Endo's products. *Id.* at 22–32.

The CGL Insurers' arguments require interpreting the language of the Parties' insurance policies. The Parties do not dispute that Pennsylvania law applies to the interpretation of the CGL Insurers' insurance policies. *See id.* at 18 (discussing Pennsylvania law); ECF No. 339-29 at 22 (same). Under Pennsylvania law, insurance policies are contracts governed by "traditional principles of contract interpretation." *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). Generally, the Court, rather than a jury, performs the task of interpreting the "existence or non-existence of coverage" under an insurance contract. *Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 154–55 (Pa. 2007) (citation omitted). In addition, the "[c]onstruction of an insurance policy is a matter of law," as long as a court can "fairly read it without ambiguity." *Scottsdale Ins. Co. v. Bieber & Assocs., Inc.*, 105 F. App'x 340, 342–43 (3d Cir. 2004). When the language within a provision of an insurance policy is "clear and unambiguous, [the Court] must give effect to that language." *Donegal Mut. Ins. Co.*, 595 Pa. at 155 (citation omitted); *see also Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, 687 F.3d 620, 623 (3d Cir. 2012) (explaining that a court should interpret an insurance policy as a whole and "give unambiguous terms [in the policy] their plain meaning").

12

With this framework in mind, the Court turns to the Parties' arguments.

## A.  Summary Judgment Is Denied on the Issue of Late Notice

The CGL Insurers first argue that coverage of the Opioid Suits is precluded because Endo did not provide them with notice of the Opioid Suits prior to settling its liability for them, and that post-settlement notice is prejudicial as a matter of law. ECF No. 314-1 at 18–22. In response, the Trustee argues that the CGL Insurers had actual or constructive notice and that, even if Endo failed to provide notice, the CGL Insurers have not demonstrated actual prejudice to their position as a result of late notice. ECF No. 339-29 at 25–30. For the reasons described below, the Court finds that Endo breached the notice provisions of the Parties' insurance policies by failing to provide the CGL Insurers with prompt notice, but that a genuine dispute remains as to whether late notice caused the CGL Insurers actual prejudice. Accordingly, summary judgment is denied on the issue of late notice.

### 1.  Endo Breached the Notice Provisions by Providing Late Notice

Under Pennsylvania law, when an insurer "seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice," the insurer must prove that (1) "the notice provision was in fact breached"; and (2) "the breach resulted in prejudice to its position." *Brakeman v. Potomac Ins. Co.*, 371 A.2d 193, 198 (Pa. 1977); *see also Brooks v. Am. Centennial Ins. Co.*, 327 F.3d 260, 264–65 (3d Cir. 2003); *Scottsdale Ins. Co.*, 105 F. App'x at 342.

The CGL Insurers' policies contained clear and unambiguous provisions requiring that notice be provided to them "as soon as practicable of an 'occurrence' or an offense which may result in a claim." ECF No. 317-31 at 28. A provision in an insurance contract requiring notice to be given "as soon as practicable" requires that notice be given "within a reasonable time depending upon the circumstances." *Farmers Nat. Bank of Ephrata v. Emps. Liab. Assurance Corp.*, 199 A.2d

13

272, 274 (Pa. 1964); *see also Am. Guar. & Liab. Ins. Co. v. L. Offs. of Richard C. Weisberg*, 524 F. Supp. 3d 430, 455 (E.D. Pa. 2021) (same). Under a plain reading of the notice provisions, Endo had a duty to carry out those provisions and ensure that the CGL Insurers received notice of any occurrence or offense that might result in a claim within a reasonable amount of time. *See* ECF No. 317-31 at 28. Indeed, the notice provisions reiterate multiple times that "*You* must see to it that [the CGL Insurers] receive written notice of the claim or 'suit' as soon as practicable." *Id.* (emphasis added). Yet nowhere does the Trustee allege in its briefing that Endo notified the CGL Insurers directly of any occurrence.

As a matter of law, Endo failed to provide the CGL Insurers with notice of the Opioid Suits "as soon as practicable." Various state and local governments, third parties, and individuals began filing the Opioid Suits at least as early as 2014, *see* ECF No. 317 ¶¶ 15–30, yet Endo did not provide the CGL Insurers with notice of those suits until the Trustee initiated the present action for coverage in 2024. *See* ECF No. 322-8 ¶ 22 ("The Travelers Insurers did not receive from Endo notice of any occurrence or offense for the claims for insurance coverage in this case before it was filed on or about August 15, 2024."); *id.* ¶ 23 ("The Travelers Insurers did not receive from Endo legal papers in connection with the claims for which the [Trustee] now seeks insurance coverage in this case before it was filed on or about August 15, 2024."); ECF No. 322-9 ¶ 3; ECF No. 322-10 ¶¶ 12–13; ECF No. 322-11 ¶¶ 12–13; ECF No. 322-14 ¶¶ 3–5.

By August 15, 2024, Endo had already filed for Chapter 11 bankruptcy. ECF No. 317 ¶ 7; ECF No. 319-9. During the bankruptcy proceedings, Endo's reorganization plan resolved the "Opioid Claims," which were defined as:

> [A]ny and all Claims and Causes of Action . . . against any of the [Endo] Debtors in any way arising out of or relating to Opioids or Opioid Products manufactured or sold by any of the [Endo] Debtors,

14

any Non-Debtor Affiliate, any of their respective predecessors, or any other Released Party . . . .

ECF No. 319-11 at 57; ECF No. 317 ¶ 9. The reorganization plan further provided that "the Distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge to the fullest extent permitted . . . of all Claims, Interests, and Causes of Action of any nature whatsoever." ECF No. 319-11 at 216; ECF No. 317 ¶ 12. The bankruptcy court also found that "[t]he Debtors and their Estates [we]re entitled to a discharge of all Claims, Interests, and Causes of Action to the full extent permitted by section 1141(d) of the Bankruptcy Code." ECF No. 319-12 at 10; ECF No. 317 ¶ 12. Once the reorganization plan was confirmed by the bankruptcy court on March 22, 2024, it thus discharged Endo "from liability for any claims that were or could have been asserted in the proofs of claims, including . . . the Opioid Claims." *Id.* ¶¶ 9–10, 12; ECF No. 113 ¶ 70. Furthermore, even before Endo had filed for bankruptcy, Endo had allegedly "settled numerous Opioid Suits for approximately $242 million and incurred defense expenses of approximately $344 million" defending those suits. ECF No. 339-1 ¶ 19; ECF No. 113 ¶ 89. Accordingly, Endo had resolved its liability for the Opioid Suits, allegedly settling them for over $800 million, *see* ECF No. 339-1 ¶ 18; ECF No. 113 ¶¶ 88–89, before the Trustee ever decided to initiate this action for coverage in 2024. ECF No. 1. As a matter of law, Endo's failure to provide prompt notice of the Opioid Suits until after they were resolved constituted a breach of the CGL Insurers' occurrence-based policies.

To fend off summary judgment, the Trustee argues that Endo did not need to provide the CGL Insurers with notice in accordance with the Parties' policies because the CGL Insurers had actual or constructive notice "regardless of the source." ECF No. 339-29 at 25–26. According to the Trustee, because the CGL Insurers were supposedly aware of and monitoring Endo's bankruptcy proceedings, and the bankruptcy court found that "insurers party to the GUC Trust

15

Insurance Policies had sufficient notice of the [bankruptcy] Plan and the Chapter 11 Cases," the CGL Insurers had actual or constructive notice of the Opioid Suits at a minimum. *Id.*; ECF No. 319-12 at 22. But the Trustee's argument misses its mark: whether the CGL Insurers may have had actual or constructive notice of the bankruptcy proceedings through their own independent research does not excuse Endo from adhering to the terms of the policies that it agreed to. *See Scottsdale Ins. Co.*, 105 F. App'x at 344 (holding that the insurer's awareness of a party's "intent to file a lawsuit" against the insured "[did] not release [the insured] from its obligation under the policy to provide" the insurer with notice of the lawsuit once it was actually filed); *Essex Ins. Co. v. Liberty Mut. Ins. Co.*, No. 10-cv-1078, 2010 WL 4751583, at *5–7 (E.D. Pa. Nov. 23, 2010) (rejecting an argument that "indirect notice" "by another party" satisfied the notice conditions of an insurance policy). Notice requirements serve an important function for insurers because "[n]ot every occurrence for which an insured faces potential liability will result in the filing of a claim, and not every unresolved claim will result in the filing of a lawsuit." *Scottsdale Ins. Co.*, 105 F. App'x at 344. "Insurers cannot be expected to station agents in the clerk's office of every court which may or may not have jurisdiction over a potential claim, waiting until the statutes of limitation for all possible causes of action have elapsed." *Id.* Under the unambiguous terms of the CGL Insurers' notice provisions, Endo was required to notify the CGL Insurers directly once it was aware of an occurrence or offense that might lead to a suit, *see* ECF No. 317-31 at 28, but Endo failed to comply.

Furthermore, not only is it clear that the CGL Insurers' policies required prompt notice, but the policies also spelled out in detail the form by which such notice should take place and the specific "[d]uties" that Endo was required to fulfill. *Id.* For example, notice needed to include "(1) How, when and where the 'occurrence' or offense took place; (2) The names and addresses of any

16

injured persons and witnesses; and (3) The nature and location of any injury or damage arising out of the 'occurrence' or offense." *Id.* And if a "claim" was made or a suit was brought against Endo, "[Y]ou must: (1) Immediately record the specifics of the claim or 'suit' and the date received; and (2) Notify us as soon as practicable." *Id.* Moreover, Endo was required to send the CGL Insurers "copies of any demands, notices, summonses, or legal papers," allow them to "obtain records," "[c]ooperate" with the insurers "in the investigation or settlement of the claim or defense against the 'suit,'" and "[a]ssist" the insurers in enforcing "any right against any person or organization which may be liable" to Endo. *Id.* at 28–29. In other words, the actions that Endo was obligated to take under the terms of the insurance policies with respect to notice were carefully proscribed and agreed to by the Parties. *NVR, Inc. v. Motorists Mut. Ins. Co.*, 371 F. Supp. 3d 233, 247 (W.D. Pa. 2019) (explaining that sending litigation papers to the insurer "would have at least provided notice" that the insured was seeking coverage, and while the insured "might not have viewed it as a big deal that they did not comply with" the contractual notice provisions, "this was not their call to make"). If the Court were to adopt the Trustee's interpretation of the notice provisions—i.e., notice is sufficient "regardless of the source," *see* ECF No. 339-29 at 26—those contractual provisions would effectively be rendered meaningless. *See Rathblott v. PeopleStrategy, Inc.*, 685 F. App'x 107, 109 (3d Cir. 2017) ("[J]udges take[] care not to render other portions of a provision or contract superfluous when construing contract language." (internal quotations and citations omitted)).

At bottom, Endo failed to provide the CGL Insurers with prompt notice and did not fulfill its duties as outlined by the terms of the policies. Endo thus breached the policies as a matter of law.

   2.  *A Genuine Dispute Remains as to Whether the CGL Insurers Suffered Actual Prejudice*

Having found that the CGL Insurers were not provided with prompt notice of an occurrence or offense, the Court next turns to whether the CGL Insurers suffered actual prejudice as a result of late notice.

In Pennsylvania, when an insured provides an insurer with late notice, the insurer is only relieved of its coverage obligations if it can also prove that breach of the notice provisions caused actual "prejudice to its position." *Brakeman*, 371 A.2d at 198; *see also Vanderhoff v. Harleysville Ins. Co.*, 997 A.2d 328, 335 (Pa. 2010) (applying *Brakeman*'s prejudice requirement in the context of an insured's failure to notify an insurer of a phantom vehicle accident); *Trs. of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 896 (3d Cir. 1987) (examining *Brakeman*). *Brakeman*'s rule also applies to insurance policies "between sophisticated parties." *Trs. of Univ. of Pa.*, 815 F.2d at 897. Actual prejudice is required because otherwise "lateness of notice itself" would essentially be a "form of prejudice, for late notice almost invariably interferes with the insurer's procedures for processing a claim." *Id.* at 898; *see also NVR, Inc.*, 371 F. Supp. 3d at 249 (explaining that *Brakeman* "rejected a strict contractual approach to policy interpretation because" insurance contracts are not "negotiated instrument[s,]" but contain conditions "large[ly] dictated by the insurance company to the insured" (internal quotations and citations omitted)). According to the Third Circuit, the "purpose of the prejudice requirement is to allow an insurer to refuse payment only if its procedural handicap has led to disadvantageous, substantive results." *Trs. of Univ. of Pa.*, 815 F.2d at 898; *see also Brakeman*, 371 A.2d at 197 ("[A] reasonable notice clause is designed to protect the insurance company from being placed in a substantially less favorable position than it would have been in had timely notice been provided"). The determination of actual

18

prejudice "is highly circumstance dependent." *Vanderhoff v. Harleysville Ins. Co.*, 78 A.3d 1060, 1067 (Pa. 2013) (internal quotations and citations omitted).

The CGL Insurers argue in their motion for summary judgment that "post-settlement notice is prejudicial" to insurers as a matter of law. ECF No. 314-1 at 20 (quoting *Nationwide Mut. Fire Ins. Co. v. Nova Real Estate LLC*, No. 09-cv-0303, 2011 WL 721905, at \*6 (E.D. Pa. Mar. 1, 2011)). The CGL Insurers rely principally on *Nationwide Mutual Fire Insurance Co.*, a case in which the insured failed to provide notice to Nationwide under an occurrence policy until "nearly a month and a half after the settlement" of a lawsuit. 2011 WL 721905, at \*6. The court found that late notice deprived Nationwide of the chance "to investigate or defend against the claims," "to have counsel of their choosing oversee the matter and to help negotiate a resolution," "to pursue a number of potential defenses through discovery and expert witnesses," and "to reasonably evaluate the verdict risk and the settlement value of the case." *Id.* Accordingly, Nationwide was placed "at a significant disadvantage" and "in a substantially less favorable position that it would have been in had timely notice been provided." *Id.*; *see also RealogicHR, LLC v. Continental Cas. Co.*, No. 22-cv-01573, 2022 WL 17904245, at \*4 (W.D. Pa. Dec. 23, 2022) (presuming prejudice as a matter of law where "notice was provided to Continental only after RealogicHR's liability was *fait accompli*").

In response, the Trustee argues that the CGL Insurers can only refuse coverage if they have suffered "disadvantageous, substantive results," ECF No. 339-29 at 27 (quoting *Trs. of Univ. of Pa.*, 815 F.2d at 898). The Trustee also contends that the CGL Insurers had the chance to object to Endo's reorganization plan (and some allegedly did), yet the bankruptcy court still confirmed the plan. *Id.* (citation omitted). According to the Trustee, notice prior to the bankruptcy proceedings thus "would not have benefited the CGL Insurers or changed the results with respect to these

liabilities[,]" and the CGL Insurers failed to make a showing that earlier notice would have led to a different outcome. *Id.* at 28–29.

Undoubtedly, the CGL Insurers' receipt of late notice for coverage after Endo had already resolved its liability for the Opioid Suits substantially impacted the CGL Insurers' litigation rights and their ability to defend their interests in connection with any settlement. For example, the CGL Insurers were deprived of the chance to investigate Endo's liability and assist in selecting counsel to defend Endo. As the *Nationwide Mutual Fire Insurance Co.* court aptly explained, the insured's failure to notify Nationwide of an occurrence until after the settlement resulted in "a loss of substantial defense opportunities." 2011 WL 721905, at *6 (quoting *Trs. of Univ. of Pa.*, 815 F.2d at 898)).

However, the Court finds that there is a genuine dispute of material fact as to whether this "procedural handicap has *led to disadvantageous, substantive results*" for the CGL Insurers. *Trs. of Univ. of Pa.*, 815 F.2d at 898 (emphasis added). This Court is bound by Third Circuit precedent, under which a party's demonstration of a "loss of substantial defense opportunities" on its own is insufficient: to establish actual prejudice, the insurer must prove that late notice "has led to disadvantageous, substantive results—in other words, if the insured's violation of its contract has proximately caused its insurer damages"—or has led to a loss of "a 'likelihood of success' in defending liability or damages if those opportunities had been available." *Id.* (citation omitted); *see also Brakeman*, 371 A.2d at 198 (requiring a demonstration of "prejudice to [the insurer's] position" and "recogniz[ing] that prejudice is a difficult matter to prove affirmatively"). The CGL Insurers have not adequately demonstrated as a matter of law that earlier notice would have led to a substantively different result, such as a lower settlement figure or lower costs of defense.

20

*Nationwide Mutual Fire Insurance Co.* does not countenance a different result. First, while *Nationwide Mutual Fire Insurance Co.* found that "post-settlement notice is prejudicial," the court also recognized that, even where "notice comes after the insured has formally settled the matter," "[when liability] is clear and the calculation of damages [is] merely an arithmetical exercise, the insurer does not have a valid claim of prejudice." 2011 WL 721905, at *6 (quoting *Granary Assocs., Inc. v. Evanston Ins. Co.*, No. 99-cv-5154, 2000 WL 1782544, at *7 (E.D. Pa. Dec. 5, 2000)). Therefore, post-settlement notice is not necessarily *always* prejudicial as a matter of law. *Id.*

Second, Nationwide pointed to facts that indicated it may have had a more advantageous result if it had been promptly notified of the suit prior to settlement. *Id.* There, individuals filed suit requesting damages for injuries from a fire that took place at a property on Glenmore Avenue in Philadelphia as a result of faulty electrical wiring. *Id.* at *1. With respect to actual prejudice, Nationwide argued that it might "have had a complete defense" to coverage based on a witness's contention that the family "was not living at the Glenmore Avenue property with permission or pursuant to a lease." *Id.* at *6. Nationwide may have also had a defense based on an "exclusion for 'bodily injury' due to rendering or failure to render any professional service." *Id.* By the time that Nationwide was notified over three and a half years after the fire had occurred, "it was foreclosed from being able to conduct discovery" related to its defenses, "recollections of witnesses had faded and evidence was obviously less available." *Id.* In other words, given the potential existence of a complete defense that would have excluded the claims from coverage, Nationwide showed that it might have achieved a different result if it had received earlier notice. *Id.* Put another way, notice

21

might have changed the settlement calculus. Accordingly, the court found that Nationwide had suffered a noticeable loss of a "likelihood of success." *Id.*[7]

Similarly, in *Trustees of the University of Pennsylvania*, the Hospital of the University of Pennsylvania ("HUP") waited ten months after an injured patient filed suit to provide notice of the suit to its insurance company. 815 F.2d at 895. Lexington Insurance Company ("Lexington") presented multiple theories of prejudice, including that it faced prejudice from late notice because it was deprived of enough time to "obtain an expert between the date of notice and the trial date" in connection with testimony about the patient's reduced life expectancy. *Id.* at 898–99. The Third Circuit found that, "[i]n accordance with [its] view that prejudice requires a showing that the lateness of notice *probably altered the result*," Lexington "must prove more" than a mere lack of time to obtain an expert. *Id.* at 899 (emphasis added). "[T]o demonstrate damages," Lexington needed to show, at a minimum, that with enough time it "probably would have found an expert to testify about [the patient's] reduced life expectancy" and that "the availability of this testimony probably would either have dissuaded HUP from accepting [the patient's] settlement demand or would have made the acceptance of such a demand unreasonable," resulting in a lower settlement. *Id.*; *see also NVR, Inc.*, 371 F. Supp. 3d at 254–55 (finding actual prejudice where the insurer argued that it would have asserted a number of defenses if it were involved earlier and where the record demonstrated that the insured waited over three years to involve the insurer, retained

---

[7] The CGL Insurers also rely on *Realogic HR, LLC*, a case in which the insured only provided an insurer with notice after a settlement agreement had already been entered into. 2022 WL 17904245, at *1. In resolving a motion to dismiss, the *Realogic HR, LLC* court "presume[d] prejudice as a matter of law" where notice was provided "only after RealogicHR's liability was *fait accompli*." *Id.* at *4. But that court did not address *Trustees of the University of Pennsylvania*'s requirement that an insurer demonstrate disadvantageous results or a loss of a likelihood of success in the litigation, 815 F.2d at 898, so its persuasive value is limited.

expensive attorneys "for its defense without consultation" with the insurer, incurring substantial costs of defense).

In comparison, here the CGL Insurers have not demonstrated as a matter of law how the results of Endo's settlement probably would have been different if the CGL Insurers had received earlier notice. *See Trs. of Univ. of Pa.*, 815 F.2d at 899 ("The mere interference with Lexington's right to 'associate' in the defense of the claim is too amorphous and cannot itself constitute prejudice unless Lexington can demonstrate that earlier notice would probably have led to a more advantageous result."). The CGL Insurers argue, for example, that they lost "any ability to 'reasonably evaluate the verdict risk and the settlement value of the case' before the settlement [was] done." ECF No. 314-1 at 21 (quoting *Nationwide Mut. Fire Ins. Co.*, 2011 WL 721905, at *6). Such arguments speak to the loss of the CGL Insurers' litigation rights; but as explained above, more is required under controlling precedent. In addition, the CGL Insurers asserted that the Trustee has not yet produced documents that are "highly relevant to potential defenses in this case," *see* ECF No. 360 at 29, which suggests they are still evaluating the extent of prejudice, if any, to their position. *See* ECF No. 389 at 12 (explaining that "discovery into the potential prejudice" the CGL Insurers have suffered from late notice is needed).

Because the Court finds that a genuine factual dispute exists as to whether the CGL Insurers might have had a more advantageous, substantive result if they had been provided with earlier notice of the Opioid Suits, the CGL Insurers have not demonstrated actual prejudice as a matter of law. The Court will thus deny the CGL Insurers' Motion for Summary Judgment in part, and deny

23

the Trustee's Cross-Motion for Partial Summary Judgment on the issue of late notice, as discovery

is needed.[8]

---

[8] The Trustee argues that summary judgment is premature because further discovery is warranted. ECF No. 339-29 at 11, 34 n.11. After certain Defendants argued that the Trustee could not raise this argument without "an affidavit or declaration under [Federal Rule of Civil Procedure] 56(d)," ECF No. 362 at 10 n.9, the Trustee attached a Rule 56(d) declaration to his sur-reply briefs. *See* ECF Nos. 379-1, ECF No. 381-1. The CGL Insurers argue that the Rule 56(d) declaration is untimely. *See* ECF No. 389 at 13–14. In addition, the CGL Insurers filed a Rule 56(d) declaration in connection with their reply in support of their motion for summary judgment and opposition to the Trustee's cross-motion for partial summary judgment. *See* ECF No. 364.

The Court need not consider the Parties' Rule 56(d) declarations given the unique procedural posture of the case. Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). The purpose of Rule 56(d) declarations is to alert courts that additional time for discovery is needed before a motion for summary judgment is ruled on. *See Jenkins v. Woodard*, 109 F.4th 242, 251 (4th Cir. 2024).

Here, in June 2025, the Parties agreed to limited summary judgment briefing on bellwether issues prior to most discovery, in order to streamline the case. *See* ECF No. 291 at 53. The Parties then proposed orders which identified these issues, and the Court adopted these orders. *See* ECF Nos. 282, 283, 284, 285, 286, 287, 288, 289. These issues were selected because they largely turn on matters of contract interpretation that require minimal, if any, discovery, and could possibly eliminate hundreds or thousands of the underlying suits for which the Trustee seeks coverage. *See* ECF No. 291 at 17; *see also Fed. Ins. Co. v. Sandusky*, No. 11-cv-2375, 2013 WL 785269, at *8 (M.D. Pa. Mar. 1, 2013) (denying a Rule 56(d) request where the language of an insurance policy was "clear and unambiguous," such that the "intent of the parties is to be ascertained by the document itself, without inquiry into extrinsic evidence").

The Parties therefore have been on notice since June that discovery may be warranted, given the limited nature of this summary judgment briefing and the early stage at which it occurred. Strict compliance with Rule 56(d) was therefore unnecessary. *See United States v. Rohner*, 634 F. App'x 495, 504 (6th Cir. 2015); *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994). Moreover, where the Court believes that discovery may be required, the Court has identified as such in its Memorandum Opinions addressing the Parties' summary judgment motions. The Court expects that the Parties will review the Memorandum opinions, meet and confer as to those areas in which discovery is still needed, and present a path forward for the remainder of this litigation.

**B. Summary Judgment Is Granted in Favor of the CGL Insurers on the Basis of the Products Exclusion**

The CGL Insurers next argue that the plain language of the Products Exclusion within their insurance policies precludes coverage of the underlying Opioid Suits because those suits involve claims for bodily injury arising out of Endo's products. ECF No. 314-1 at 22–32. The Trustee concedes that coverage is precluded with respect to the CGL Insurers for claims involving bodily injury arising out of products "manufactured or sold by Endo," such as Opana. ECF No. 381 at 6 ("Injuries allegedly caused by the consumption of Endo's products are not at issue here."). In his response, the Trustee argues that the Products Exclusion does not exclude coverage for liability that Endo may have incurred with respect to its involvement in *unbranded* promotions and marketing campaigns, and "the resulting bodily injuries that were caused by opioids made or sold by others or illicit opioids." ECF No. 339-29 at 30; *see also* ECF No. 381 at 6 ("[T]he Trustee seeks coverage under the CGL Policies for injuries allegedly caused in whole or in part by the consumption of opioids *not* manufactured or sold by Endo." (emphasis in original)). For the reasons described below, the Court holds that the Products Exclusion bars coverage of the Opioid Suits to the extent the underlying suits involve claims for bodily injury arising from Endo's products, including Endo's unbranded promotions.

*1. Principles of Insurance Policy Interpretation*

In interpreting the Products Exclusion at issue, this Court is "guided by the polestar principle that insurance policies are contracts between an insurer and a policyholder." *Kurach*, 235 A.3d at 1116. "[T]raditional principles of contract interpretation" are thus applied to determine the meaning of the provisions used in the CGL Insurers' policies, which requires the Court "to effectuate the intent of the contracting parties." *Id.* When the policy's language is "clear and unambiguous, a court must enforce that language," giving effect to the plain and ordinary meaning

25

of the terms. *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 321 (3d Cir. 2011). However, if a provision contains ambiguities and is "reasonably susceptible to more than one interpretation," it must be construed in the insured's favor. *Id.* A policy is not necessarily ambiguous where an operative term lacks a definition. *County of Delaware v. Travelers Prop. & Cas. Co. of Am.*, 559 F. Supp. 3d 425, 434 (E.D. Pa. 2021).

When there is a dispute over coverage in Pennsylvania, "[i]n the first instance, the insured bears the burden of demonstrating that its claim falls within the policy's affirmative grant of coverage." *Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 158 (3d Cir. 2017). "Where an insurer seeks to disclaim coverage on the basis of a policy exclusion—as [the CGL Insurers] do[] here—the insurer bears the burden of proving the applicability of the exclusion as an affirmative defense." *Id.* (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)). If an insurer establishes that an exclusion applies, the burden shifts back to the insured to "prov[e] that an exception to the exclusion applies." *County of Delaware*, 559 F. Supp. 3d at 434. Summary judgment may be granted based on a policy exclusion within an insurance policy. *Madison Constr. Co.*, 735 A.2d at 102, 110.

### 2. *In Pennsylvania, "Arising Out Of" Requires "But for" Causation*

The CGL Insurers' policies contain Products Exclusion provisions that exclude coverage for "products-completed operations hazard." ECF No. 317-31 at 57. Specifically, the Products Exclusion bars coverage for "all 'bodily injury' and 'property damage' . . . arising out of 'your product,'" subject to certain exceptions. *Id.* "Your product" is defined to mean "[a]ny goods or products, including any of 'your biotechnology products' and any of 'your medical products[.]'" *Id.* The meaning of "Your product" also expressly includes: "(1) [w]arranties or representations made at any time, or that should have been made with respect to the fitness, quality, durability,

performance, handling, maintenance, operation, safety, or use of such goods or products;" and "(2) [t]he providing of, or failure to provide, warnings or instructions with respect to such goods or products[.]" *Id.* at 58. Summed up, the Products Exclusion bars coverage for all bodily injury that arises out of (1) any of Endo's goods or products; (2) warranties or representations; and (3) failure to warn about its goods or products.

First, the CGL Insurers and the Trustee disagree as to what standard of causation the phrase "arising out of" requires within the Products Exclusion provisions. The CGL Insurers argue that "arising out of" must be interpreted to require "but for" causation, *see* ECF No. 314-1 at 22–24, while the Trustee argues that "arising out of" requires proximate causation. *See* ECF No. 339-29 at 35–37. Applying binding Third Circuit precedent, it is clear that "arising out of" requires "but for" causation.

Under Pennsylvania law, it is "well-settled" that "'arising out of'—when used in the context of an insurance exclusion—[] mean[s] causally connected with, not proximately caused by." *Gen. Refractories Co.*, 855 F.3d at 159 (quoting *McCabe v. Old Republic Ins. Co.*, 228 A.2d 901, 903 (Pa. 1967)). An insurance policy provision that has the language "arising out of" is thus "satisfied by 'but for' causation, i.e., a cause and result relationship." *Id.* (quoting *Mfrs. Cas. Ins. Co. v. Goodville Mut. Cas. Co.*, 170 A.2d 571, 573 (1961)) (hereinafter "*Goodville*") (cleaned up); *see also The Cincinnati Specialty Underwriters Ins. Co. v. Mainline Private Sec., LLC*, No. 24-cv-3871, 2025 WL 3644242, at *5 (E.D. Pa. Dec. 16, 2025) (same). "'But for' causation requires the plaintiff to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Gen. Refractories Co.*, 855 F.3d at 161 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)) (cleaned up). Moreover, "but for" causation sets a low bar: it "is a de minimis standard of causation, under which even the most remote and insignificant

force may be considered the cause of an occurrence." *Id.* (citation omitted). Pennsylvania courts have consistently applied this interpretation of "arising out of" in the context of insurance policy disputes and have also found on multiple occasions that "arising out of" is not an ambiguous phrase. *See id.* at 159–60 (citing cases); *see also Westminster Am. Ins. Co. v. Sec. Nat'l Ins. Co.*, No. 23-cv-2902, 2024 WL 4987242, at \*5 (3d Cir. Dec. 5, 2024); *Madison Constr. Co.*, 735 A.2d at 110; *Forum Ins. Co. v. Allied Sec., Inc.*, 866 F.2d 80, 82 (3d Cir. 1989). Because the phrase "arising out of" is not ambiguous, it must be given its plain meaning. *Gen. Refractories Co.*, 855 F.3d at 158.

The Trustee cites to Pennsylvania cases that purportedly require proximate causation, *see* ECF No. 339-29 at 35–36, but those cases are inapposite. First, the Trustee relies on *Manufacturers Casualty Insurance Co. v. Goodville Mutual Casualty Co.*, 170 A.2d 571 (Pa. 1961) in support of his argument that "arising out of" is "ambiguous" and should be narrowly construed against the insurer to require proximate causation. ECF No. 339-29 at 35. But *Goodville* directly contradicts the Trustee's argument. There, the Pennsylvania Supreme Court rejected a lower court's interpretation of "arising out of" as meaning "proximately caused by." 170 A.2d at 573. Instead, the court found that "'arising out of' means causally connected with, not proximately caused by. 'But for' causation, i.e., a cause and result relationship, is enough to satisfy this provision of the policy." *Id.*

Moreover, only a few years later, the Pennsylvania Supreme Court expressly addressed *Goodville*'s finding that the phrase "arising out of" was ambiguous and cabined *Goodville* to the coverage clause in the "particular policy involved" in that case, where "the context in which the words were employed was the determining factor." *McCabe*, 228 A.2d at 903. In *McCabe*, a construction worker's estate filed a wrongful death suit against the town after a trench collapsed,

28

resulting in the worker's death. *Id.* at 902. The town impleaded the construction worker's company, which later sought a defense from its insurance carrier. *Id.* at 902–03. The insurance policy at issue excluded coverage "for injury or death of an employee 'arising out of and in the course of his employment.'" *Id.* at 903. In arguing for coverage, the construction company contended that the worker's "death did not 'arise out of' his employment, but rather arose out of the absence of shoring in the trench." *Id.* Relying on *Goodville*, the construction company then argued that the meaning of "arising out of" was ambiguous, "must be construed strictly against the insurer . . . and, so construed, means 'proximately caused by' one's employment." *Id.* The *McCabe* court disagreed with the construction company that "any ambiguity exists" with respect to the meaning of the phrase "arising out of" in the "instant exclusionary clause." *Id.* The court emphasized that "[i]t does not follow [from *Goodville*], that every time the phrase ["arising out of"] is used in an insurance policy that an indefinite meaning must be ascribed" to it. *Id.* Ruling in favor of the insurer, the court reiterated *Goodville*'s key holding that "'arising out of' means causally connected with, not proximately caused by." *Id.* Therefore, *Goodville* does not support the Trustee's insistence on the application of proximate causation.

Second, the Trustee relies on *Eichelberger v. Warner*, 434 A.2d 747 (Pa. Super. Ct. 1981), and a series of automobile insurance cases that purportedly have used a proximate causation standard. ECF No. 339-29 at 35–37. *Eichelberger* is also distinguishable. There, Dava Rice was standing on the side of a highway because her car had run out of fuel. 434 A.2d at 748–49. While another individual, Herby Eichelberger, helped her refuel, she negligently stepped into the path of a car and was killed. *Id.* at 749. Eichelberger was also injured during the incident and subsequently filed suit against Vivian Warner, the driver of the car that hit Rice, who joined the administrator of Rice's estate. *Id.* at 748. On appeal, the court addressed whether Rice's insurance policies covered

her liability. *Id.* An exclusionary clause in Rice's homeowner's policy did not cover liability for "bodily injury . . . arising out of the ownership, maintenance, operation, use, loading or unloading of . . . any motor vehicle owned or operated by or rented or loaned to any insured." *Id.* at 750. The court found the policy ambiguous and read *Goodville* to require the phrase "arising out of" to be strictly construed against the insurer, with the result that the exclusionary clause had to be interpreted to "exclude only those injuries which are proximately caused by the automobile." *Id.* at 752. But nowhere did the *Eichelberger* court grapple with any of the subsequent Pennsylvania authority cabining *Goodville* and applying a "but for" causation standard. *See, e.g.*, *McCabe*, 228 A.2d at 903.[9]

Furthermore, in the context of a release clause, the Superior Court of Pennsylvania recently addressed and rejected a similar argument that the Trustee raises here (and that was addressed in *Eichelberger*). *See Werner v. 1281 King Assocs., LLC*, 327 A.3d 291, 299 (Pa. Super. Ct. 2024). In

---

[9] The Trustee claims that *Eichelberger* "has been broadly cited and repeatedly endorsed" and cites to a string of Third Circuit cases. *See* ECF No. 381 at 19 & n.29. But the Trustee overstates the significance of those cases with respect to the issues that are before the Court on the Parties' motions for summary judgment. For instance, *Westport Insurance Corp. v. Bayer*, 284 F.3d 489 (3d Cir. 2002), did not deal with whether "arising out of" should be interpreted to require a proximate or but for causation standard, nor did the Third Circuit "cit[e] *Eichelberger*'s holding with approval." ECF No. 381 at 19 n.29. Instead, the Third Circuit merely cited to *Eichelberger* in a footnote for the proposition that insurance coverage clauses should be "interpreted broadly" to afford protection to an insured. *Westport Ins. Corp.*, 284 F.3d at 498 n.7 (internal quotations and citation omitted). Similarly, the Third Circuit neither examined the meaning of "arising out of" nor touched on the appropriate causation standard in *PNC Bank N.A. v. Axis Insurance Co*. *See* No. 24-1670, 2025 WL 880013, at *2 n.4 (3d Cir. Mar. 21, 2025) (mentioning *Eichelberger* in a footnote for the proposition that exclusions should generally be interpreted in favor of coverage to an insured). While the Third Circuit addressed *Eichelberger* in greater depth in *National Casualty Co. v. Borough of Wyomissing*, that case is distinguishable because it dealt with coverage in the context of an automobile accident after a police chase and involved an automobile insurance policy that contained "almost identical . . . language" to the one at issue in *Eichelberger*. 57 F. App'x 62, 64–65 (3d Cir. 2003). The Products Exclusion language at issue here is distinct from the automobile exclusion in *National Casualty Co.* and *Eichelberger*.

*Werner*, relying on *Goodville*, plaintiffs contended that "arising out of" was ambiguous and thus must be "construed [] in their favor as the non-drafting party, which would result in the more narrow application of proximate causation." *Id.* The *Werner* court rejected plaintiffs' argument, emphasizing that *McCabe* had distinguished *Goodville*. *Id.* The court instead found that "arising out of" was unambiguous and should be interpreted to require "but for" causation, "not proximate causation." *Id.* at 300; *see also McCabe*, 228 A.2d at 903 (finding that an exclusionary policy precluded coverage where "there [was] an obvious causal connection between [the decedent's] employment and his death"). The Court thus disagrees with the Trustee that *Eichelberger* applies to the facts of the instant case and declines to extend it beyond the automobile injury context in light of other contrary authority.[10]

Instead, the Court finds that the phrase "arising out of" in the CGL Insurers' policies is clear and unambiguous. And the Court follows the multitude of Third Circuit and Pennsylvania cases, which hold that "Pennsylvania courts consistently interpret 'arising out of' to require 'but for' causation"; "[t]his understanding of the phrase is entrenched in Pennsylvania jurisprudence." *Gen. Refractories Co.*, 855 F.3d at 159–60 (citing cases); *see also Varga v. Allied World Ins. Co.*, No. 24-cv-3410, 2025 WL 1385112, at *4 (E.D. Pa. May 13, 2025); *Nautilus Ins. Co. v. Motel Mgmt. Servs. Inc.*, Nos. 21-2590 & 21-2871, 2022 WL 15722613, at *2 n.4 (3d Cir. Oct. 28, 2022); *Colony Ins. Co. v. Mid-Atl. Youth Servs. Corp.*, 485 F. App'x 536, 541–42 (3d Cir. 2012); *Fed. Ins. Co. v. KDW Restructuring & Liquidation Servs., LLC*, 889 F. Supp. 2d 694, 702–03 (M.D. Pa.

---

[10] In addition, the Supreme Court of Pennsylvania recently granted certiorari and is examining whether the Superior Court of Pennsylvania erred when it found the term "arising out of" to be ambiguous in an automobile exclusion endorsement, such that the exclusion applied "only to injuries proximately caused by an 'auto' as opposed to but for causation." *Chris Eldredge Containers, LLC v. Crum & Foster Specialty Ins. Co.*, No. 267 MAL 2025 & No. 268 MAL 2025, 348 A.3d 85 (Pa. Oct. 20, 2025); *see also Chris Eldredge Containers, LLC v. Crum & Foster Specialty Ins. Co.*, 335 A.3d 1216 (Pa. Super. Ct. 2025).

2012) (citing cases); *Minn. Laws. Mut. Ins. Co. v. Ahrens*, No. 09-cv-1661, 2010 WL 1994181, at *4 (M.D. Pa. May 18, 2010). Accordingly, the CGL Insurers need only demonstrate "but for" causation.

### 3. The Products Exclusion Bars Coverage of Claims for Bodily Injury Arising Out of Endo's Products

The CGL Insurers argue that other courts across the country have barred coverage for opioid lawsuits based on "materially identical 'products exclusions.'" ECF No. 314-1 at 26 (citing cases). The Court finds the reasoning in these cases instructive as to the Products Exclusion provisions at issue here.

In *Travelers Property Casualty Company of America v. Anda, Inc.*, the Eleventh Circuit held that two "general commercial liability policies [] specifically exclude[d] coverage for products liability" in connection with an opioid lawsuit that was filed against Anda. 658 F. App'x 955, 958 (11th Cir. 2016). Applying California law, the Eleventh Circuit found that the "arising out of" and "results from" language in the products exclusion at issue in that insurance policy only required a "minimal causal connection or link between the products sold or distributed by an insured and the alleged injury." *Id.* In the underlying suit for which coverage was sought, West Virginia had alleged that "Anda and other pharmaceutical distributors have so flooded the market with their products that West Virginia suffers from an opioid epidemic." *Id.* The State sought "monetary damages arising from the injuries—whether they be 'bodily' or not—caused by these products." *Id.* These types of allegations established a "causal connection between Anda's products and the injuries" purportedly suffered by the State, and met the "low bar set by California law" for causation. *Id.* at 958–59. Therefore, the Eleventh Circuit held that the claims from West Virginia's suit "render[ed] any coverage inapplicable," due to the products exclusion. *Id.* at 959.

In *Zogenix, Inc. v. Federal Insurance Company*, the Northern District of California applied the same reasoning to find that coverage was barred by that insurance policy's products exclusion. No. 20-cv-6578, 2022 WL 3908529, at *9 (N.D. Cal. May 26, 2022). There, the underlying "Walker County complaint allege[d] that Zogenix intentionally misrepresented and marketed the efficacy and safety of its opioid, Zohydro." *Id.* at *8. All of the harm that was asserted in the complaint "stem[med] from Zogenix's manufacture and marketing of Zohydro and representations and omissions about Zohydro," and the complaint "allege[d] a direct connection between Zohydro, the statements Zogenix made about Zohydro, and the overdose and addictions caused by Zogenix's products." *Id.* at *8, 9. In other words, if Zogenix had not manufactured Zohydro, the action would not have existed. *Id.* Therefore, the Northern District of California found that the products exclusion precluded coverage of the underlying Walker County Action. *Id.*; *see also The Travelers Prop. Cas. Co. of Am. v. Actavis, Inc.*, 16 Cal. App. 5th 1026, 1046 (Cal. Ct. App. 2017) (hereinafter "*Actavis, Inc.*") (finding the products exclusion barred coverage where the underlying "complaints allege[d] a direct connection between the statements and representations made . . . to increase sales of its opioid products and the . . . injuries caused by those products"); *Opioid Master Disbursement Trust II v. Ace Am. Ins. Co.*, No. 22SL-CC02974, 2025 Mo. Cir. LEXIS 4, at *3–4 (Mo. Cir. Ct. Mar. 10, 2025) (finding that the Trust presented claims that fell within the scope of a products exclusion where liability "'arose out of' Mallinckrodt's opioid products, including the manner in which Mallinckrodt sold its opioids and opioid ingredients to the public, and the representations that [it] made as part of its alleged effort to increase its sales").

Courts have also precluded coverage for similar products exclusions outside of the opioid context. For example, in *Taurus Holdings, Inc. v. U.S. Fidelity & Guaranty Company*, the Supreme Court of Florida addressed whether a products exclusion in gun manufacturers' commercial

33

general liability insurance policies precluded coverage of damages from "all bodily injury" "arising out of your product." 913 So.2d 528, 530 (Fla. 2005). Interpreting the meaning of "arising out of," the court found that the phrase "require[d] some level of causation greater than coincidence," but did not "equate to proximate causation." *Id.* at 533, 539–40. Moreover, that interpretation was in line with how other jurisdictions had interpreted "arising out of." *Id.* at 535–36 (citing cases). Next, the court examined the plain language of the provision at issue, which "exclude[d] coverage for 'all bodily injury and property damage occurring away from premises you own or rent and arising out of your product,'" and which defined "your product" as including "any goods or products . . . manufactured, sold, handled, distributed or disposed of by" the manufacturer. *Id.* at 537, 540. That language was broad, "connot[ing] a scope extending beyond merely defective products." *Id.* at 537. Turning to the underlying complaints for which coverage was sought, the court noted that the alleged damages were "for increased health care costs and the increased costs for police and emergency medical services due to gun violence, and the costs associated with the prosecution of gun-related crimes." *Id.* at 540. Because the alleged damages were for bodily injuries that "all originated from [the manufacturer's] products—that is, the discharge of their manufactured guns"—the court held that coverage was barred by the policy. *Id.*; *see also Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 7 (1st Cir. 2000).

The same reasoning applies here with respect to the Products Exclusion in the CGL Insurers' policies. Applying Pennsylvania's interpretation of "arising out of" to the Products Exclusion in the CGL Insurers' policies, the exclusion precludes coverage for any "bodily injury" "arising out of" Endo's "products"—that is, "bodily injury" that would not have occurred "but for" Endo's "products," which includes its warranties or representations, and failure to warn. ECF No.

34

317-31 at 57–58. The allegations and claims underlying the Opioid Suits for which the Trustee seeks coverage demonstrate that the Opioid Suits stem from Endo's products, i.e., but for Endo's products, Endo would not have been sued. For example, the complaint filed in *City of Chicago v. Purdue Pharma L.P.* alleges that Endo misrepresented the safety of its opioid products so that it could increase its sales. *See, e.g.*, ECF No. 319-17 ¶ 416 (describing Endo's promotion of its opioid products, including "Opana and Opana ER," "through the full array of marketing channels[,]" and Endo's "[m]isleading claims," "deceptive statements and omissions" about its products); *id.* ¶ 418 (alleging that Endo conveyed "deceptive messages" to prescribers "with the intent that Chicago prescribers and/or consumers would rely on them in choosing to use opioids to treat chronic pain"); *id.* ¶ 419 ("Endo used deceptive direct marketing to increase the sales of its dangerous opioids. . . . [and] conveyed these deceptive messages . . . in unbranded advertising."). The requisite minimal causal connection between the Opioid Suits and Endo's products, representations, and advertising has been established. This causal connection is further demonstrated by Endo's bankruptcy reorganization plan, which defined "Opioid Claims" as "any and all Claims and Causes of Action . . . *in any way arising out of or relating to Opioids or Opioid Products* manufactured or sold by any of the Debtors." ECF No. 319-11 at 57 (emphasis added); ECF No. 317 ¶ 9; *see also* ECF No. 319-11 at 216 ("[T]he Distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge to the fullest extent permitted . . . of all Claims, Interests, and Causes of Action of any nature whatsoever"). Accordingly, the Products Exclusion precludes coverage of the Opioid Suits to the extent the underlying suits involve claims for "bodily injury" "arising out of" Endo's "products."

The Trustee argues that the Products Exclusion was only "intended to apply to typical products liability claims arising out of the insured's products." ECF No. 339-29 at 31. Put

differently, the Trustee asks this Court to find that the Products Exclusion was solely intended to preclude claims for defective products.

In support of this reading that the Products Exclusion precludes only "typical products liability claims," the Trustee relies on *The Harford Mutual Insurance Co. v. Moorhead*, 578 A.2d 492 (Pa. Super. Ct. 1990). ECF No. 339-29 at 31. But *The Harford Mutual Insurance Co.* dealt with a separate issue. There, the Moorheads sold wine making supplies, including sulphur strips, which later ignited and caused a wooden whiskey barrel to explode and injure an individual. 578 A.2d at 493. In connection with subsequent litigation asserting a negligent failure to warn claim, Harford Mutual Insurance Company ("Harford") filed a declaratory judgment action seeking a ruling that it did not owe a duty to defend the Moorheads based on a products hazard exclusion, which was intended to preclude coverage of injuries sustained by products sold by the Moorheads. *Id.* at 493–94. The Moorheads argued in response that the policy did not expressly "exclude a claim that the insured was negligent in failing to provide warnings or instructions." *Id.* at 494. The Superior Court of Pennsylvania agreed with the Moorheads, finding that failure to warn claims could qualify as either negligence or products liability claims. *Id.* at 503. If Harford had intended to exclude coverage for that "region of overlap," it needed to "unequivocally" exclude those claims in its policy, which it failed to do. *Id.* The court found that Harford's policy did not provide "the insured any indication that such a claim would not be covered," so the products exclusion did not bar coverage. *Id. The Harford Insurance Co.* thus does not hold that products exclusions are only "intended to apply to typical products liability claims," *see* ECF No. 339-29 at 31; to the contrary, that court was tasked with deciding whether a failure to warn claim qualified as a negligence or products liability claim, recognized that it could be both, and ultimately found coverage where an insurance policy did not explicitly speak to the exclusion of the claim at issue.

36

The Court rejects the Trustee's invitation to re-write the CGL Insurers' Products Exclusion, which contains no such limiting language. Here, the CGL Insurers' Products Exclusion is clear: as explained above, the Products Exclusion bars coverage for "*all* 'bodily injury' . . . arising out of 'your product.'" ECF No. 317-31 at 57 (emphasis added). And the Products Exclusion specifically defines "Your product" to mean (1) "*[a]ny* goods or products, including *any* of 'your biotechnology products' and *any* of 'your medical products;'" (2) "[w]arranties or representations *made at any time*, or that should have been made with respect to the fitness, quality, durability, performance, handling, maintenance, operation, safety, or use of such goods or products;" and (3) failure to warn. *Id.* at 57–58 (emphasis added). The plain language of the policies is not ambiguous and does not reflect an intention to exclude coverage only for claims related to defective products, so the Court declines to read that requirement into existence. *See Taurus Holdings, Inc.*, 913 So.2d at 537 (finding that the use of the "word 'any' before 'goods or products' connote[d] a scope extending beyond merely defective products" and that "nothing in the text of the exclusion suggests it applies only to defective products"); *see also Charter Oak Fire Ins. Co. v. Interface Performance Materials Inc.*, 340 F. Supp. 3d 437, 442–43 (E.D. Pa. 2018) (discussing an insurance policy provision that defined "Your Product" as meaning "Any goods or products" and finding the "exclusion [was] broad" and "plainly prohibits coverage for any product used in connection with *any* aircrafts parts").

### a.    The Products Exclusion Covers Endo's Unbranded Promotions

The Trustee also disputes whether the Products Exclusion precludes coverage for claims for bodily injury arising from Endo's *unbranded* promotions of opioids. The Trustee argues that "Unbranded Claims" that arose out of Endo's "Unbranded Campaign are well outside the scope" of a "traditional products liability claim": "[r]ather than depending upon allegations that any Endo

product is faulty or harmful or mislabeled, Endo's liability for the Unbranded Claims results squarely from its Unbranded Campaign, which in turn led to bodily injuries that were proximately caused by non-Endo products, including illicit opioids, such as heroin and fentanyl." ECF No. 339-29 at 31. According to the Trustee, the Products Exclusion was not "intended to address" this "type of liability." *Id.* By contrast, the CGL Insurers contend that the Products Exclusion sweeps in unbranded promotions because such promotions were "merely a back-door way for Endo to market and sell Endo's own products using false and misleading representations about the supposed safety and efficacy of opioids." ECF No. 314-1 at 30.

(1) The Trustee's Extrinsic Evidence Does Not Demonstrate a Latent<br>Ambiguity in the Products Exclusion

In support of his argument that unbranded promotions are not excluded from coverage by the Products Exclusion, the Trustee asks the Court to rely on a proffered expert's interpretation of what a "pharmaceutical company executive" might understand "warranties or representations" about Endo's products to encompass: "only statements that are subject to FDA regulation, i.e., statements about the company's own products." ECF No. 339-29 at 33–34. Neither party addressed the full standard by which a district court can consider extrinsic evidence in accordance with Pennsylvania law, so the Court begins there.

The Third Circuit has discussed in detail the circumstances under which it is appropriate to consider extrinsic evidence when interpreting a contract. *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92–96 (3d Cir. 2001). Pennsylvania law begins with the principle that "the intent of the parties to a written contract is contained in the writing itself." *Id.* at 92 (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. 1993)). If the parties' intent is clear, then it is not necessary to "resort to extrinsic aids or evidence" and the contract's meaning "must be determined by its contents alone." *Id.* (citation omitted). A contract is unambiguous where a

38

"court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Id.* at 93 (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995)); *see also Utica Mut. Ins. Co. v. Cincinnati Ins. Co.*, 361 F. Supp. 3d 451, 458 (E.D. Pa. 2019) ("A contract is not ambiguous just because the parties do not agree on the proper construction.").

However, if a contract's terms are ambiguous, a court can consider extrinsic evidence to determine their meaning. *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93. "Ambiguity in a contract can be either patent or latent." *Id.* An ambiguity is patent when it "appears on the face of the instrument." *Id.* "[A] latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Id.* (citation omitted). A party is permitted to rely on extrinsic evidence in support of a "claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." *Id.* In other words, "a claim of latent ambiguity must be based on a 'contractual hook,'" rather than the parties' "expectations, standing alone." *Id.* at 93, 96 (citation omitted). Moreover, "the alternative meaning that a party seeks to ascribe to the specific term in the contract must be reasonable; courts must resist twisting the language of the contract beyond recognition." *Id.* at 93. When deciding whether a "latent ambiguity exists in a facially unambiguous contract, a court must consider whether the extrinsic evidence that the proponent of the alternative interpretation seeks to offer is the type of evidence that could support a reasonable alternative interpretation of the contract" in light of these principles. *Id.* at 96. Summed up, the "key inquiry" with respect to a latent ambiguity is "whether the proffered extrinsic evidence is about the parties' objectively manifested 'linguistic reference' regarding the

39

terms of the contract, or is instead merely about their expectations." *Id.* at 94 n.3. The latter is not the "right type of extrinsic evidence for establishing latent ambiguity"; that is, "[e]vidence regarding a party's beliefs about the general ramifications of the contract would not be the right type to establish latent ambiguity." *Id.*

First, it does not escape the Court that the Trustee seemingly flip flops between whether or not he considers the Products Exclusion to be ambiguous. On the one hand, the Trustee represents that "the plain language of the 'Your Product' exclusion . . . by itself, render[s] it inapplicable here," ECF No. 339-29 at 34, suggesting that there is no ambiguity. *Id.* at 33 ("The plain language of the 'Your Product' exclusion expressly limits its application to bodily injuries that arise out of the use of or warranties or representations about 'your' (i.e., Endo's) product."). On the other hand, the Trustee asserts that context is needed "to ascertain the parties' intent," *id.* at 34, and takes the position in his sur-reply that a "latent ambiguity" exists because the "FDA's regulatory framework did not view general statements in unbranded campaigns as encompassing statements about specific drugs." ECF No. 381 at 24; *id.* (claiming that extrinsic evidence—the Declaration from Professor Theodore Ruger (the "Ruger Declaration") (ECF No. 339-28))—speaks to how "pharmaceutical product manufacturers understand that whether statements are 'about' their products requires specific references to their products, and that pharmaceutical product manufacturers employ unbranded campaigns specifically to avoid making statements 'about' their products").

Second, the Trustee makes little, if any, attempt to base his claim that there is a latent ambiguity in the Products Exclusion on a "contractual hook," let alone on the proffered extrinsic evidence. *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93. The Trustee suggests that a phrase that is not in the contract—"warranties or representations about 'your product'"—would have been

40

understood to have a specific meaning by those within the pharmaceutical industry. ECF No. 339-29 at 34. But that is not the "contractual hook" that is required. *See Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93. To the extent the Trustee intended to suggest that only the phrase "[w]arranties or representations" is ambiguous and requires extrinsic evidence to disentangle, the Trustee comes nowhere close to providing the Court with a feasible, "alternative interpretation" of those specific terms. *See id.* at 96. Based on a purported "industry understanding," the Trustee hints at an interpretation of "[w]arranties or representations" as intending to encompass solely statements from branded campaigns. ECF No. 381 at 24. But it is telling that the Trustee provides only a "*See generally*" citation to the Ruger Declaration. ECF No. 339-29 at 33. Rather than using the extrinsic evidence to provide support for "an alternative meaning of a specific term or terms contained in the contract," the Trustee instead argues about the parties' *expectations* for the Products Exclusion and distorts the plain language "to establish the ambiguity." *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 96, 93. This is not the correct type of evidence to demonstrate a latent ambiguity in the Products Exclusion.

In any event, the Court finds that neither the Products Exclusion's definition of "Your product," nor the phrase "warranties or representations" are ambiguous. ECF No. 317-31 at 57–58. And "where, as here, the parties have reduced their agreement to writing, Pennsylvania courts presume that the parties' mutual intent can be ascertained by examining the writing." *Duquesne Light Co.*, 66 F.3d at 613. The Court thus does not need to resort to the Trustee's extrinsic evidence and interprets the contract "according to the natural meaning of its terms." *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 96; *see also Duquesne Light Co.*, 66 F.3d at 613 ("Only where the writing is ambiguous may the factfinder examine all the relevant extrinsic evidence to determine the parties' mutual intent.").

(2) "Your Product" Includes Unbranded Promotions

The Products Exclusion in the CGL Insurers' policies expressly defined "Your product" as including Endo's "[w]arranties or representations made at any time, or that should have been made with respect to the fitness, quality, durability, performance, handling, maintenance, operation, safety, or use of such goods or products[.]" ECF No. 317-31 at 58. The CGL Insurers argue that this exclusionary language extends to Endo's unbranded marketing and promotions, which Endo engaged in for the purpose of increasing overall sales of its products. ECF No. 314-1 at 30–32.

The CGL Insurers cite to two cases in the opioid context in support of their contention that bodily injuries from Endo's unbranded promotions also "arise out of" Endo's products and are thus excluded from coverage. *Id.* at 31–32. In *Opioid Master Disbursement Trust II*, a Missouri state court recently held that "[a]ny alleged injuries caused by Mallinckrodt's 'unbranded' representations arose out of Mallinckrodt's products." 2025 Mo. Cir. LEXIS 4, at *3. This was so because Mallinckrodt's "unbranded representations were part of [its] efforts to boost its own opioid product sales and because unbranded representations about the safety and efficacy of opioids in general encompass Mallinckrodt's products." *Id.* Therefore, the court found that the products exclusions language at issue in that case precluded coverage of injuries arising from "'unbranded' representations." *Id.*

In addition, a California state court addressed whether bodily injury from an alleged uptick in heroin use could be considered to "arise out of" Watson Pharmaceutical's ("Watson") products, even though Watson, an opioid manufacturer, did not "ma[ke] or distribute[]" heroin. *Actavis, Inc.*, 16 Cal. App. 5th at 1046. Watson had purchased a common general liability insurance policy from the Travelers Property Casualty Company of America, which contained a similar products exclusion barring coverage for "all 'bodily injury' . . . arising out of 'your product' or 'your work'"

42

and defining "your work" as including "[w]arranties or representations made at any time." *Id.* at

1032. In *Actavis, Inc.*, the fact that heroin was not "a product made or distributed by Watson," was

"not dispositive." *Id.* at 1046. The products exclusion language broadly extended "to bodily injury

arising out of warranties or representations made by Watson in connection with its products." *Id.*

And the underlying complaints for which coverage was being sought adequately

> allege[d] a direct causal connection between those warranties and
> representations and the resurgence in heroin use: Watson's
> warranties and representations made as part of this campaign to
> increase the sales of highly addictive opioid painkillers allegedly
> had the intended effect of increasing their sales, use, and addiction,
> which led to a dramatic increase in the use of heroin as a cheaper
> alternative.

*Id.* Therefore, the increase in heroin was found to have "arise[n] out of Watson's opioid products

and the statements and representations Watson made about them." *Id.* at 1047. The products

exclusion thus barred coverage of damages from this category of bodily injury as well. *Id.* at 1046.

The Court finds that similar reasoning applies here, so the Products Exclusion bars

coverage of claims for bodily injury arising from Endo's unbranded promotions. Multiple

complaints filed in the underlying Opioid Suits are replete with allegations that Endo employed

"unbranded marketing" as a tool to increase overall sales of its products. *See, e.g.*, ECF No. 319-

17 ¶ 111 ("Defendants worked through branded and unbranded marketing to build confidence in

long-term opioid use by overstating its benefits and downplaying its risks, and *thereby expand the

chronic pain market*." (emphasis added)); *id.* ¶ 144 ("Defendants used unbranded, third party

marketing, *which they deployed as part of their national marketing strategies for their branded

drugs*." (emphasis added)); *id.* (Defendants "exercis[ed] substantial control over the content of the

[unbranded] messages these third parties generated and disseminated, and distribut[ed] certain of

these materials themselves."); *id.* ("Defendants' unbranded marketing created and relied upon an

appearance of independence and credibility" and their "unbranded marketing allowed them to evade the oversight of federal regulators"); *id.* ¶ 153 ("Through unbranded materials, Defendants presented information and instructions concerning opioids generally that were contrary to, or at best, inconsistent with information and instructions listed on Defendants' branded marketing materials and drug labels and with Defendants' own knowledge of the risks, benefits and advantages of opioids."); *id.* ¶ 154 ("Even where such unbranded messages were channeled through third-party vehicles, Defendants adopted these messages as their own when they cited to, edited, approved, and distributed such materials knowing they were false, misleading, unsubstantiated, unbalanced, and incomplete."); *id.* ¶ 155 ("By funding, directing, editing, and distributing these [third-party] materials, Defendants exercised control over their deceptive messages and acted in concert with these third parties to fraudulently promote the use of opioids for the treatment of chronic pain."); *id.* ¶ 156 ("Defendants instead created and disseminated these same unsupported claims—that opioids allow patients to sleep, return to work, or walk more easily—through *unbranded* marketing materials."); *id.* ¶ 209 ("Defendants put their relationships with Front Groups to work to engage in largely unbranded patient education about opioid treatment for chronic pain."); *id.* ¶ 210 ("The drug companies expect that they will recoup their investment in direct-to-consumer advertisements because they will capture at least some of any additional prescriptions that result from patients 'asking their doctor' about drugs that can treat their pain."); *id.* ¶ 419 ("Like the other Defendants, Endo used deceptive direct marketing to increase the sales of its dangerous opioids. As set forth below, Endo conveyed these deceptive messages in training of its sales force and recruited speakers, who in turn conveyed them to physicians; in a misleading journal supplement; and in unbranded advertising."); *id.* ¶ 454 ("Endo also used unbranded advertisements to advance its goals. By electing to focus on unbranded marketing, Endo was able

44

to make claims about the benefits of its opioids that the FDA would never allow in its branded materials."); ECF No. 319-15 ¶ 29 ("Each Defendant used both direct marketing and unbranded advertising disseminated by seemingly independent third parties to spread false and misleading statements about the risks and benefits of long-term opioid use."); *id.* ¶ 43 ("Defendants also deceptively marketed opioids in California through unbranded advertising – i.e., advertising that promotes opioid use generally but does not name a specific opioid. . . . But by funding, directing, reviewing, editing, and distributing this unbranded advertising, Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain."); ECF No. 319-18 ¶ 71 ("ENDO's dissemination of misleading materials included branded and non-branded books and pamphlets that were held out as nominatively medical and/or scientific (but, in fact, flagrantly misrepresented accepted medical science regarding chronic opioid therapy and were intended solely to drum-up sales of ENDO Opioids).").

Just as in *Actavis, Inc.*, where (1) "warranties and representations made as part of [Watson's] campaign to increase the sales" of opioids allegedly increased the "use of heroin as a cheaper alternative," and (2) those representations were found to "arise out of" Watson's products, 16 Cal. App. 5th at 1046, the allegations in the Opioid Suits demonstrate that Endo's purported unbranded marketing about the safety of opioids was allegedly designed to increase the market for its opioid products. Even if Endo's unbranded marketing did not expressly mention Endo's products by name, based on the allegations from the underlying Opioid Suits, there is enough of a causal connection under the de minimis "but for" causation standard for the Court to find that bodily injuries allegedly resulting from Endo's unbranded promotions "arise out of" Endo's

45

products.[11] *See Opioid Master Disbursement Tr. II*, 2025 Mo. Cir. LEXIS 4, at *3 ("[a]ny alleged injuries caused by Mallinckrodt's 'unbranded' representations arose out of Mallinckrodt's products" because "those unbranded representations were part of [its] efforts to boost its own opioid product sales"). Accordingly, the Products Exclusion extends to Endo's unbranded promotions and marketing campaigns. The Court will thus grant summary judgment in favor of the CGL Insurers on the Products Exclusion issue, and finds that the Products Exclusion bars coverage of the Opioid Suits to the extent the underlying suits involve claims for bodily injury arising from Endo's products, including Endo's unbranded promotions. The Court will deny the Trustee's Cross-Motion for Partial Summary Judgment on this issue.

### C. The CGL Insurers' Motion for Partial Summary Judgment and Joinder

The CGL Insurers also filed a Motion for Partial Summary Judgment and Joinder in part in the Products Insurers' Motions for Summary Judgment. *See* ECF No. 323. The CGL Insurers explain that the Trustee also seeks coverage from them for the government opioid suits and third-party payor opioid suits. *Id.* at 2. The CGL Insurers' policies provide coverage for "sums that [Endo] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." ECF No. 317-31 at 19. The "bodily injury" or "property damage" must be "caused by an 'occurrence,'" which is defined as "an accident," and "occur[]] during the policy period." *Id.* at 19, 32.

---

[11] The Trustee claims that the Trust "is seeking coverage under the CGL Policies for the opioid injuries that were caused by non-Endo products" "for which Endo was liable because of its participation in an Unbranded Campaign among opioid manufacturers to promote the robust treatment of pain that resulted in the increased consumption of opioids generally." ECF No. 381 at 6 & n.2. But the Trustee does not even propose a principled way by which it would parse out which unbranded promotions allegedly resulted in bodily injury from Endo's products as opposed to other companies' products.

In the Court's Memorandum Opinions addressing the bellwether issues raised by the 2013–2014 and 2017–2018 insurance policy towers, *see* ECF Nos. 390, 394, the Court found that many government and third-party payor suits fall outside those towers' coverage because many of those complaints do not seek damages "for bodily injury." *See* ECF No. 390 at 30–33; ECF No. 394 at 26–28. However, at least some government and third-party payor suits might potentially seek recovery of costs paid to treat specific injuries and may have pleaded theories of causation that could proceed on an individualized proof basis. *See* ECF No. 390 at 33–36; ECF No. 394 at 28–31. The Court incorporates its analysis and reasoning here with respect to the CGL Insurers' policies, which contain similar "damages because of 'bodily injury'" language. ECF No. 317-31 at 19. Likewise, the Court concludes only that the CGL Insurers' policies—which cover damages "because of 'bodily injury'"—would not cover a number of government and third-party payor suits. ECF No. 390 at 36; ECF No. 394 at 31. Accordingly, the Court will grant in part and deny in part the CGL Insurers' Motion for Partial Summary Judgment.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court will deny in part the CGL Insurers' Motion for Summary Judgment (ECF No. 314) on the issue of Late Notice, and grant in part the CGL Insurers' Motion for Summary Judgment on the Products Exclusion issue because the Court finds that the Products Exclusion bars coverage of the Opioid Suits to the extent the underlying suits involve claims for bodily injury arising from Endo's products, including Endo's unbranded promotions. The Court will also grant in part and deny in part the CGL Insurers' Motion for Partial Summary Judgment (ECF No. 323). Finally, the Court will deny the Trustee's Cross-Motion for Partial Summary Judgment (ECF No. 339). An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**