**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTHEW DUNDON, AS THE TRUSTEE OF THE ENDO GENERAL UNSECURED CREDITORS' TRUST, | : : : | Civil Action |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| ACE PROPERTY AND CASUALTY INSURANCE COMPANY, et al., | : : | No. 24-4221 |
| *Defendants*. | : | |

**<u>MEMORANDUM</u>**

**KENNEY, J.**                                                                                   **July 27, 2026**

The Excess Insurers, Aspen Insurance UK, Ltd. ("Aspen"), and Columbia Casualty Company's ("Columbia"), move for summary judgment on bellwether insurance coverage issues as applied to non-party Endo International PLC's ("Endo") liability related to its transvaginal surgical mesh products (the "Mesh Claims"). ECF No. 378. Plaintiff, and Trustee, Matthew Dundon cross-moves for summary judgment. ECF No. 401. For the reasons set forth below, the Court will **GRANT** the Excess Insurers' Motion for Summary Judgment (ECF No. 378) and **DENY** Plaintiff's Cross-Motion for Summary Judgment (ECF No. 401).

## I.    BACKGROUND

### A.  Factual Background[1]

This is an insurance coverage dispute arising from a series of lawsuits brought against litigation non-party, Endo for injuries stemming from prescription opioids and transvaginal surgical mesh products (the "Mesh Products").[2]  As a result of the plethora of lawsuits filed against Endo, Endo declared bankruptcy.  *See* ECF No. 378 ¶ 30.

On March 22, 2024, the bankruptcy court discharged Endo's liabilities in connection with the Mesh Claims.  *Id.* ¶ 31.  As part of the Plan, however, the Endo Mesh Trust Agreement (the "Trust Agreement") was established for Mesh Claims holders.  *Id.* ¶ 32.  The Trust Agreement established a claims-submission process for Mesh Claims.  *Id.*  The Plan also provided for the formation of the Endo General Unsecured Creditors' Trust and for the appointment of the Trustee.  *See, e.g.*, ECF No. 390 at 3.  The Trustee proceeds here under that authority.

In April of 2011, Endo acquired American Medical Systems, Inc. and its related entities ("AMS").  ECF No. 378-3 ¶ 5.  AMS made transvaginal surgical mesh products (the Mesh Products").  ECF No. 378-4 ¶¶ 3–4.  After Endo's acquisition of AMS, Endo added Mesh Products

---

[1] The following facts are taken from the Parties' Statements of Stipulated Material Facts (ECF Nos. 378-3, 401-34) as well as the Parties' respective Statements of Additional Material Facts (ECF Nos. 378-4, 401-35) to the extent those facts are well-supported by pinpoint citations to the record. *See* Fed. R. Civ. P. 56(c)(1); *see also Ullrich v. U.S. Sec. of Veterans Affs.*, 457 F. App'x. 132, 137 (3d Cir. 2012) ("Rule 56 explicitly requires the party asserting the absence or existence of a genuinely disputed fact to support that assertion by citing to specific parts of the record." (citing Fed. R. Civ. P. 56(c)(1))).

[2] In addition to the Mesh Claims, Endo also faced liability for its role in manufacturing and promoting opioids.  Beginning in at least as early as 2014, various state and local governments, third parties, and individuals sued Endo and its affiliates (the "Opioid Claims").  After the Opioid Claims were initiated, Endo filed for Chapter 11 bankruptcy before the U.S. Bankruptcy Court for the Southern District of New York.  *See* ECF No. 378-3 ¶ 30; *see also In re Endo Int'l plc*, No. 22-22549 (Bankr. S.D.N.Y. Aug. 16, 2022).

to its business.  *See id.* ¶¶ 1–2; *see also* ECF No. 401-3 at 190, 236.  This acquisition not only resulted in a new business segment for Endo, *see* ECF No. 401-3 at 190, 236, but in real and significant exposure for alleged injuries caused by the Mesh Products.  *See* ECF No. 378-4 ¶ 5.  This is because, as early as 2008, AMS's Mesh Products had resulted in litigation against AMS for the alleged injuries the Mesh Products had caused patients who had a device surgically implanted.[3]  *See* ECF No. 378-3 ¶ 3.

Faced with the mesh litigation, Endo and the Excess Insurers negotiated a "tower" of insurance coverage for the policy period covering September 26, 2011 to September 26, 2012.  ECF No. 378-3 ¶ 26.  (The term "insurance tower," or "tower" refers to a "plan," or a structure in which "a primary insurer responds first to any covered loss, and excess insurers respond in a predetermined order if the loss exceeds the coverage provided by the primary policy." *Pharmacia Corp. v. Arch Specialty Ins. Co.*, No. 22-2586, 2024 WL 208146, at *1 n.1 (3d Cir. Jan. 19, 2024) (cleaned up).)

Lexington Insurance Company policy number 6794179 (the "Lexington Policy") serves as the primary policy at the base of the tower.  ECF No. 378-3 ¶ 26 (chart identifying 2011–12 Products Tower); ECF No. 113-1 at 1–2 (chart identifying 2011–12 Products Tower).  The Excess Insurers provided the next two levels of coverage, or excess coverage (the "Excess Policies").  ECF

---

[3] In 2008, AMS was named in a lawsuit alleging that its mesh products "were defective and caused injuries to individuals who had them surgically inserted." *Id.*  After Endo acquired AMS in 2011, Endo too became a named defendant in numerous Mesh Claims.  *Id.* ¶ 7; *see, e.g.*, *Reaves v. Endo Pharms.*, Case No. 110902688; *Purdue v. Endo Pharms.*, Case No. 110902664.  Many of the federal Mesh Claims pending against AMS were later consolidated in the U.S. District Court for the Southern District of West Virginia (the "AMS MDL").  ECF No. 378-3 ¶ 14; *In Re: Am. Med. Sys., Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, 2:12-md-2325.  The AMS MDL also named Endo as a defendant.  *See* ECF No. 378-3 ¶ 17.  Endo was dismissed from the AMS MDL.  *Id.* ¶¶ 18–19.  However, Endo did pay settlements and/or judgments of the Mesh Claims following its dismissal from the AMS MDL.  *Id.* ¶ 22.

No. 378-3 ¶ 26 (chart identifying 2011–12 Products Tower); ECF No. 113-1 at 1–2 (chart identifying 2011–12 Products Tower). Columbia policy number 2054989843-9 (the "Columbia Excess Policy") forms the first level of excess coverage, while Aspen, Ltd. policy number O0A0YWK11A0H (the "Aspen Excess Policy") forms the second level of excess coverage in the tower (collectively, the "Mesh Policies"). ECF No. 378-3 ¶ 26 (chart identifying 2011–12 Products Tower); ECF No. 113-1 at 1–2 (chart identifying 2011–12 Products Tower).

### B. Procedural History

Plaintiff Matthew Dundon, as the Trustee of the Endo General Unsecured Creditors' Trust (hereinafter, the "Trustee") initiated the instant lawsuit by filing a civil complaint against Endo's insurance carriers. ECF No. 1 ¶ 1. The Trustee seeks declaratory judgments defining the Excess Insurers' coverage obligations under their respective policies, including coverage for the Mesh Claims.[4] ECF No. 113 ¶¶ 4–6.

On October 14, 2025, the Court, after a conference with the Parties, established a briefing schedule for motions for partial summary judgment on the bellwether issues concerning discrete and determinative coverage issues regarding the Mesh Claims. ECF No. 346. The Parties specifically identified the following bellwether issues as to the Mesh Claims:

> **a. The Self-Insured Retention ("SIR").** Whether: (1) the $2.5 million per claimant Self-Insured Retention in the Lexington Policy and (2) the $2.5 million per claimant Self-Insured Retention in the Columbia Casualty Policy apply to Mesh Claim-related liability asserted against or borne by Endo entities other than AMS;

---

[4] The Trustee has made a number of other claims relating to Endo's Ranitidine products were later dismissed without prejudice. ECF No. 250. Additionally, certain bellwether issues pertaining to Endo's underlying claims relating to its manufacturing and promotion of certain opioid products (the "Opioid Claims") were separately briefed and addressed in partial motions for summary judgment. See ECF Nos. 390, 392, 394, 396. A detailed recitation of the underlying facts of the Parties insurance coverage dispute regarding the Opioid Claims can be found at: ECF Nos. 390 at 1–6, 392 at 1–8, 394 at 1–7, 396 at 2–8.

**b. Applicable Coverage Period and Trigger.** Whether the 2011-2012 Products Policies, subject to their other terms, conditions, and exclusions, limit coverage for Mesh Claims to claims involving "bodily injury" that occurred after the applicable Retroactive Date and before the end of the policy period; and

**c. Known Loss Exclusion Endorsement.** Whether the Known Loss Exclusion Endorsement in the Catlin Policy precludes coverage for the Mesh Claims under the Catlin Policy.

*Id.* at 2. This last issue is now moot, leaving only the first two bellwether issues to be resolved.[5]

As scheduled, the Excess Insurers moved for summary judgment on each of these two bellwether issues regarding the Mesh Claims. ECF No. 378. The Trustee cross-moved for summary judgment. ECF No. 401. There then followed a flurry of replies and sur-reply briefs. ECF Nos. 423, 431, 433, 435. Accordingly, the Motion is fully briefed and will be decided on the Parties' submissions.

## 1. The Coverage Issues in Dispute

As described above, the Court is tasked with resolving two coverage issues. *First*, the Parties dispute whether the Mesh Policies limit coverage for the Mesh Claims to claims for a specific time period. The Excess Insurers posit that the clear language of the Mesh Policies Mesh only provides coverage for the Mesh Claims on a claims-made basis, and for a limited window of time between the Retroactive Date[6] and the end of the Lexington Policy period. The Excess Insurers argue that the Lexington Policy's mesh-specific language found in Endorsement 18, an amendatory provision found later in the policy, expressly limits coverage this way by defining an

---

[5] On June 1, 2026, the Trustee and Defendant Catlin Syndicate Limited a/k/a AXA XL Syndicate Limited ("Catlin") filed a Joint Stipulation of Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2). ECF No. 454.

[6] The Retroactive Date is the date by which the claimant must have had the Mesh Product implanted into them.

"occurrence" under the policy as the first date of a claimant's surgical implantation with a Mesh Product and that the policy otherwise requires that "occurrence" take place during that limited window of time.

By contrast, the Trustee takes the position that coverage for the Mesh Claims is not limited to claims made before the end of the policy period on the basis that Endorsement 3 to the Lexington Policy, the Batch Occurrence Endorsement, permits Endo to "batch" its Mesh Claims.  (A so-called, "batch occurrence endorsement" enables the insured to "batch" together a series of claims arising from different injuries together, as if the claims each originated from one injury.[7]  This kind of policy endorsement may prove beneficial for an insured because it permits the insured to treat the different claims and associated injuries as one injury for the purpose of making the claim and for the purpose of meeting the insurance policy's deductible.)  As applied to the Mesh Claims, the Batch Occurrence Endorsement would act to treat later made Mesh Claims as arising out of the same "occurrence" for the purpose of coverage.

*Second*, the Parties dispute whether the Self-Insured Retentions ("SIR") found in the Lexington and Columbia Casualty Policies apply to Mesh Claim-related liability against any Endo entities beyond AMS.  The Excess Insurers take the position that the first and second levels of

---

[7] For illustrative purposes, suppose a wholesaler of fencing equipment seeks coverage under his insurance policy for a series of fencing-related injuries stemming from the same product over the span of ten years.  If the purveyor's insurance policy permits batching of any "fencing related claims," arising out of a specific product the fencing equipment purveyor sells, then the purveyor may seek coverage for the entire "batch" of claims regardless of when the fencing-related injury occurred or when the claim was made.  While the specific terms are often heavily negotiated, the overarching principle is that a batch occurrence endorsement would permit the insured to seek coverage for a series of claims as though they constituted a single occurrence instead of seeking coverage for perhaps tens, or hundreds of claims.  Under a batch occurrence endorsement, these claims would be "batched" together so long as one was made during the policy.  In sum, this expands coverage and allows the insured to obtain coverage for an aggregate of claims instead of seeking coverage for each claim in piecemeal.

excess coverage—the Columbia Policy and the Aspen Policy—are not reached by the vast majority of the Mesh Claims that were made within the relevant window because most do not exceed the combined $5,000,000 SIR, or Self Insured Retention, applicable under the Lexington Policy and the Mesh Policies. *Infra* Part III(A).

The Trustee argues that the Mesh Claims are not subject to a per-claimant combined $2,500,000 SIR imposed by the Lexington Policy but are instead subject to a $10 million *per occurrence* SIR. Thus, the Trustee's position is that the Lexington Policy and the Excess Policies contemplate coverage for all Mesh Claims regardless of when the surgical implantation date was, and of what the value of the claim is. The Trustee's view on the applicable SIR is worlds apart from the Excess Insurers' argument that coverage was always intended to be limited to a small number of high-value Mesh Claims.

### C.   Relevant Policy Language

The Mesh Policies are described in relevant part below:

### 1.   The Lexington Policy (The Primary Policy & Base of the Insurance Tower)

The Lexington Policy period ran from September 26, 2011 to September 26, 2012, with a policy limit of $15,000,000. ECF No. 378-26 at 1. The Lexington Policy imposes a Retroactive Date of October 15, 2011. *Id.* at 55. The Lexington Policy provides coverage for "bodily injury" and "property damage" included within the "products-completed operation hazard" and requires that the injury or damage occur within the window of time between that Retroactive Date and the end of the policy period. *Id.* at 5. The Lexington Policy provides that:

> This insurance applies to "bodily injury" and "property damage" included within the "products-completed operations hazard" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs on or after the Retroactive Date shown in Item **6** of the Declarations, but prior to the end of the "policy period"; and

(3) A claim for damages because of the "bodily injury or "property damage" is first made against any insured in accordance with Paragraph **c.** below during the "policy period" or any Extended Reporting Period we provide under **SECTION VI – EXTENDED REPORTING PERIODS**, if applicable.

*Id.* at 5–6.

 As discussed, the Lexington Policy also contains a Batch Occurrence Endorsement.  *Supra* Part

I(B)(1).  Endorsement 3 is a "Batch Occurrence Endorsement." ECF No. 378-26 at 28.  The Batch

Occurrence Endorsement provides in relevant part that:

This endorsement modifies insurance provided by the policy:

Paragraph **20.**, "Occurrence" of **SECTION IV – DEFINITIONS** is deleted in its entirety and replaced with the following:

**20. "Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Notwithstanding the prior sentence, with respect to an "occurrence" arising out of "your product" , whether alone or in combination with another product or incorporated into another product and whether you are a distributor or manufacturer, all covered claims or "suits" for "bodily injury" and/or "property damage" which arise out of the same hazard, defect, source of contamination, design or formulation of "your product" shall be considered as arising **out of one "occurrence"** (hereinafter, referred to as a "**batch occurrence**").  All claims or "suits" for damages arising from such "batch occurrence" shall be deemed to have been made at the time of the first of those claims or "suits" is made against any insured, subject always to the following provisions:

If the first claim or "suit" for damages arising from a "batch occurrence" is **first made against any insured during the policy period** (or the Basic Extending Reporting Period or Supplemental Extending Reporting Period, if applicable),

> then all subsequent claims or "suits" arising from that "batch occurrence" shall attach against the Limits of Insurance stated in the Declarations of this Policy, regardless of whether such subsequent claims or "suits" are made during the policy period or at any time thereafter.
>
> **NOTHING CONTAINED IN THIS ENDORSEMENT SHALL BE CONSTRUED TO INCREASE AND/OR REINSTATE THE LIMITS OF INSURANCE OF THIS POLICY.**
>
> All other terms and conditions of the policy remain the same.

*Id.* (emphasis added).

The Court notes that if the Lexington Policy contained no other amendatory provisions, then the Court's discussion of the Trustee's arguments in support of the Mesh Policies' *expansive* coverage of the Mesh Claims would differ greatly. However, the Lexington Policy goes on.

Later in the Lexington Policy, Endorsement 18 supplies *another* definition of the term "occurrence." *Id.* at 57. Unlike the earlier provisions, Endorsement 18 contains language that specifically refers to Mesh Products and any potential Mesh Claims that may arise. *See id.* at 55–57.That is, Endorsement 18 of the Lexington Policy "modifies insurance provided by the policy" such that AMS is named as an "Additional Named Insureds" with an inception Date of October 15, 2011. *Id.* at 55. Endorsement 18 also provides a specific Retroactive Date for AMS. *Id.* Specifically, Endorsement 18 states that:

> [The] Retroactive Date for 'Your Products' except Mesh of any type or description: **6/15/95**[.]
>
> [The] Retroactive Date **for Mesh of any type or description**: **10/15/11**[.]

*Id.* (emphasis added). As relevant to this dispute, Endorsement No. 18 also contains a definition of the term "occurrence." *Id.* at 57. Endorsement 18 provides in relevant part that:

**20.** "Occurrence" means:

> **a.** With respect to non-mesh products, an accident, including continuous or repeated exposure to substantially the same general harmful conditions, or

> **b.** With respect [sic] "bodily injury**" arising out of mesh products,** the date of the first surgical implantation of your mesh product in the claimant. **If multiple surgical implantations have occurred with respect to one claimant, then the data of the first surgical implantation shall be the date of the "occurrence".**

All other terms and conditions of the policy remain the same.

*Id.* (emphasis added).

In addition to the defining the term "occurrence," the Lexington Policy provides additional requirements for coverage specific as to, and by direct reference to, the Mesh Claims. That is, the Lexington Policy includes a Self-Insured Retention Endorsement, or SIR, Endorsement 23. *Id.* at 65.

Endorsement 23 contains five (5) separate SIRs. *Id.* Because it is the Trustee's position that *all* five of the SIRs provided by Endorsement 23 apply to the Mesh Claims, ECF No. 401-37 at 27–32, the Court includes them all here. Endorsement 23 provides the following SIRs:

| Self-Insured Retention ("Retained Limit") | |
|---|---|
| Entity or Person: | |
| Endo Pharmaceuticals Holdings, Inc. | |
| Endo Pharmaceuticals, Inc. | |
| Endo Pharma Canada, Inc. | |
| Endo Pharma Delaware, Inc. | |
| Endo Pharma Ireland Limited | |
| EPI Company | |
| BML Pharmaceuticals, Inc. | |
| Endo Pharmaceuticals Colorado LLC | |
| Diane D'Allesio, but only as respects any "bodily injury", "property damage" or "act, error, or omission" arising out of "your product", Frova. | |
| $10,000,000 | ☒ Each Occurrence |
| | ☐ Each Claim |
| | ☐ Each Claimant |
| $10,000,000 | Aggregate Retained Limit |

10

ECF No. 378-26 at 65.

| Self-Insured Retention ("Retained Limit") | | |
|---|---|---|
| Entity or Person: | | |
| CPEC LLC | | |
| InterNutria, Inc. | | |
| IPI Management Corporation | | |
| Ledgemont Royalty Sub LLC | | |
| Endo Pharmaceuticals Solutions, Inc. F/K/A Indevus Pharmaceuticals, Inc. | | |
| Endo Pharmaceuticals Solutions, Inc. | | |
| Indevus Pharmaceuticals, Inc. | | |
| Endo Pharmaceuticals Valera, Inc. | | |
| Endo Pharmaceuticals Valera, Inc. F/K/A Valera Pharmaceuticals, Inc. | | |
| Valera Pharmaceuticals, Inc. | | |
| Valera Pharmaceuticals Ireland Limited | | |
| **$100,000** | ☒ Each Occurrence | |
| | ☐ Each Claim | |
| | ☐ Each Claimant | |
| **$500,000** | Aggregate Retained Limit | |

*Id.*

11

| Self-Insured Retention ("Retained Limit") *but only as respects any "bodily injury", "property damage" or "act, error, or omission" arising out of all of "your products", except mesh of any type or description* |  |  |
|---|---|---|
| <u>Entity or Person</u>:<br>American Medical Systems Holdings, Inc.<br>American Medical Systems, Inc.<br>American Medical Systems Australia Pty., Ltd.<br>American Medical Systems Benelux B.V.B.A.<br>American Medical Systems Canada, Inc.<br>American Medical Systems France, S.A.R.L.<br>American Medical Systems Deutschland GMBH<br>American Medical Systems Iberica, S.L.<br>American Medical Systems UK, Ltd.<br>American Medical Technologies Ltd.<br>American Medical Systems Argentina, SRL<br>American Medical Systems Luxembourg S.A.R.L.<br>American Medical Systems Do Brasil Productos Urologico Ginecologic Os Ltda.<br>AMS Sales Corporation<br>AMS Research Corporation<br>American Medical Systems Gynecology, Inc.<br>American Medical Systems Europe BV<br>Thermatrx, Inc.<br>Cryogen Europe SAS<br>Ovion, Inc.<br>American Medical Systems Italia SRL<br>Biocontrol Medical, Inc.<br>Solarant Medical, Inc.<br>Cytrix Israel, Ltd.<br>Kermit Merger Corp.<br>AMS Medical Systems Ireland Limited<br>AMS Sverige<br>Nippon AMS K.K.<br>Laserscope<br>InnovaQuartz Incorporated<br>Laserscope International, Inc. |  |  |
| **$3,000,000** | ☒ Each Occurrence |  |
|  | ☐ Each Claim |  |
|  | ☐ Each Claimant |  |
| **$3,000,000** | Aggregate Retained Limit |  |

*Id.* at 66.

There is one SIR that specifically refers to the Mesh Products. The fourth SIR listed in Endorsement No. 23 provides that the following SIR applies to injuries arising out of Mesh Products:

12

| Self-Insured Retention ("Retained Limit") *but only as respects any "bodily injury", "property damage" or "act, error, or omission" arising out of "your product", mesh of any type or description* | | |
|---|---|---|
| Entity or Person: | | |
| American Medical Systems Holdings, Inc. | | |
| American Medical Systems, Inc. | | |
| American Medical Systems Australia Pty., Ltd. | | |
| American Medical Systems Benelux B.V.B.A. | | |
| American Medical Systems Canada, Inc. | | |
| American Medical Systems France, S.A.R.L. | | |
| American Medical Systems Deutschland GMBH | | |
| American Medical Systems Iberica, S.L. | | |
| American Medical Systems UK, Ltd. | | |
| American Medical Technologies Ltd. | | |
| American Medical Systems Argentina, SRL | | |
| American Medical Systems Luxembourg S.A.R.L. | | |
| American Medical Systems Do Brasil Productos Urologico Ginecologic Os Ltda. | | |
| AMS Sales Corporation | | |
| AMS Research Corporation | | |
| American Medical Systems Gynecology, Inc. | | |
| American Medical Systems Europe BV | | |
| Thermatrx, Inc. | | |
| Cryogen Europe SAS | | |
| Ovion, Inc. | | |
| American Medical Systems Italia SRL | | |
| Biocontrol Medical, Inc. | | |
| Solarant Medical, Inc. | | |
| Cytrix Israel, Ltd. | | |
| Kermit Merger Corp. | | |
| AMS Medical Systems Ireland Limited | | |
| AMS Sverige | | |
| Nippon AMS K.K. | | |
| Laserscope | | |
| InnovaQuartz Incorporated | | |
| Laserscope International, Inc. | | |
| **$2,500,000** | ☐ Each Occurrence | |
| | ☐ Each Claim | |
| | ☒ Each Claimant | |
| **No Aggregate Applies** | Aggregate Retained Limit | |

*Id.* at 66–67.  Endorsement 23 continues to provide a fifth, and final SIR:

| Self-Insured Retention ("Retained Limit") | |
|---|---|
| Entity or Person: | |
| Generics International (US), Inc. | |
| Generics Bidco II, LLC | |
| Generics Bidco I, LLC | |
| Vintage Pharmaceuticals, LLC | |
| Quartz Specialty Pharmaceuticals, LLC | |
| **$500,000** | ☒ Each Occurrence |
| | ☐ Each Claim |
| | ☐ Each Claimant |
| **$2,500,000** | Aggregate Retained Limit |

13

*Id.* at 67.

### 2. The Columbia Excess Policy (The First Level of Excess Coverage)

The first level of excess coverage, the Columbia Excess Policy, has a policy period of from September 26, 2011 to September 26, 2012, with a policy limit of $10 million.  ECF No. 378-27 at 1.  Like the Lexington Policy, the Columbia Excess Policy also imposes a separate $2,500,000 million SIR (Self Insured Retention) to the Mesh Claims:

> Section **IV. Limit of Liability** is amended to add the following paragraph:
>
> 6.  Upon exhaustion of the $2,500,000 Each Claimant Self-Insured Retention applicable to any of "your products" referred to as "mesh of any type or description" specified in the **primary policy**, **a retained limit of $2,500,000 Each Claimant shall apply under this Policy.** Our limit under this Policy shall be in excess of the **applicable underlying limits** covered under the **underlying insurance**.

*Id.* at 20 (emphasis added).

### 3. The Aspen Excess Policy (The Second Level of Excess Coverage)

The second level of excess coverage, the Aspen Excess Policy, has a policy period of September 26, 2011 to September 26, 2012, with a policy limit of $15 million.  ECF No. 378-28 at 1.  The Aspen Excess Policy includes a "Schedule of Followed Policy, Primary Policies and Underlying Excess Policies" as follows:

14

**SCHEDULE OF FOLLOWED POLICY, PRIMARY POLICIES AND**
**UNDERLYING EXCESS POLICIES**

| Type of Coverage | Insurer Policy Number Policy Period | Limits of Liability | |
|---|---|---|---|
| 1. Claims Made | Self Insured Retention | $10,000,000 | Per occurrence |
| | | $10,000,000 | Aggregate Limit |
| | | $2,500,000 | Per Claimant for mesh products |
| | | Various | As per Endorsement 15 of Followed Wording |
| 2. Claims Made | Lexington Insurance Company 6794179 26th September 2011 to 26th September 2012 | $15,000,000 $15,000,000 | Per Occurrence Aggregate Limit *(excess of item 1, above)* |
| 3. Claims Made | Columbia Casualty Company 2054989843 26th September 2011 to 26th September 2012 | $10,000,000 $10,000,000 | Per Occurrence Aggregate Limit *(excess of above items)* |

*Id.* at 5.

## II.   LEGAL STANDARD

Summary judgment is proper when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, "[s]ummary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (internal quotations and citation omitted). A fact is considered "material" if it could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). The Court is not to engage in "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" as those are functions that are reserved for the jury. *Id.* at 255. Genuine disputes over material facts exist "if a reasonable jury could return a verdict for the nonmoving party." *Wiest v. Tyco Elec. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016) (internal quotations and citation omitted).

While district courts should not "needlessly" encourage "piecemeal litigation," motions for summary judgment may be limited to certain issues in the case, such as only certain claims or "part[s] of [a] claim or defense." *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund.*, 778 F.3d 593, 606 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).  Such a motion "can serve [as] a useful brush-clearing" of the case and "facilitate the resolution of the remainder of the case through settlement" under appropriate circumstances.  *See id.* (citations omitted).

## III.   **DISCUSSION**

The Parties dispute the scope of insurance coverage for the Mesh Claims.  The Parties are not asking the Court to address whether a particular mesh claimant's underlying claim is or is not covered.  Rather, at this preliminary posture the Parties are asking the Court to analyze the applicable policy language to determine the *scope* of the Excess Insurers' coverage of the Mesh Claims.  Accordingly, the Excess Insurers ask the Court to make the following findings:

> (1) coverage for the Mesh Claims is limited to claimants:
>
>> (a) whose first surgical implantation of an AMS Mesh Product was between October 15, 2011 and September 26, 2012; and
>>
>> (b) who made claims during the September 26, 2011 to September 26, 2012 policy period; and
>
> (2) each Mesh Claim is subject to the $2.5 million per-claimant SIRs set out in both the Lexington Policy and the Columbia Casualty Excess Policy.

ECF No. 378-1 at 1.

Whereas, the Trustee, by contrast, asks the Court to instead make the following findings:

> (1) all Mesh Claims with an implant date after October 15, 2011 are *batched* to the Mesh Policies; and

16

> (2) any payments made by *Endo* to defend against, settle, or resolve the Mesh Claims are subject to the *Endo SIR*, not the AMS Mesh SIR.

ECF No. 401 at 1 (emphasis added).

### A. The Excess Insurers' Motion for Summary Judgment

The Court begins with the Excess Insurers' Motion for Summary Judgment. The Excess Insurers have moved for summary judgment on (1) the applicable coverage window and trigger; and (2) the applicable SIRs. *See* ECF No. 378-2 at 17–23. As described above, the Excess Insurers argue that coverage of the Mesh Claims under the Excess Policies is limited by both the applicable coverage window and trigger as well as the applicable SIRs. *See id.* The Trustee opposes and has cross moved for summary judgment, arguing that the language of the Lexington Policy and the Excess Policies provides a much broader coverage window for the Mesh Claims, and that the SIRs found in the Lexington and the Aspen Excess Policies do not apply to the Mesh Claims paid by Endo. *See* ECF No. 401-37 at 22–32.

### 1. Principles of Insurance Policy Interpretation

Under Pennsylvania law, insurance policies are contracts governed by "traditional principles of contract interpretation."[8] *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020) (citation omitted). Generally, the Court, rather than a jury, performs the task of interpreting the "existence or non-existence of coverage" under an insurance contract. *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (citation omitted). This is because "[c]onstruction

---

[8] The Parties do not dispute that Pennsylvania law governs the interpretation of the Mesh Policies with the exception of the Aspen Excess Policy, which is governed by New York law. *See* ECF No. 401-37 at 20–21; ECF No. 378-2 at 17 n.50. As it pertains to the Court's analysis below, New York State law is consistent with Pennsylvania state law. *See, e.g.*, *Andrichyn v. TD Bank, N.A.*, 93 F. Supp. 3d 375, 385 (E.D. Pa. 2015) (citation omitted). Accordingly, the Court only refers to Pennsylvania state law.

of an insurance policy is a matter of law," as long as a court can "fairly read it without ambiguity." *Scottsdale Ins. Co. v. Bieber & Assocs., Inc.*, 105 F. App'x 340, 342–43 (3d Cir. 2004) (citation omitted). To do so, the reviewing court must consider the language of the insurance policy "in its entirety," *Kurach*, 235 A.3d at 1116 (citing *Pa. Nat'l Mut. Cas. Ins. v. St. John*, 106 A.3d 1, 14 (Pa. 2014)), and must "give effect to all of its provisions, and . . . not interpret one provision of a contract in a manner which results in another portion being annulled." *Commonwealth ex rel. Shapiro v. UPMC*, 208 A.3d 898, 911 (Pa. 2019) (citation and internal quotation marks omitted). However, where the policy contains more specific provisions in addition to more general ones, "the specific provisions control the general ones." *Andrichyn*, 93 F. Supp. 3d at 385 (citing 11 *Williston on Contracts* § 32:10 (4th ed. 2014)).

Where the policy language within a provision of an insurance policy is "clear and unambiguous, [the Court] must give effect to that language." *Donegal Mut. Ins. Co.*, 938 A.2d at 290 (citation omitted); *see also Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, 687 F.3d 620, 623 (3d Cir. 2012) (explaining that a court should interpret an insurance policy as a whole and "give unambiguous terms [in the policy] their plain meaning" (citation omitted)). Where a policy term is ambiguous, extrinsic evidence may be used to resolve that ambiguity. *See Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citation omitted). But where "a provision of the policy [remains] ambiguous, the policy provision is to be construed in favor of the policyholder and against the insurer[.]" *Kurach*, 235 A.3d at 1116 (citing *Prudential Prop. & Cas. Ins. Co. v. Sartno*, 903 A.2d 1170, 1177 (Pa. 2006)). Policy language is only deemed "ambiguous" where there is "more than one reasonable interpretation when applied to a particular set of facts." *Id.* (quoting *Madison Constr. Co. v. Hartleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)).

With this framework in mind, the Court turns to addressing the disputed coverage issues.

### 1. Coverage Window and Trigger

*First*, the Parties dispute whether the Batch Occurrence Endorsement applies to the Mesh Claims, and if so, whether the Batch Occurrence Endorsement expands the coverage window for the Mesh Claims.[9]  *See* ECF No. 378-2 at 18–20; ECF No. 401-37 at 22–26.  The Excess Insurers argue that Endorsement 18, not the Batch Occurrence Endorsement, provides the operative definition of "occurrence" for the Mesh Claims.  ECF No. 378-2 at 18–20.  In the Excess Insurers' view, the Mesh Claims are only covered by the Excess Policies when (1) the "bodily injury" to the claimant is caused by an "occurrence;" (2) the "bodily injury" occurs on or after the Retroactive Date of October 15, 2011, but prior to the end of the policy on September 26, 2012; and (3) the claim is first made against any insured during the policy period or any extended reporting period.  ECF No. 378-2 at 19–20.  In support of their position, the Excess Insurers argue that Endorsement 18 of the Lexington Policy explicitly defines an "occurrence" as "the date of the first surgical implantation of your mesh product in the claimant[,]" and that "[i]f multiple surgical implantations have occurred with respect to one claimant, then the date of the *first* surgical implantation shall be the date of the 'occurrence.'"  *Id.* at 19 (emphasis added).

To be clear, the Excess Insurers do not dispute that the Lexington Policy contains a Batch Occurrence Endorsement, they dispute whether the Batch Endorsement applies to the Mesh Claims.  ECF No. 423 at 9–10.  The Excess Insurers further argue that even if the Batch Occurrence Endorsement provided the operative definition of "occurrence" for the Mesh Claims, there would

---

[9] See *supra* Part I(B)(1) for a discussion of what a batch endorsement is under an insurance contract.

be no change to the coverage window because the date of the claimant's "bodily injury" must have also occurred within the coverage window.[10]  *Id.* at 10–11.

The Trustee argues instead that the Batch Occurrence Endorsement provides the operative definition of "occurrence," so that the coverage window for the Mesh Claims is expanded by "batching" any claims that arise out of one "occurrence" together for the purpose of coverage. ECF No. 401-37 at 22–26.  In the Trustee's view, the Mesh Claims are covered under the Lexington Policy and the Excess Policies—regardless of when the Mesh Product was implanted into the claimant or when the claim was made—because the Batch Occurrence Endorsement permits Mesh Claims that arise out of one "occurrence" to be batched together and attach against coverage during the Policy Period.  *Id.*  The Trustee further argues that the drafting of the Lexington Policy demonstrates that the drafters intended for Batch Occurrence Endorsement and Endorsement 18 to apply to the Mesh Claims.  *See id.* at 22–25.  The Trustee argues that the Batch Occurrence Endorsement is consistent with Endorsement 18 because Endorsement 18 explicitly states that "[a]ll other terms and conditions of the policy remain the same."  *Id.*  According to the Trustee,

---

[10] In reply, the Excess Insurers address the Trustee's argument that the Batch Endorsement applies to the Mesh Claims.  There, the Excess Insurers argue that Endorsement 18 is the controlling provision of the Lexington Policy because it is specific to the Mesh Claims.   ECF No. 423 at 6–8.  Specifically, the Excess Insurers argue that Endorsement 18 provides the operative definition of "occurrence" because it contains both the industry standard definition of the term, as well as the more specific definition that applies to the Mesh Claims.  *Id.*  The Excess Insurers further argue that even if the Batch Endorsement applied to the Mesh Claims, the Batch Endorsement would have no effect on the "bodily injury" requirement imposed by the Lexington Policy, only the date by which claims are deemed "made" under the policy.  *Id.* at 10.  The Excess Insurers argue that because the Batch Endorsement does not change the date of the claimant's "bodily injury occurred, the Batch Endorsement would not expand coverage for the Mesh Claims.  *Id.* at 11.  The Excess Insurers further argue that, under their construction of the Lexington Policy, the application of the "Endo SIR" to the Mesh Claims results in quite restrictive potential coverage because the "Endo SIR" requires that the insured exhaust an additional $10,000,000 per occurrence.  However, pursuant to the definition of  "occurrence" provided in Endorsement 18, the "Endo SIR" becomes a $10,000,000 per-claimant SIR.  *Id.* at 19.

this language is evidence that the Mesh Insurers did not intend to modify the Batch Occurrence Endorsement in order to limit coverage under the Lexington Policy or the Excess Policies for the Mesh Claims. *Id.* The Trustee argues that elsewhere, the Excess Insurers drafted the Lexington Policy to explicitly override previous portions of the policy. *Id.* at 25 n.10. The Trustee also argues in the alternative that, if the Court determines that the Batch Endorsement does not supersede the language found in Endorsement 18, and that the provisions of the Lexington Policy conflict, the Court should find that the Trustee's interpretation of the language is reasonable, therefore the ambiguity must be resolved in favor of coverage.[11] *Id.* at 26–27.

Thus, the Excess Insurers view coverage as limited to only certain claimants whose first surgical implantation date was between October 15, 2011 and September 26, 2012, and who made claims during the policy period. *See* ECF No. 378-2 at 18–20. Whereas the Trustee's construction of the Lexington Policy would require the Excess Insurers to potentially cover all Mesh Claims so long as there was a surgical implantation date during the policy period regardless of when the claim was made. *See* ECF No. 401-37 at 22–26. To resolve the Parties' dispute over the applicable coverage window under the Excess Policies the Court must consult the policy language itself.

Like with any contract, the Court's primary goal in interpreting an insurance contract is to "ascertain the intent of the parties as manifested by the language of the written instrument." *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 162 (3d Cir. 2011) (quoting *J.C. Penny Life Ins. Co. v. Pilosi*, 393 F.3d 356, 363 (3d Cir. 2004)). To do so, the Court must read and consider the policy "in its entirety[.]" *Kurach*, 235 A.3d at 1116 (citation omitted). But the Court must not afford one provision of the contract meaning while nullifying another, *see Commonwealth ex rel Shapiro v.*

---

[11] For the reasons discussed *infra*, the Court need not reach this argument as it finds that there is only *one* reasonable interpretation of the policy language at issue.

*UPMC*, 208 A.3d at 911 (citation omitted), and must give effect to more "specific" provisions over more general provisions. *Andrichyn*, 93 F. Supp. 3d at 385 (citation omitted); *Yakitori Boy, Inc. v. Starr Indem. & Liab. Co.*, CV No. 18-4094, 2019 WL 2724039, at *6 (E.D. Pa. June 28, 2019) ("when [there is] a specific form of insurance . . . provided by an endorsement [that is] tailored to meet the particular needs of the insured and the company, that language must be followed to carry out the intentions of the parties." (quoting *St. Paul Fire & Marine Inc. Co. v. U.S. Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir. 1981))).

Here, there are two provisions of the Lexington Policy at issue: the Batch Occurrence Endorsement and Endorsement 18. Both are "endorsements," or amendatory provisions, to the Lexington Policy. *See* RESTATEMENT OF THE LAW OF LIABILITY INSURANCE § 31 cmt. c (AM. L. INST. 2019). So, both are "more specific" policy provisions than the general policy language and could supply the operative definition of "occurrence." The issue before the Court, therefore, is to determine which provision of the policy controls. This is a straightforward task.

The Court's analysis begins with the policy language. The Excess Insurers direct the Court to Endorsement 18. ECF No. 378-2 at 19. Endorsement 18 is denoted as an "AMENDATORY ENDORSEMENT: (I) ADDITIONAL NAMED INSUREDS WITH LIMITATIONS, (II) EXCLUSION TO THE EXTENT COVERAGE IS PROVIDED BY SPECIFIC INSURANCE, AND (III) AMENDMENT TO DEFINION OF OCCURRENCE ENDORSEMENT[.]" ECF No. 378-26 at 55. The endorsement does precisely what it says it does: it denotes AMS as an "additional insured," alters the standard definition of "occurrence" to account for the nature of "bodily injuries" caused by the Mesh Products, and provides the specific retroactive date for Mesh Claims. *Id.* at 55–57.

As the Mesh Insurers point out, the explicit language of Endorsement 18 is tailored specifically for the Mesh Claims.[12]  *See* ECF No. 378-2 at 17–18; *see also* ECF No. 378-26 at 57 ("With respect [to] 'bodily injury' arising out of mesh products . . .").  That is, the language used in the definition of "occurrence" found in Endorsement 18 specifically addresses both mesh and non-mesh products.  ECF No. 378-26 at 57.  The endorsement provides that it applies to "bodily injury arising out of mesh products[.]"  *Id.*  No such language is in the definition of "occurrence" found in the Batch Occurrence Endorsement.  *Id.* at 28.  Instead, the language used is more general, and does not refer to a specific kind of "product" or "device" from which the "bodily injury" arises out of.  *See id.*  This express language demonstrates that the intent of the insurers and the insureds was to provide and obtain more limited coverage for the Mesh Claims.  *Cf. Yakitori Boy, Inc.*, 2019 WL 2724039, at *6 ("[A] significant indicator of the parties' intent—and the insured's expectations—[is] the fact that the insured paid an added premium for the coverage [in an Endorsement]." (quoting *Bishops, Inc. v. Penn Nat'l Ins.*, 984 A.2d 982, 992 (Pa. Super. 2009))).

The Court sees no need to second guess the clear intent of the insurer and insured at the time the policy was signed and executed.  Therefore, the Court finds that Endorsement 18 provides the operative definition of "occurrence," [13] as the date of the claimant's first surgical implantation

---

[12] In addition, Endorsement 18 provides the applicable Retroactive Date for the Mesh Claims.  *Id.* at 55.  The Trustee concedes as much.  *See* ECF No. 401-37 at 22.

[13] To be sure, even if the Court were to apply the Trustee's selected provision of the Lexington Policy, the Batch Endorsement, the Court would reach the same result on coverage.  As the Excess Insurers point out, *see* ECF No. 378-2 at 19–20, the Lexington Policy's general policy language imposes two conditions precedent to coverage for Mesh Claims.  *See also* ECF No. 378-26 at 5. First, the claimant's surgical implantation must have occurred *after* the Retroactive Date but *before* the end of the policy.  *Id.*  Second, the claimant must make a claim for their injuries during the policy period.  *Id.*  Each of these conditions can be found in general policy paragraph b.  *Id.* at 5. These conditions precedent are not both modified by the Batch Occurrence Endorsement.  S*ee id.* at 5–6; 28.  This is because the ability to "batch" later Mesh Claims to an earlier claim does not modify the condition precedent that the claimant's surgical implantation occurred within the

of a Mesh Product. Accordingly, the Court will award summary judgment to the Excess Insurers on this coverage limitation as follows: Coverage for the Mesh Claims is limited to claimants: (a) whose first surgical implantation of an AMS Mesh Product was between October 15, 2011 and September 26, 2012; and (b) who made claims during the September 26, 2011 to September 26, 2012 policy period.

### 2. The Applicable Self-Insured Retentions

*Second*, the Excess Insurers argue that potential coverage for the Mesh Claims is even more limited. The Excess Insurers next argue that the Mesh Claims are subject to two (2) identical $2,500,000 per-claimant SIRs imposed by the Lexington Policy and the Columbia Excess Policy. ECF No. 378-2 at 20–23. That is, the Excess Insurers argue that the Lexington Policy imposes a *specific* SIR on AMS Mesh Products, *id.*, and that the Columbia Excess Policy also imposes a "nearly identical" $2,500,000 per claimant SIR on Mesh Claims that must be exhausted in addition to the Lexington Policy SIR and $15,000,000 Lexington Policy limits. *Id.* at 20–21. The Excess Insurers contend that the terms "arising out of" in the Lexington Policy Mesh Products SIR are clear evidence that the SIR was intended to limit liability for the Mesh Claims. *Id.* at 21. The Excess Insurers also argue that the phrasing "to any of 'your products' referred to as 'mesh of any type of description[,]'" in the Columbia Excess Policy is clear evidence that the Columbia Excess Policy SIR applies to Mesh Claims. *Id.* at 22. The Excess Insurers further argue that these SIRs are reflected in the Aspen Policy as well. *Id.* at 21.

---

coverage window: after the Retroactive Date of October 15, 2011 and before the end of the policy on September 26, 2012. Accordingly, even if the Court were to conclude—which it does not— that the Batch Endorsement applies to the Mesh Claims and provides the operative definition of "occurrence," this would not result in expanded coverage for the Mesh Claims.

In opposition, the Trustee argues that the Lexington Policy does not contain one general SIR that is applicable to *all* Mesh Claims.  ECF No. 401-37 at 28.  Instead, the Trustee argues that the Lexington Policy contains five separate SIRs that distinguish between different named insured in different instances and that there is only one $2,500,000 per-claimant SIR that applies to Mesh Claims, and that SIR is only applicable to the Mesh Claims that were "settled and paid for *specifically by AMS*." *Id.* (emphasis in original).

The Court's analysis of the applicable SIRs under the various insurance contracts in dispute begins with the policy language itself.  Endorsement 23, the "SELF-INSURED RETENTION ENDORSEMENT" contains five (5) separate SIRs as the Trustee points out.  ECF No. 378-26 at 65–67.  However, contrary to the Trustee's assertion that all five of the SIRs provided in Endorsement 23 apply to Mesh Claims, it is apparent that only the fourth SIR, below, applies to the Mesh Claims.  That is, the plain meaning of the text provided in the fourth SIR makes it clear that it applies to the Mesh Claims.  The SIR in question is provided below:

| Self-Insured Retention ("Retained Limit") ***but only as respects any "bodily injury", "property damage" or "act, error, or omission" arising out of "your product", mesh of any type or description*** <br> <u>Entity or Person</u>: <br>    American Medical Systems Holdings, Inc. <br>    American Medical Systems, Inc. <br>    American Medical Systems Australia Pty., Ltd. <br>    American Medical Systems Benelux B.V.B.A. <br>    American Medical Systems Canada, Inc. <br>    American Medical Systems France, S.A.R.L. <br>    American Medical Systems Deutschland GMBH <br>    American Medical Systems Iberica, S.L. <br>    American Medical Systems UK, Ltd. <br>    American Medical Technologies Ltd. <br>    American Medical Systems Argentina, SRL <br>    American Medical Systems Luxembourg S.A.R.L. <br>    American Medical Systems Do Brasil Productos Urologico Ginecologic Os Ltda. <br>    AMS Sales Corporation <br>    AMS Research Corporation <br>    American Medical Systems Gynecology, Inc. <br>    American Medical Systems Europe BV <br>    Thermatrx, Inc. <br>    Cryogen Europe SAS <br>    Ovion, Inc. <br>    American Medical Systems Italia SRL <br>    Biocontrol Medical, Inc. <br>    Solarant Medical, Inc. <br>    Cytrix Israel, Ltd. <br>    Kermit Merger Corp. <br>    AMS Medical Systems Ireland Limited <br>    AMS Sverige <br>    Nippon AMS K.K. <br>    Laserscope <br>    InnovaQuartz Incorporated <br>    Laserscope International, Inc. | |
|---|---|
| **$2,500,000** | ☐ Each Occurrence |
| | ☐ Each Claim |
| | ☒ Each Claimant |
| **No Aggregate Applies** | Aggregate Retained Limit |

*Id.* at 66–67.

This SIR contains the language, "but only as respects any 'bodily injury,' 'property damage' or "act, error, or omission' **arising out of** 'your product', **mesh of any type or description**." *Id.* (emphasis added). This SIR lists AMS as an "insured." However, AMS is also listed under the third SIR provided by Endorsement 23. In the third SIR, however, the following language is included: "but only as respects any 'bodily injury' 'property damage' or 'act, error, or omission' arising out of all of 'your products' **except mesh of any type or description**." *Id.* at 66 (emphasis

26

added).  Thus, while both of these SIRs apply to claims against AMS, only the fourth SIR applies specifically to the Mesh Claims brought against AMS.

The Trustee argues that the fourth SIR provided by Endorsement 23 does not apply to the Mesh Claims, despite the fact that it specifically contemplates claims arising out of "mesh" products.  Instead, the Trustee argues that the more general SIR—the only SIR that lists Endo as an insured entity—is the only SIR that is applicable to the Mesh Claims.  ECF No. 401-37 at 28.  The Trustee argues that the $10,000,000 per occurrence SIR is applicable to Endo, and that the specific SIR that is applicable depends on who the claim was paid by.  *Id.* at 9; 27–32.  In addition, the Trustee further contends that because Endo has paid to resolve most of the Mesh Claims that the AMS-specific SIR cannot apply.  *Id.*

However, when the first SIR provided by Endorsement 23 is read (1) in the context of Endorsement 23 in its entirety, and (2) in the context of the Lexington Policy as a whole, the Court does not reach the same conclusion as the Trustee.  That is, elsewhere, the Lexington Policy refers to the Mesh Claims by specifying that it applies to AMS's "mesh products."  *See* ECF No. 378-26 at 57.  Portions of the Lexington Policy that are specific to the Mesh Claims must be given effect over more general provisions in the policy that are not mesh-specific.  The Court is unpersuaded by the Trustee's argument that the SIR must be specific to Endo because Endo paid to settle the claims.  The Trustee's argument cleverly ignores the undisputed facts that Endo acquired AMS, that AMS produced the Mesh Products, and that the policy only specifies as to mesh.

Instead, the Court is guided by the legal framework discussed *supra* Part III(A).  Namely, that where the policy contains more specific provisions in addition to more general ones, "the specific provisions control the general ones."  *Andrichyn*, 93 F. Supp. 3d at 385 (citation omitted).  Here, the fourth SIR is more specific.  It is specific to "bodily injury' arising out of 'your product'

27

mesh of any type or description." No other SIR is specific to the Mesh Products. Further, it is undisputed that Endo acquired AMS and that AMS, a subsidiary of Endo, manufactured the Mesh Products. ECF No. 378-3 ¶ 3, 5. It follows, therefore, that the SIR be applicable to the Mesh Claims where it denotes AMS—the subsidiary of Endo responsible for producing the Mesh Products—as the "[e]ntity or [p]erson" and specifically refers to "bodily injury' . . . "arising out of" . . . "mesh of any type or description." ECF No. 378-26 at 66. This arrangement is explicitly contemplated by the Lexington Policy. *See id.* at 29.[14] Therefore, the Court finds that this language refers to the Mesh Products because it is specifically tailored to them. *See id.* Accordingly, for these reasons, the Court finds that the Lexington Policy imposes a $2,500,000, per claimant, SIR on the Mesh Claims.

An identical SIR can be found in the Columbia Excess Policy. That is, the Columbia Excess Policy specifically provides in an endorsement, or amendatory provision, that:

> Section IV. Limit of Liability is amended to add the following paragraph:
>
> 6. Upon exhaustion of the $2,500,000 Each Claimant Self-Insured Retention applicable to any of "your products" referred to as "mesh of any type or description" specified in the **primary policy, a retained limit of $2,500,000 Each Claimant shall apply under this Policy.** Our limit under this Policy shall be in

---

[14] Endorsement 4 of the Lexington Policy explicitly states that:

> Named Insured on the Declaration Page; . . . also includes: . . . (2) [a]ny subsidiary, associated, affiliated, or allied company or corporation (including subsidiaries thereof) of which any insured named as the Named Insured on the Declaration Page has more than a 50% ownership interest in or exercises management or financial control over at the inception date of this policy, provided such subsidiary, associated, affiliated, or allied company or corporation and their operations have been declared to us, in writing, prior to the inception date of this policy.

*Id.*

> excess of the **applicable underlying limits** covered by the
> **underlying insurance**.

ECF No. 378-27 at 20 (emphasis added).  This endorsement, like the Lexington Policy, specifically refers to "mesh products." *Id.*  A plain reading of this endorsement requires that, in order to obtain coverage for the Mesh Claims under the Columbia Excess Policy, Endo must exhaust an additional $2,500,000 per-claimant SIR on any Mesh Claims.  *See Andrichyn*, 93 F. Supp. 3d at 385 ("It is a fundamental principle of contract interpretation that specific provisions control more general ones." (citation omitted)).

Upon review, the Court is satisfied that, as a matter of law, the Mesh Claims are subject to two separate $2,500,000 per-claimant SIRs.  The Lexington Policy and the Columbia Excess Policy each explicitly state that the Mesh Claims shall be subject to a $2,500,000 per-claimant SIR in addition to the underlying policy limits.  Accordingly, to reach the Mesh Policies, the Mesh Claims must first exhaust the $2,500,000 per-claimant SIR imposed on AMS's Mesh Products in addition to the underlying policy limits imposed by the *Lexington Policy*, before exhausting another $2,500,000 per-claimant SIR imposed by the first level of excess coverage, the *Columbia Excess Policy*.  In fewer words, the Mesh Policies only cover Mesh Claims that exceed the per-claimant $2,500,000 dollar amount.

## B. Plaintiff's Cross-Motion for Summary Judgment

The Trustee has also cross-moved for summary judgment on bellwether insurance coverage issues regarding the Mesh Claims.  ECF No. 401.  However, for the reasons discussed *supra* at Part III(A), the Court will grant the Excess Insurers' Motion for Summary Judgment.  Accordingly, the Court will deny the Trustee's Cross-Motion for Summary Judgment.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** the Excess Insurers' Motion for Summary Judgment (ECF No. 378).   The Court will **DENY** the Trustee's Cross-Motion for Summary Judgment (ECF No. 401).   An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**